1  SEYFARTH SHAW LLP
   Laura Wilson Shelby (SBN 151870)
2  lshelby@seyfarth.com
   Elizabeth M. Levy (SBN 268926)
3  elevy@seyfarth.com
   Lauren Schwartz (SBN 312253)
4  lschwartz@seyfarth.com
   2029 Century Park East, Suite 3500
5  Los Angeles, California 90067-3021
   Telephone:   (310) 277-7200
6  Facsimile:   (310) 201-5219

7  Attorneys for Defendant
   MICHAEL KORS (USA), INC.

8

9

10                 UNITED STATES DISTRICT COURT

11               CENTRAL DISTRICT OF CALIFORNIA

12

13  BARBARA GAYTAN,                    Case No. ___2:21-cv-6021___

14              Plaintiff,             **DECLARATION OF LAUREN
                                       SCHWARTZ IN SUPPORT OF**
15       v.                            **NOTICE OF REMOVAL OF CIVIL
                                       ACTION TO UNITED STATES**
16  ADECCO USA, INC., a corporation;   **DISTRICT COURT**
    MICHAEL KORS (USA), INC., a
17  corporation; and DOES 1 through 25, (Los Angeles Superior Court Case No.
    INCLUSIVE,                         21STCV21743)
18
              Defendant.              Complaint Filed:   June 10, 2021)
19

20

21

22

23

24

25

26

27

28

                              1
───────────────────────────────────────────────
        DECLARATION OF LAUREN SCHWARTZ IN SUPPORT OF REMOVAL
73277889v.1

1    I, Lauren Schwartz, declare and state as follows:

2       1.    I have personal knowledge of the facts contained in this declaration, and if

3    called as a witness, could and would testify as to their accuracy.

4       2.    I am an attorney licensed to practice before this Court and the courts of State

5    of California.  I am an associate in the Los Angeles office of Seyfarth Shaw LLP and am

6    one of the attorneys responsible for representing Defendant MICHAEL KORS (USA),

7    INC. ("Defendant") in the above-captioned lawsuit filed on behalf of Plaintiff

8    BARBARA GAYTAN.  All of the pleadings in this lawsuit are maintained in our office

9    in the ordinary course of business under my direction and control.

10      3.    A true and correct copy of the Summons and Complaint served on

11   Defendant on June 25, 2021 is attached as **Exhibit A**.  Also included in Exhibit A are

12   true and correct copies of the civil case cover sheet, proof of service, notice of case

13   assignment, the state court's June 22, 2021 order to show cause hearing notice for failure

14   to file proof of service and notice of case management conference.

15      4.    A true and correct copy of the Answer filed by Defendant in this action in

16   the Los Angeles County Superior Court on July 22, 2021 is attached as **Exhibit B**.

17      5.    Exhibits A and B constitute all of the pleadings served on Defendants, filed

18   by any party in the Superior Court, or retrieved from the Superior Court's records prior to

19   filing of this Notice of Removal.

20      6.    Based on my experience, attorneys' fees in employment discrimination cases

21   often exceed $75,000.  In this regard, it is more likely than not that the fees will exceed

22   $75,000 through discovery and a summary judgment hearing, and the fees would

23   certainly exceed $75,000 if the case proceeds to trial.

24      7.    Attached hereto as **Exhibit C** are true and correct copies of jury verdict

25   reports for disability discrimination cases entered in favor of plaintiffs in California

26   where damages exceeded $75,000.  These documents from Westlaw were retrieved at my

27   direction.

28

DECLARATION OF LAUREN SCHWARTZ IN SUPPORT OF REMOVAL

8.     Attached hereto as **Exhibit D** are true and correct copies of jury verdict reports for cases that have awarded emotional distress damages in excess of $75,000 in cases involving cause of action for disability discrimination, wrongful termination, and retaliation.  These documents from Westlaw were retrieved at my direction.

9.     Attached hereto as **Exhibit E** are true and correct copies of jury verdict reports for cases that have awarded attorneys' fees in excess of $75,000 in disability discrimination cases.  These documents from Westlaw were retrieved at my direction.

10.     Attached hereto as **Exhibit F** is a true and correct copy of a publicly-filed document entitled "Declaration of Megan Guyton In Support Of Defendant Adecco USA, Inc.'s Notice Of Removal" filed in the matter of *Taylor v. Michael Kors, Inc. et al.*, case no. 2:20-CV-4931 in the Central District of California.

I declare under penalty of perjury under the laws of the States of California and the United States that the foregoing is true and correct.

Executed this 26 day of July, 2021, in Los Angeles, California.

Lauren Schwartz

---

DECLARATION OF LAUREN SCHWARTZ IN SUPPORT OF REMOVAL

73277889v.1

# EXHIBIT A

 **CT Corporation**

**Service of Process Transmittal**
06/25/2021
CT Log Number 539801644

**TO:**   Jennifer Rodriguez, Counsel, Labor and Employment
Michael Kors
11 West 42nd Street, 29th Floor
New York, NY 10036

**RE:**   **Process Served in California**

**FOR:**   MICHAEL KORS (USA), INC.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Barbara Gaytan, Pltf. vs. Adecco Usa,Inc, etc., et al., Dfts. // To: Michael Kors (USA) |
| **DOCUMENT(S) SERVED:** | -- |
| **COURT/AGENCY:** | None Specified<br>Case # 21STCV21743 |
| **NATURE OF ACTION:** | Employee Litigation - Wrongful Termination |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, GLENDALE, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 06/25/2021 at 14:41 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 06/25/2021, Expected Purge Date: 06/30/2021 |
| | Image SOP |
| | Email Notification,  Krista McDonough  krista.mcdonough@michaelkors.com |
| | Email Notification,  Jennifer Rodriguez  jennifer.rodriguez@michaelkors.com |
| | Email Notification,  Na'Asia Cobb  naasia.cobb@capriholdings.com |
| | Email Notification,  Natalie Newman  natalie.newman@capriholdings.com |
| | Email Notification,  Alexandra Simmerson  alexandra.simmerson@capriholdings.com |
| **REGISTERED AGENT ADDRESS:** | C T Corporation System<br>330 N BRAND BLVD<br>STE 700<br>GLENDALE, CA 91203<br>866-401-8252<br>EastTeam2@wolterskluwer.com |

 **CT Corporation**

**Service of Process Transmittal**
06/25/2021
CT Log Number 539801644

| | |
|---|---|
| **TO:** | Jennifer Rodriguez, Counsel, Labor and Employment<br>Michael Kors<br>11 West 42nd Street, 29th Floor<br>New York, NY 10036 |
| **RE:** | **Process Served in California** |
| **FOR:** | MICHAEL KORS (USA), INC.  (Domestic State: DE) |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**              Fri, Jun 25, 2021

**Server Name:**       Victor Mendez

| Entity Served | MICHAEL KORS ( USA), INC. |
| --- | --- |
| Case Number | 21STCV21743 |
| Jurisdiction | CA |



Electronically FILED by Superior Court of California, County of Los Angeles on 06/10/2021 01:08 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez, Deputy Clerk

Case 2:21-cv-06001-ODW-MRW Document 1-1 Filed 07/26/21 Page 8 of 155 Page ID #:24
21STCV21743

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
ADECCO USA, INC., a corporation; MICHAEL KORS (USA), INC., a corporation; and DOES 1 through 25, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
BARBARA GAYTAN

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO!* Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Los Angeles Superior Court<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | CASE NUMBER:<br>*(Número del Caso):*<br>21STCV21743 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Mohamed Eldessouky; Eldessouky Law, APC;17139 Bellflower Blvd., Suite 202, Bellflower, CA 90706; (562) 461-0995

| DATE: 06/10/2021<br>*(Fecha)* | Sherri R. Carter Executive Officer / Clerk of Court<br>Clerk, by<br>*(Secretario)* R. Perez | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☒ on behalf of *(specify):* Michael Kors (USA), Inc., a Corporation

under: ☒ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

[SEAL]

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |
|---|---|---|

Electronically FILED by Superior Court of California, County of Los Angeles on 06/10/2021 02:09 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez, Deputy Clerk
21STCV21743

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Michelle Williams Court

1  Mohamed Eldessouky, Esq., State Bar No. 289955
mohamed@eldessoukylaw.com
2  Maria E. Garcia, Esq., State Bar No. 321700
maria@eldessoukylaw.com
3  **ELDESSOUKY LAW, APC**
17139 Bellflower Blvd., Suite 202
4  Bellflower, CA 90706
5  Telephone: (562) 461-0995
Facsimile: (562) 461-0998
6

7  Attorneys for Plaintiff
**BARBARA GAYTAN**
8

9       **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10         **IN AND FOR THE COUNTY OF LOS ANGELES**

11

12  BARBARA GAYTAN,                    | Case No.    21STCV21743

13         Plaintiff,                  | UNLIMITED JURISDICTION

14  v.                                 | **COMPLAINT FOR DAMAGES FOR:**

15  ADECCO USA, INC., a corporation;   | 1. Disability Discrimination (Cal. Gov't. Code
16  MICHAEL KORS (USA), INC., a        |    § 12940(a));
    corporation; and DOES 1 through 25,|  2. Failure to Accommodate (Cal. Gov't. Code
17  inclusive,                         |    § 12940(m));
                                       |  3. Failure to Engage in an Interactive Process
18                                     |    (Cal. Gov't Code § 12940(n));
                                       |  4. Retaliation under FEHA (Cal. Gov't. Code
19         Defendants.                 |    § 12940(h));
                                       |  5. Failure to Prevent Discrimination (Cal. Gov't
20                                     |    Code § 12940(k));
                                       |  6. Retaliation under CFRA (Cal. Gov't. Code
21                                     |    § 12945.2(l)(1)); and
                                       |  7. Wrongful Termination in Violation of Public
22                                     |    Policy.

23                                     | **DEMAND FOR JURY TRIAL**

24

25       Plaintiff BARBARA GAYTAN, by and through her attorney, alleges against Defendants,

26  and each of them, as follows:

27                      **JURISDICTION AND VENUE**

28       1.    Jurisdiction is conferred on the Court over Defendants named herein as they are

-1-

COMPLAINT FOR DAMAGES

ELDESSOUKY LAW, APC
17139 Bellflower Blvd., Suite 202
Bellflower, CA 90706
Phone: (562) 461-0995 | Fax: (562) 461-0998

ELDESSOUKY LAW, APC
17139 Bellflower Blvd., Suite 202
Bellflower, CA 90706
Phone: (562) 461-0995 | Fax: (562) 461-0998

1   residents of the State of California, and/or conducts business in the State of California. Jurisdiction

2   is conferred on this Court as to all causes of action as they arise under state statutory or common

3   law.

4       2.     Venue is proper in this Court because Defendants reside in this County or conducts

5   business in this County, and because a substantial part of the events and omissions giving rise to

6   Plaintiff's causes of action occurred in this County.

7                                          **THE PARTIES**

8       3.     Plaintiff BARBARA GAYTAN ("Plaintiff" or "Ms. Gaytan") is, and at all times

9   material hereto was an individual residing in the County of Los Angeles, State of California.

10      4.     Plaintiff is informed and believes, and on that basis alleges that at all times relevant

11  herein, Defendant ADECCO USA, INC. ("Defendant" or "ADECCO"), was a Delaware corporation

12  doing substantial business under the laws of the State of California, in the County of Los Angeles.

13  ADECCO is a staffing agency.   ADECCO employed Plaintiff within the State of California and

14  assigned her, and other employees, to work at 3777 Workman Mill Rd., Whittier, CA 90601.

15  Plaintiff is informed and believes that Defendant ADECCO engaged in the unlawful conduct alleged

16  below.

17      5.     Plaintiff is informed and believes, and on that basis alleges that at all times relevant

18  herein, Defendant  MICHAEL KORS (USA), INC. ("Defendant" or "MICHAEL KORS"), was a

19  Delaware corporation doing business under the laws of the State of California, in the County of

20  Los Angeles. MICHAEL KORS manufactures, distributes, and designs clothes in California and

21  employed Plaintiff within the State of California at 3777 Workman Mill Rd., Whittier, CA 90601.

22  Plaintiff is informed and believes that Defendant MICHAEL KORS engaged in the unlawful conduct

23  alleged below.

24      6.     Plaintiff is informed and believes, and based upon such information and belief,

25  alleges that Defendants DOES 1 through 25 are employed by Defendant, or acted in partnership with

26  ADECCO and/or MICHAEL KORS, in hiring, training, supervising, and retaining Defendants

27  DOES 1 through 25.

28      7.     The true names and capacities of Defendants sued herein as Does 1 through 25,

-2-
COMPLAINT FOR DAMAGES

1 inclusive, are unknown to Plaintiff, who therefore sues such Defendants by such fictitious names

2 pursuant to Code of Civil Procedure § 474.  Plaintiff alleges that each fictitiously named Defendant

3 acted or failed to act in such a manner that each has contributed in proximately causing the damages

4 to Plaintiff as herein alleged.  Plaintiff will seek leave of Court to amend this Complaint to set forth

5 their true names and capacities when ascertained.

6      8.     All of the acts and failures to act alleged herein were duly performed by and

7 attributable to all Defendants, each acting as a successor, agent, alter ego, employee, indirect

8 employer, joint employer, integrated enterprise and/or under the direction and control of the others,

9 except as specifically alleged otherwise.  Said acts and failures to act were within the scope of such

10 agency and/or employment, and each Defendant participated in, approved and/or ratified the

11 unlawful acts and omissions by the other Defendants complained of herein.  Whenever and wherever

12 reference is made in this Complaint to any act by a Defendant or Defendants, such allegations and

13 reference shall also be deemed to mean the acts and failures to act of each Defendant acting

14 individually, jointly, and/or severally.

15 **FACTS COMMON TO MORE THAN ONE CAUSE OF ACTION**

16      9.     Plaintiff began her employment with Defendant ADECCO on February 4, 2019 as a

17 Receiver Clerk at Defendant Michael Kors's business located at 3777 Workman Mill Rd., Whittier,

18 CA 90601, earning $14.25 per hour.

19      10.    Plaintiff was diagnosed with pre-cancer and filed a Disability Medical FMLA Claim

20 with ADECCO's disability provider MATRIX, indicating that her last day of work would be

21 September 9, 2019, and estimated to return to work on October 15, 2019.

22      11.    On September 10, 2019, Plaintiff underwent her first surgery.

23      12.    On October 9, 2019, Plaintiff scheduled a second surgery for November 13, 2019.

24      13.    In December 2019, Plaintiff received clearance to return to work without restrictions.

25 On December 4, 2019, Plaintiff sent text messages to an ADECCO supervisor, attempting to confirm

26 Plaintiff's return to work on December 16, 2019. The supervisor informed Plaintiff that "Christina"

27 or "Alej" (Alejandra) would contact Plaintiff regarding her return.

28      14.    On December 9, 2019, Defendant ADECCO sent Plaintiff a letter approving her

ELDESSOUKY LAW, APC
17139 Bellflower Blvd., Suite 202
Bellflower, CA 90706
Phone: (562) 461-0995 | Fax: (562) 461-0998

-3-

1    medical leave from September 9, 2019 to December 15, 2019.

2         15.    On December 16, 2019, Alejandra Rodriguez, a supervisor at ADECCO, called

3    Plaintiff notifying her of her termination alleging that ADECCO had no work for Plaintiff, even

4    though ADECCO had previously been reluctant to give Plaintiff days off due to the high volume of

5    work.

6         16.    On December 15, 2020, Plaintiff obtained a right to sue letter from the Department of

7    Fair Employment and Housing ("DFEH"), Matter Number: 202012-12096216.  On April 1, 2021,

8    Plaintiff amended her right to sue letter.

9                                   **FIRST CAUSE OF ACTION**

10              **DISABILITY DISCRIMINATION IN VIOLATION OF FEHA**

11                        **(Cal. Gov't. Code § 12940(a) et seq.)**

12                   **Against All Defendants Inclusive of DOES 1-25**

13        17.    Plaintiff alleges and incorporates by reference the allegations in the preceding

14   paragraphs as though fully set forth herein.

15        18.    The California Fair Employment and Housing Act ("FEHA") prohibits employers

16   from discharging or otherwise discriminating against an employee on the basis of disability in

17   compensation, terms, conditions, or privileges of employment. Cal. Gov't Code § 12940(a).

18        19.    At all times mentioned in this Complaint, Plaintiff was an "eligible employee" under

19   the California Labor and Government Codes.

20        20.    At all times mentioned in this Complaint, Defendants were a "covered employer"

21   under FEHA, Cal. Gov't Code § 12900, et seq., as Defendants employed 5 or more people to perform

22   services for a salary or wage in the State of California.

23        21.    Plaintiff suffered from a disability during her employment with Defendants. Plaintiff

24   was subjected to discrimination and adverse employment action when, on December 16, 2019, her

25   employment was terminated for suffering from a disability and having taken medical leave.

26        22.    Plaintiff reasonably believes she can perform the essential functions of multiple

27   employment positions with Defendants, including, but not limited to, Receiver Clerk and Sales

28   Clerk.

ELDESSOUKY LAW, APC
17139 Bellflower Blvd., Suite 202
Bellflower, CA 90706
Phone: (562) 461-0995 | Fax: (562) 461-0998

-4-

23. Plaintiff was able to perform the essential functions of her job with reasonable accommodation at the time of her termination.

24. Plaintiff is informed and believes, and thereon alleges, that her disability, and need for medical leave of absence, were substantial motivating reasons for Defendants' decision to terminate her employment, in violation of Government Code § 12940, *et seq.*

25. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff has suffered special damages, including, but not limited to, past and future loss of income, benefits, and other damages to be proven at time of trial.

26. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff has suffered general damages, including, but not limited to, shock, embarrassment, physical distress and injury, humiliation, emotional distress, stress and other damages to be proven at the time of trial.

27. The unlawful conduct alleged above was engaged in by supervisors and/or managing agents of each of the Defendants who were acting at all times relevant to this Complaint within the scope and course of their employment. Defendants are liable for the conduct of said agents and employees under the doctrine of strict liability.

28. Defendants committed these acts maliciously, fraudulently, and oppressively in conscious disregard for the Plaintiff's rights. Defendants committed and/or ratified the acts alleged herein. These acts were committed with the knowledge of employees' lack of fitness in the workplace but were allowed to proceed, managing agents of Defendants. Plaintiff is therefore entitled to recover punitive damages from Defendants in an amount according to proof at trial.

29. As a result of the conduct of Defendants, Plaintiff was forced to retain an attorney in order to protect her rights. Accordingly, Plaintiff seeks the reasonable attorneys' fees and costs incurred in this litigation in an amount according to proof at trial.

## SECOND CAUSE OF ACTION

### FAILURE TO ACCOMMODATE IN VIOLATION OF FEHA

#### (Cal. Gov't. Code § 12940(m) et seq.)

#### Against All Defendants Inclusive of DOES 1-25

30. Plaintiff alleges and incorporates by reference the allegations in the preceding

-5-

COMPLAINT FOR DAMAGES

ELDESSOUKY LAW, APC
17139 Bellflower Blvd., Suite 202
Bellflower, CA 90706
Phone: (562) 461-0995 | Fax: (562) 461-0998

1 | paragraphs as though fully set forth herein.

2 |     31.    Defendants had an affirmative duty to make reasonable accommodations for
3 | Plaintiff's disability.  This duty arises even if an accommodation is not requested.  Defendants
4 | breached this duty first when they terminated Plaintiff on December 16, 2019, without
5 | accommodating Plaintiff's disability.

6 |     32.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff
7 | has suffered special damages, including, but not limited to, past and future loss of income, benefits,
8 | and other damages to be proven at time of trial.

9 |     33.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff
10 | has suffered general damages, including, but not limited to, shock, embarrassment, physical distress
11 | and injury, humiliation, emotional distress, stress and other damages to be proven at the time of trial.

12 |     34.    The unlawful conduct alleged above was engaged in by the officers, directors,
13 | supervisors and/or managing agents of each of the Defendants who were acting at all times relevant
14 | to this Complaint within the scope and course of their employment.  Defendants are liable for the
15 | conduct of said agents and employees under the doctrine of strict liability.

16 |     35.    Defendants committed these acts maliciously, fraudulently and oppressively in
17 | conscious disregard for the Plaintiff's rights.  Defendants committed and/or ratified the acts alleged
18 | herein.  These acts were committed with the knowledge of employees' lack of fitness in the
19 | workplace but were allowed to proceed, by officers, directors, and/or managing agents of
20 | Defendants.  Plaintiff is therefore entitled to recover punitive damages from Defendants in an
21 | amount according to proof at trial.

22 | **THIRD CAUSE OF ACTION**

23 | **FAILURE TO ENGAGE IN AN INTERACTIVE PROCESS IN VIOLATION OF FEHA**

24 | **(Cal. Gov't. Code § 12940(n) et seq.)**

25 | **Against All Defendants Inclusive of DOES 1-25**

26 |     36.    Plaintiff alleges and incorporates by reference the allegations in the preceding
27 | paragraphs as though fully set forth herein.

28 |     37.    Plaintiff was diagnosed with a disability that limited Plaintiff in major life activities,

**ELDESSOUKY LAW, APC**
17139 Bellflower Blvd., Suite 202
Bellflower, CA 90706
Phone: (562) 461-0995 | Fax: (562) 461-0998

1   including, but not limited to, working.  Defendants knew about Plaintiff's disability.  Despite her

2   disability, Plaintiff was qualified and able to perform the essential functions of her job with or

3   without a reasonable accommodation.

4       38.   Plaintiff maintained Defendants informed of her medical condition.  Plaintiff timely

5   followed protocol and made sure her employer received the required information.

6       39.   Defendants failed to engage in a good faith interactive process to determine whether

7   reasonable accommodations could be made to ensure Plaintiff could continue to perform the

8   essential functions of her job, or other open positions with Defendants.  Instead, Defendants chose

9   to not to accommodate Plaintiff.

10       40.   Defendants failed to perform an individual assessment of Plaintiff's ability to perform

11   the essential functions of any position with Defendant, either with or without a reasonable

12   accommodation.

13       41.   Defendant's failure to engage in the interactive process was a substantial factor in

14   causing Plaintiff harm.

15       42.   As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff

16   has suffered special damages, including, but not limited to, past and future loss of income, benefits,

17   and other damages to be proven at time of trial.

18       43.   As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff

19   has suffered general damages, including, but not limited to, shock, embarrassment, physical distress

20   and injury, humiliation, emotional distress, stress and other damages to be proven at the time of trial.

21       44.   The unlawful conduct alleged above was engaged in by the officers, directors,

22   supervisors and/or managing agents of each of the Defendants who were acting at all times relevant

23   to this Complaint within the scope and course of their employment.  Defendants are liable for the

24   conduct of said agents and employees under the doctrine of strict liability.

25       45.   Defendants committed these acts maliciously, fraudulently and oppressively in

26   conscious disregard for the Plaintiff's rights.  Defendants committed and/or ratified the acts alleged

27   herein.  These acts were committed with the knowledge of employees' lack of fitness in the

28   workplace but were allowed to proceed, managing agents of Defendants.  Plaintiff is therefore

ELDESSOUKY LAW, APC
17139 Bellflower Blvd., Suite 202
Bellflower, CA 90706
Phone: (562) 461-0995 | Fax: (562) 461-0998

-7-

1   entitled to recover punitive damages from Defendants in an amount according to proof at trial.

2       46.     As a result of the conduct of Defendants, Plaintiff was forced to retain an attorney in

3   order to protect her rights. Accordingly, Plaintiff seeks the reasonable attorneys' fees and costs

4   incurred in this litigation in an amount according to proof at trial.

5                           **FOURTH CAUSE OF ACTION**

6                      **RETALIATION IN VIOLATION OF FEHA**

7                        **(Cal. Gov't. Code § 12940(h) et seq.)**

8                   **Against All Defendants Inclusive of DOES 1-25**

9       47.     Plaintiff alleges and incorporates by reference the allegations in the preceding

10  paragraphs as though fully set forth herein.

11      48.     California law further protects employees from retaliation for exercising the right to

12  oppose a practice prohibited by FEHA, Cal. Gov't Code, § 12900, *et seq.*

13      49.     Plaintiff's request to take medical leave related to her disability was a motivating

14  reason for her termination.

15      50.     Defendant's retaliatory conduct was a substantial factor in causing Plaintiff's harm.

16      51.     Defendants committed unlawful retaliation in violation of Section 12940, subdivision

17  (h), by terminating Plaintiff for seeking accommodation and opposing disability discrimination,

18  practices prohibited by FEHA.  Plaintiff was subjected to discrimination and adverse employment

19  action by Defendants because of her disability.  Specifically, Defendant refused to accommodate

20  Plaintiff's disability.

21      52.     Defendants, by and through their supervisors and/or agents, discriminated and

22  retaliated against Plaintiff because of her disability. Plaintiff was subjected to discrimination and

23  adverse employment action by Defendants because of her disability. Specifically, Defendants

24  terminated Plaintiff for requesting, and needing, medical leave of absence related to her disability.

25      53.     Plaintiff is informed and believes, and thereon alleges, that her disability, along with

26  the possibility that she would require leave for her aneurism in the future, were substantial

27  motivating factors in Defendants' decision to treat her differently from similarly situated non-

28  disabled employees.  Plaintiff further alleges, on information and belief, that she was subjected to

ELDESSOUKY LAW, APC
17139 Bellflower Blvd., Suite 202
Bellflower, CA 90706
Phone: (562) 461-0995 | Fax: (562) 461-0998

-8-

ELDESSOUKY LAW, APC
17139 Bellflower Blvd., Suite 202
Bellflower, CA 90706
Phone: (562) 461-0995 | Fax: (562) 461-0998

1  different terms and conditions of employment than her non-disabled co-workers.

2  54.   As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff

3  has suffered special damages, including, but not limited to, past and future loss of income, benefits,

4  and other damages to be proven at time of trial.

5  55.   As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff

6  has suffered general damages, including, but not limited to, shock, embarrassment, physical distress

7  and injury, humiliation, emotional distress, stress and other damages to be proven at the time of trial.

8  56.   The unlawful conduct alleged above was engaged in by supervisors and/or managing

9  agents of each of the Defendants who were acting at all times relevant to this Complaint within the

10  scope and course of their employment.  Defendants are liable for the conduct of said agents and

11  employees under the doctrine of strict liability.

12  57.   Defendants committed these acts maliciously, fraudulently, and oppressively in

13  conscious disregard for the Plaintiff's rights.  Defendants committed and/or ratified the acts alleged

14  herein.  These acts were committed with the knowledge of employees' lack of fitness in the

15  workplace but were allowed to proceed, by managing agents of Defendants.  Plaintiff is therefore

16  entitled to recover punitive damages from Defendants in an amount according to proof at trial.

17  58.   As a result of the conduct of Defendants, Plaintiff was forced to retain an attorney in

18  order to protect her rights. Accordingly, Plaintiff seeks the reasonable attorneys' fees and costs

19  incurred in this litigation in an amount according to proof at trial.

20  **FIFTH CAUSE OF ACTION**

21  **FAILURE TO PREVENT DISCRIMINATION IN VIOLATION OF FEHA**

22  **(CAL. GOV'T CODE § 12940(k) et seq.)**

23  **(Against All Defendants Inclusive of DOES 1-25)**

24  59.   Plaintiff alleges and incorporates by reference the allegations in the preceding

25  paragraphs as thought fully set forth herein.

26  60.   Defendants failed to take all reasonable steps to prevent discrimination against

27  Plaintiff from occurring and failed to take immediate corrective action to remedy the discrimination,

28  in violation of FEHA, Cal. Gov't Code § 12940(k)).

-9-

1   61.    Specifically, Defendants failed to take any disciplinary measures to prevent and/or

2   remedy the discrimination against Plaintiff, such as issuing a formal warning, providing

3   counseling, or imposing probation, suspension, or termination, or conducting a prompt and thorough

4   investigation into the discrimination, and retaliation Plaintiff was subjected to, that are the subject of

5   this lawsuit.

6   62.    As a direct and proximate result of the unlawful conduct of the Defendants and

7   Defendants failure to act, Plaintiff has suffered special damages, including, but not limited to, past

8   and future loss of income, benefits, and other damages to be proven at time of trial.

9   63.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff

10  has suffered general damages, including, but not limited to, shock, embarrassment, physical distress

11  and injury, humiliation, emotional distress, stress and other damages to be proven at the time

12  of trial.

13  64.    The unlawful conduct alleged above was engaged in by supervisors and/or managing

14  agents of each of the Defendants who were acting at all times relevant to this Complaint within the

15  scope and course of their employment.  Defendants are liable for the conduct of said agents and

16  employees under the doctrine of strict liability.

17  65.    Defendants committed these acts maliciously, fraudulently, and oppressively in

18  conscious disregard for the Plaintiff's rights.  Defendants committed and/or ratified the acts alleged

19  herein.  These acts were committed with the knowledge of employees' lack of fitness in the workplace

20  but were allowed to proceed managing agents of Defendants.  Plaintiff is therefore entitled to

21  recover punitive damages from Defendants in an amount according to proof at trial.

22  66.    As a result of the conduct of Defendants, Plaintiff was forced to retain an attorney in

23  order to protect her rights.  Accordingly, Plaintiff seeks the reasonable attorneys' fees and costs

24  incurred in this litigation in an amount according to proof at trial.

25  ///

26  ///

27  ///

28  ///

ELDESSOUKY LAW, APC
17139 Bellflower Blvd., Suite 202
Bellflower, CA 90706
Phone: (562) 461-0995 | Fax: (562) 461-0998

-10-
COMPLAINT FOR DAMAGES

## SIXTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF CFRA

### (Cal. Gov't. Code § 12945.2(k))

### Against All Defendants Inclusive of DOES 1-25

67. Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

68. The California Family Rights Act ("CFRA"), Cal. Gov't Code § 12945.2, et seq., ensures employee leave rights for, *inter alia*, an employee's own serious health condition.

69. The CFRA also makes it unlawful for an employer to discriminate against or retaliate against an employee who exercises her right to family care leave. Government Code 18 § 12945.2(k) ("It shall be an unlawful employment practice for an employer to refuse to hire, or to discharge, fine, suspend, expel, or discriminate against, any individual because of ... [a]n individual's exercise of the right to family care and medical leave."); *see also* 2 Cal. Code Regs. 21 § 11089(a)(2). Plaintiff is an eligible employee under the CFRA.

70. Plaintiff is informed and believes, and thereon alleges that she was discriminated and retaliated against in the terms and conditions of her employment, as outlined above, as a result of exercising her right to request and/or take medical leave from her employment.

71. Plaintiff was an "eligible employee" under the California Family Rights Act ("CFRA").

72. Defendants were a "covered employer" under the CFRA.

73. Plaintiff provided employer Defendants with adequate notice of Plaintiff's request for protected medical leave.

74. Plaintiff requested medical leave from her employment for reasons covered under the CFRA, including Plaintiff's own serious medical condition.

75. Defendants violated the CFRA, and retaliated against Plaintiff following her medical leave, by retaliating and terminating her employment for taking protected leave from work.

76. Defendants had a legal duty to not interfere or retaliate with Plaintiff's rights under the CFRA.

ELDESSOUKY LAW, APC
17139 Bellflower Blvd., Suite 202
Bellflower, CA 90706
Phone: (562) 461-0995 | Fax: (562) 461-0998

ELDESSOUKY LAW, APC
17139 Bellflower Blvd., Suite 202
Bellflower, CA 90706
Phone: (562) 461-0995 | Fax: (562) 461-0998

77. Plaintiff is informed and believes and thereon alleges that Defendants willfully and/or with reckless indifference, violated the CFRA, California Government Code Section 12945.2, by retaliating against Plaintiff for exercising her right to take a medical leave. Such actions have resulted in damage and injury to Plaintiff as alleged herein.

78. Plaintiff's disability and assertion of her right to CFRA leave were motivating reasons for her termination.

79. Defendants' retaliatory conduct was a substantial factor in causing Plaintiff's harm.

80. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff has suffered special damages, including, but not limited to, past and future loss of income, benefits, and other damages to be proven at time of trial.

81. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff has suffered general damages, including, but not limited to, shock, embarrassment, physical distress and injury, humiliation, emotional distress, stress and other damages to be proven at the time of trial.

82. The unlawful conduct alleged above was engaged in by the officers, directors, supervisors and/or managing agents of each of the Defendants who were acting at all times relevant to this Complaint within the scope and course of their employment. Defendants are liable for the conduct of said agents and employees under the doctrine of strict liability.

83. Defendants committed these acts maliciously, fraudulently, and oppressively in conscious disregard for the Plaintiff's rights. Defendants committed and/or ratified the acts alleged herein. These acts were committed with the knowledge of employees' lack of fitness in the workplace but were allowed to proceed, by managing agents of Defendants. Plaintiff is therefore entitled to recover punitive damages from Defendants in an amount according to proof at trial.

84. As a result of the conduct of Defendants, Plaintiff was forced to retain an attorney in order to protect her rights. Accordingly, Plaintiff seeks the reasonable attorneys' fees and costs incurred in this litigation in an amount according to proof at trial.

///

///

///

**SEVENTH CAUSE OF ACTION**

**WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

**Against All Defendants Inclusive of DOES 1-25**

85.     Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

86.     The general rule in California is that, in the absence of an express or implied employment contract, the employment relationship is presumed to be terminable by either party "at will." Labor Code §2922. One exception to the at-will employment doctrine is that employers have no right to terminate an employee for a reason that contravenes fundamental public policy. "This exception is enforced through tort law by permitting the discharged employee to assert against the employer a cause of action for wrongful discharge in violation of fundamental public policy." *Stevenson v Superior Court* (1997) 16 C4th 880, 887, 66 CR2d 888.

87.     At all times relevant to this Complaint, FEHA was in full force and effect and binding upon Defendants.  FEHA prohibits employers from discharging or otherwise discriminating or retaliating against an employee on the basis of disability in compensation, terms, conditions, or privileges of employment. Cal. Gov't Code § 12940(a).

88.     It is "the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of . . . physical disability, mentally disability, [or] medical condition." Cal. Gov't Code § 12920.

89.     Defendants violated California public policy by terminating, and/or constructively, Plaintiff's employment because of her disability and request for reasonable accommodations.  The termination was in violation of fundamental, substantial public policies of this state, including, but not limited to the FEHA, CFRA, and FMLA.

90.     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff has suffered actual, consequential, and incidental damages, including without limitation, loss of regular employment and loss of career advancement opportunities in an amount subject to proof at trial.

ELDESSOUKY LAW, APC
17139 Bellflower Blvd., Suite 202
Bellflower, CA 90706
Phone: (562) 461-0995 | Fax: (562) 461-0998

ELDESSOUKY LAW, APC
17139 Bellflower Blvd., Suite 202
Bellflower, CA 90706
Phone: (562) 461-0995 | Fax: (562) 461-0998

91.     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff has suffered, and continues to suffer, substantial earnings and job benefits, in addition to humiliation, embarrassment, and mental and emotional distress in an amount exceeding jurisdictional limits, the precise amount of which is subject to proof at trial.

92.     Defendants' acts were committed maliciously, fraudulently, and oppressively, with the wrongful intention of harming Plaintiff.  Therefore, Plaintiff is entitled to punitive damages in amount subject to proof at trial.

93.     Defendants' wrongful conduct has also necessitated the retention of legal counsel to pursue Plaintiff's claims, the costs of which should be borne by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against defendant, and each of them, as follows:

1.     For all actual, consequential, and incidental financial losses, including but not limited to, loss of earnings and employment benefits, together with prejudgment interest, according to proof;

2.     For compensatory, general, and special damages, including front pay, in an amount according to proof;

3.     For punitive damages;

4.     For statutory attorneys' fees;

5.     For prejudgment and post-judgment interest according to any applicable provision of law, according to proof;

6.     For costs of suit;

7.     For expert witness fees pursuant to FEHA; and

8.     For such other and further relief as the Court may deem just and proper.

Dated: June 10, 2021                      **ELDESSOUKY LAW, APC**

By: _____

Mohamed Eldessouky, Esq.
Attorneys for Plaintiff
**BARBARA GAYTAN**

-14-

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Mohamed Eldessouky, Esq. (SBN: 289955); Maria E. Garcia, Esq. (SBN: 321700)
Eldessouky Law, APC
17139 Bellflower Blvd., Suite 202, Bellflower, CA 90706

TELEPHONE NO.: (562) 461-0995    FAX NO. *(Optional):* (562) 461-0998
ATTORNEY FOR *(Name):* Barbara Gaytan

*FOR COURT USE ONLY*

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles 90012
BRANCH NAME: STANLET MOSK COURTHOUSE

CASE NAME:
Barbara Gaytan v. Adecco USA, Inc., et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [x] Unlimited (Amount demanded exceeds $25,000)    [ ] Limited (Amount demanded is $25,000) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | 21STCV21743<br>JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[x] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [x] punitive
4. Number of causes of action *(specify):* 7
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: June 10, 2021

Mohamed Eldessouky, Esq.
_____
(TYPE OR PRINT NAME)

_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courts.ca.gov*

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET
CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

| SHORT TITLE: Barbara Gaytan v. Adecco USA, Inc., et al. | CASE NUMBER |
|---|---|

# CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

| This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court. |
|---|

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Court Filing Location (Column C) |
|---|

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.

2. Permissive filing in central district.

3. Location where cause of action arose.

4. Mandatory personal injury filing in North District.

5. Location where performance required or defendant resides.

6. Location of property or permanently garaged vehicle.

7. Location where petitioner resides.

8. Location wherein defendant/respondent functions wholly.

9. Location where one or more of the parties reside.

10. Location of Labor Commissioner Office.

11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| **Other Personal Injury/ Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 1, 11 |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 1, 11 |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1, 4, 11 |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1, 4, 11 |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1, 4, 11 |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1, 4, 11 |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE: Barbara Gaytan v. Adecco USA, Inc., et al. | CASE NUMBER |
|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1, 2, 3 |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☑ A6037  Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ A6109  Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 5, 6, 11 |
| | | ☐ A6012  Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ A6031  Tortious Interference | 1, 2, 3, 5 |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation       Number of parcels_____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2, 6 |
| | | ☐ A6032  Quiet Title | 2, 6 |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2, 6, 11 |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE: Barbara Gaytan v. Adecco USA, Inc., et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160  Abstract of Judgment | 2, 6 |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment With Damages | 2, 3, 9 |
| | | ☐ A6123  Workplace Harassment With Damages | 2, 3, 9 |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case With Damages | 2, 3, 9 |
| | | ☐ A6190  Election Contest | 2 |
| | | ☐ A6110  Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100  Other Civil Petition | 2, 9 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 3 of 4

| SHORT TITLE: Barbara Gaytan v. Adecco USA, Inc., et al. | CASE NUMBER . |
|---|---|

**Step 4:** **Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected.  Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON:<br><br>☐ 1. ☑ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11. | ADDRESS:<br><br>3777 Workman Mill Rd. |
|---|---|

| CITY:<br>Whittier | STATE:<br>CA | ZIP CODE:<br>90601 |
|---|---|---|

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the Central _____ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: June 10, 2021 _____

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1.  Original Complaint or Petition.

2.  If filing a Complaint, a completed Summons form for issuance by the Clerk.

3.  Civil Case Cover Sheet, Judicial Council form CM-010.

4.  Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5.  Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6.  A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7.  Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 4 of 4

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>06/10/2021<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ R. Perez _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT**<br><br>**UNLIMITED CIVIL CASE** | |
| Your case is assigned for all purposes to the judicial officer indicated below. | CASE NUMBER:<br>21STCV21743 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Michelle Williams  Court | 74 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

Sherri R. Carter, Executive Officer / Clerk of Court

on 06/11/2021
(Date)

By R. Perez _____, Deputy Clerk

LACIV 190 (Rev 6/18)
LASC Approved 05/06

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

2019-GEN-014-00

**FILED**
Superior Court of California
County of Los Angeles

**MAY 03 2019**

Sherri R. Carter, Executive Officer/Clerk

by _____, Deputy
Elizabeth Mina

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| IN RE LOS ANGELES SUPERIOR COURT ) | FIRST AMENDED GENERAL ORDER |
| — MANDATORY ELECTRONIC FILING ) | |
| FOR CIVIL ) | |

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) **DEFINITIONS**

   a) **"Bookmark"**  A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

   b) **"EFiling Portal"**  The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

   c) **"Electronic Envelope"**  A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

   d) **"Electronic Filing"**  Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

1   e) "**Electronic Filing Service Provider**"  An Electronic Filing Service Provider (EFSP) is a

2   person or entity that receives an electronic filing from a party for retransmission to the Court.

3   In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an

4   agent of the Court.  (California Rules of Court, rule 2.250(b)(8).)

5   f) "**Electronic Signature**"  For purposes of these local rules and in conformity with Code of

6   Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision

7   (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule

8   2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or

9   process attached to or logically associated with an electronic record and executed or adopted

10  by a person with the intent to sign the electronic record.

11  g) "**Hyperlink**"  An electronic link providing direct access from one distinctively marked place

12  in a hypertext or hypermedia document to another in the same or different document.

13  h) "**Portable Document Format**"  A digital document format that preserves all fonts,

14  formatting, colors and graphics of the original source document, regardless of the application

15  platform used.

16  2) MANDATORY ELECTRONIC FILING

17  a) Trial Court Records

18  Pursuant to Government Code section 68150, trial court records may be created, maintained,

19  and preserved in electronic format.  Any document that the Court receives electronically must

20  be clerically processed and must satisfy all legal filing requirements in order to be filed as an

21  official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

22  b) Represented Litigants

23  Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to

24  electronically file documents with the Court through an approved EFSP.

25  c) Public Notice

26  The Court has issued a Public Notice with effective dates the Court required parties to

27  electronically file documents through one or more approved EFSPs.  Public Notices containing

28  effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

2019-GEN-014-00

d) **Documents in Related Cases**

Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3) **EXEMPT LITIGANTS**

a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4) **EXEMPT FILINGS**

a) The following documents shall not be filed electronically:

   i) Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

   ii) Bonds/Undertaking documents;

   iii) Trial and Evidentiary Hearing Exhibits

   iv) Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

   v) Documents submitted conditionally under seal. The actual motion or application shall be electronically filed. A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

b) **Lodgments**

Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

//

//

2019-GEN-014-00

5) **ELECTRONIC FILING SYSTEM WORKING PROCEDURES**

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) **TECHNICAL REQUIREMENTS**

   a) Electronic documents must be electronically filed in PDF, text searchable format when technologically feasible without impairment of the document's image.

   b) The table of contents for any filing must be bookmarked.

   c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4).  Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookmarked item and briefly describe the item.

   d) Attachments to primary documents must be bookmarked.  Examples include, but are not limited to, the following:

      i) Depositions;

      ii) Declarations;

      iii) Exhibits (including exhibits to declarations);

      iv) Transcripts (including excerpts within transcripts);

      v) Points and Authorities;

      vi) Citations; and

      vii) Supporting Briefs.

   e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

   f) Accompanying Documents

   Each document accompanying a single pleading must be electronically filed as a separate digital PDF document.

   g) Multiple Documents

   Multiple documents relating to one case can be uploaded in one envelope transaction.

2019-GEN-014-00

b) **Writs and Abstracts**

Writs and Abstracts must be submitted as a separate electronic envelope.

i) **Sealed Documents**

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) **Redaction**

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) **ELECTRONIC FILING SCHEDULE**

a) **Filed Date**

i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing. Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted.   (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of:  (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) **EX PARTE APPLICATIONS**

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day before the ex parte hearing.

5

2019-GEN-014-00

b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing. A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) **PRINTED COURTESY COPIES**

a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled. If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

i) Any printed document required pursuant to a Standing or General Order;

ii) Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

iii) Pleadings and motions that include points and authorities;

iv) Demurrers;

v) Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

vi) Motions for Summary Judgment/Adjudication; and

vii) Motions to Compel Further Discovery.

c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents. Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) **WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS**

a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver. (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

2019-GEN-014-00

1) SIGNATURES ON ELECTRONIC FILING

For purposes of this General Order, all electronic filings must be in compliance with California Rules of Court, rule 2.257. This General Order applies to documents filed within the Civil Division of the Los Angeles County Superior Court.

This First Amended General Order supersedes any previous order related to electronic filing, and is effective immediately, and is to remain in effect until otherwise ordered by the Civil Supervising Judge and/or Presiding Judge.

DATED: May 3, 2019



KEVIN C. BRAZILE
Presiding Judge

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



Superior Court of California
County of Los Angeles



Los Angeles County
Bar Association
Litigation Section

Los Angeles County
Bar Association Labor and
Employment Law Section



Consumer Attorneys
Association of Los Angeles

Southern California
Defense Counsel

Association of
Business Trial Lawyers



California Employment
Lawyers Association

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

PLAINTIFF:

DEFENDANT:

**STIPULATION – DISCOVERY RESOLUTION**

This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.

The parties agree that:

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii. Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i. Also be filed on the approved form (copy attached);

      ii. Include a brief summary of why the requested relief should be denied;

<table>
<tr><td>SHORT TITLE:</td><td>CASE NUMBER:</td></tr>
</table>

iii.   Be filed within two (2) court days of receipt of the Request; and

iv.   Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying ex parte for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| | |
|---|---|
| | |

**The following parties stipulate:**

Date: _____

[TYPE OR PRINT NAME]

> _____
> [ATTORNEY FOR PLAINTIFF]

Date: _____

[TYPE OR PRINT NAME]

> _____
> [ATTORNEY FOR DEFENDANT]

Date: _____

[TYPE OR PRINT NAME]

> _____
> [ATTORNEY FOR DEFENDANT]

Date: _____

[TYPE OR PRINT NAME]

> _____
> [ATTORNEY FOR DEFENDANT]

Date: _____

[TYPE OR PRINT NAME]

> _____
> [ATTORNEY FOR _____]

Date: _____

[TYPE OR PRINT NAME]

> _____
> [ATTORNEY FOR _____]

Date: _____

[TYPE OR PRINT NAME]

> _____
> [ATTORNEY FOR _____]

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**STIPULATION – EARLY ORGANIZATIONAL MEETING**

This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.

The parties agree that:

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, to discuss and consider whether there can be agreement on the following:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| | |
|---|---|
| SHORT TITLE: | CASE NUMBER: |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at www.lacourt.org under "Civil" and then under "General Information").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at www.lacourt.org under "Civil", click on "General Information", then click on "Voluntary Efficient Litigation Stipulations".

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____          ►  _____
        (TYPE OR PRINT NAME)                        (ATTORNEY FOR PLAINTIFF)
Date:

_____          ►  _____
        (TYPE OR PRINT NAME)                        (ATTORNEY FOR DEFENDANT)
Date:

_____          ►  _____
        (TYPE OR PRINT NAME)                        (ATTORNEY FOR DEFENDANT)
Date:

_____          ►  _____
        (TYPE OR PRINT NAME)                        (ATTORNEY FOR DEFENDANT)
Date:

_____          ►  _____
        (TYPE OR PRINT NAME)                        (ATTORNEY FOR _____)
Date:

_____          ►  _____
        (TYPE OR PRINT NAME)                        (ATTORNEY FOR _____)

_____          ►  _____
        (TYPE OR PRINT NAME)                        (ATTORNEY FOR _____)

LACIV 229 (New 03/11)          **STIPULATION – EARLY ORGANIZATIONAL MEETING**          Page 2 of 2
LASC Approved 04/11

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
| --- | --- | --- |
| TELEPHONE NO.:        FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

| COURTHOUSE ADDRESS: | |
| --- | --- |
| PLAINTIFF: | |
| DEFENDANT: | |

| INFORMAL DISCOVERY CONFERENCE | CASE NUMBER: |
| --- | --- |
| (pursuant to the Discovery Resolution Stipulation of the parties) | |

1. This document relates to:

   ☐ Request for Informal Discovery Conference
   ☐ Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).

3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).

4. For a Request for Informal Discovery Conference, **briefly** describe the nature of the discovery dispute, including the facts and legal arguments at issue. For an Answer to Request for Informal Discovery Conference, **briefly** describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

| | | |
|---|---|---|
| NAME AND ADDRESS OF ATTORNEY (OR PARTY WITHOUT ATTORNEY): | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
| TELEPHONE NO.:    FAX NO. (Optional): | | |
| E-MAIL ADDRESS (Optional): | | |
| ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

| COURTHOUSE ADDRESS: |
|---|
| PLAINTIFF: |
| DEFENDANT: |

| STIPULATION AND ORDER – MOTIONS IN LIMINE | CASE NUMBER: |
|---|---|

This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE | CASE NUMBER |
|-------------|-------------|
|             |             |

**The following parties stipulate:**

Date: _____

_____           ➤ _____
(TYPE OR PRINT NAME)                   (ATTORNEY FOR PLAINTIFF)

Date: _____

_____           ➤ _____
(TYPE OR PRINT NAME)                   (ATTORNEY FOR DEFENDANT)

Date: _____

_____           ➤ _____
(TYPE OR PRINT NAME)                   (ATTORNEY FOR DEFENDANT)

Date: _____

_____           ➤ _____
(TYPE OR PRINT NAME)                   (ATTORNEY FOR DEFENDANT)

Date: _____

_____           ➤ _____
(TYPE OR PRINT NAME)                   (ATTORNEY FOR _____)

Date: _____

_____           ➤ _____
(TYPE OR PRINT NAME)                   (ATTORNEY FOR _____)

Date: _____

_____           ➤ _____
(TYPE OR PRINT NAME)                   (ATTORNEY FOR _____)

**THE COURT SO ORDERS.**

Date: _____                 _____
                                       JUDICIAL OFFICER



## Superior Court of California, County of Los Angeles

## ALTERNATIVE DISPUTE RESOLUTION (ADR)
## INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

### What is ADR?

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

### Advantages of ADR

- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

### Disadvantages of ADR

- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

### Main Types of ADR

1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all.  Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may not be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

## How to Arrange Mediation in Los Angeles County

Mediation for civil cases is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**
   If all parties in an active civil case agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases).

- **ADR Services, Inc.** Case Manager Elizabeth Sanchez, elizabeth@adrservices.com (949) 863-9800
- **JAMS, Inc.** Assistant Manager Reggie Joseph, RJoseph@jamsadr.com (310) 309-6209
- **Mediation Center of Los Angeles** Program Manager info@mediationLA.org (833) 476-9145

These organizations cannot accept every case and they may decline cases at their discretion. They may offer online mediation by video conference for cases they accept. Before contacting these organizations, review important information and FAQs at www.lacourt.org/ADR.Res.List

**NOTE: The Civil Mediation Vendor Resource List program does not accept family law, probate or small claims cases.**

b. **Los Angeles County Dispute Resolution Programs**
   https://hrc.lacounty.gov/wp-content/uploads/2020/05/DRP-Fact-Sheet-23October19-Current-as-of-October-2019-1.pdf

   Day of trial mediation programs have been paused until further notice.

   **Online Dispute Resolution (ODR).** Parties in small claims and unlawful detainer (eviction) cases should carefully review the Notice and other information they may receive about (ODR) requirements for their case.

c. Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

3. **Arbitration:** Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC):** MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit http://www.lacourt.org/division/civil/C10047.aspx

Los Angeles Superior Court ADR website: http://www.lacourt.org/division/civil/C10109.aspx
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm

# EXHIBIT B

Electronically FILED by Superior Court of California, County of Los Angeles on 07/22/2021 12:22 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Yanez,Deputy Clerk

1  SEYFARTH SHAW LLP
   Elizabeth Levy (SBN 268926)
2  Email: elevy@seyfarth.com
   Lauren Schwartz (SBN 312253)
3  Email: lscwartz@seyfarth.com
   2029 Century Park East, Suite 3500
4  Los Angeles, California 90067-3021
   Telephone:    (310) 277-7200
5  Facsimile:    (310) 201-5219

6  Attorneys for Defendant
   MICHAEL KORS (USA), INC.

7

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                      COUNTY OF LOS ANGELES

11

12  BARBARA GAYTAN,                    Case No. 21STCV21743

13              Plaintiff,              (ASSIGNED FOR ALL PURPOSES TO:  JUDGE
                                        MICHELLE WILLIAMS COURT, DEPT. 74)
14       v.
                                        **DEFENDANT MICHAEL KORS (USA),**
15  ADECCO USA, INC., a corporation; MICHAEL  **INC.'S ANSWER TO PLAINTIFF'S**
   KORS (USA), INC., a corporation; and DOES 1  **COMPLAINT**
16  through 25, INCLUSIVE,
                                        Complaint Filed:  June 10, 2021
17              Defendants.             Trial Date:     None Set

18

19

20

21

22

23

24

25

26

27

28

73333096v.1

Defendant, MICHAEL KORS (USA), INC. ("Defendant" or "MK USA") answers Plaintiff Barbara Gaytan ("Plaintiff")'s Complaint for Damages as follows:

## GENERAL DENIAL

Pursuant to the provisions of California Code of Civil Procedure § 431.30(d), Defendant denies, generally and specifically, each and every allegation, statement, matter and each purported cause of action contained in Plaintiff's Complaint and without limiting the generality of the foregoing, denies generally and specifically that Plaintiff has been damaged in the manner or sums alleged, or any way at all, by reason of any acts or omissions of Defendant.

## AFFIRMATIVE DEFENSES

In further answer to Plaintiff's Complaint, and as separate and distinct defenses, Defendant alleges as follows without assuming the burden of proof on any defense on which it would not otherwise have the burden of proof by operation of law. Defendant does not presently know all of the facts and circumstances respecting Plaintiff's claims. Defendant reserves the right to amend this Answer should Defendant later discover facts demonstrating the existence of additional defenses.

## FIRST DEFENSE

### (Failure to State Cause of Action - All Causes of Action)

1.     Plaintiff's Complaint as a whole, and each purported cause of action alleged therein, fails to state facts sufficient to constitute a cause of action against Defendant upon which relief may be granted.

## SECOND DEFENSE

### (Statute of Limitations - All Causes of Action)

2.     Plaintiff's Complaint, and each purported cause of action alleged therein, is barred in whole or in part to the extent Plaintiff seeks relief for any claim that did not accrue within the applicable statute of limitations period before the commencement of this action, including, but not limited to, California Government Code sections 12940 and 12945.2.

DEFENDANT MICHAEL KORS (USA), INC.'S ANSWER TO PLAINTIFF'S COMPLAINT

73333096v.1

### THIRD DEFENSE

### (Failure to Exhaust - All Causes of Action)

3.     Plaintiff's Complaint, and each purported cause of action alleged therein, is barred in whole or in part to the extent Plaintiff failed to exhaust her administrative remedies and/or statutory prerequisites in a complete and timely manner under applicable law, including but not limited to, Government Code Sections 12940, 12960 and 12965 and all other applicable laws.

### FOURTH DEFENSE

### (Failure to Take Advantage of Corrective Opportunities - All Causes of Action)

4.     Plaintiff's Complaint, and each purported cause of action alleged therein, is barred, and any recovery of damages is precluded in whole or in part because, on information and belief, Plaintiff unreasonably failed to take advantage of Defendant's preventive or corrective opportunities (including internal grievance procedures), or unreasonably failed to avoid harm otherwise.

### FIFTH DEFENSE

### (Laches - All Causes Of Action)

5.     Plaintiff's claims are barred by the equitable doctrine of laches.

### SIXTH DEFENSE

### (Undue Hardship - All Causes of Action)

6.     Assuming, *arguendo*, that Plaintiff was disabled and Defendant was aware of the alleged disability, Plaintiff's claims are barred because the accommodation(s) demanded was not reasonable, and would cause Defendant undue hardship.

### SEVENTH DEFENSE

### (Good Faith Reasonable Accommodation - All Causes of Action)

7.     Assuming, *arguendo*, that Plaintiff was disabled and Defendant was aware of the disability, Plaintiff's claims are barred because Defendant made a good-faith effort to engage in the interactive process with Plaintiff to make a reasonable accommodation to the extent possible in light of business needs and necessities.

3

73333096v.1

**EIGHTH DEFENSE**

**(Reasonable Care - All Causes of Action)**

8.      Plaintiff's Complaint, and each purported cause of action alleged therein, is barred, and any recovery of damages is precluded in whole or in part, because Defendant exercised reasonable care to prevent and promptly correct any alleged discriminatory behavior in that Defendant had an equal employment opportunity policy, and an anti-discrimination/anti-retaliation policy which were communicated to all employees and strictly enforced.

**NINTH DEFENSE**

**(Could Not Perform Essential Duties - All Causes of Action)**

9.      Plaintiff's causes of action fail to the extent that Plaintiff could not safely perform the essential duties of her position with or without a reasonable accommodation.

**TENTH DEFENSE**

**(No Reasonable Accommodation Existed - All Causes of Action)**

10.     Plaintiff's causes of action fail to the extent that no reasonable accommodation existed that would have enabled Plaintiff to perform the essential duties of her job.

**ELEVENTH DEFENSE**

**(After-Acquired Evidence - All Causes of Action)**

11.     Defendant is informed and believes and thereon alleges that Plaintiff's Complaint, and each purported cause of action alleged therein, is barred in whole or in part by the doctrine of after-acquired evidence or, alternatively, the doctrine of after-acquired evidence limits and reduces Plaintiff's alleged damages.

**TWELFTH DEFENSE**

**(Waiver - All Causes of Action)**

12.     Plaintiff's Complaint, and each purported cause of action alleged therein, is barred by the doctrine of waiver.

73333096v.1

## THIRTEENTH DEFENSE

### (Estoppel - All Causes of Action)

13.     Plaintiff's Complaint, and each purported cause of action alleged therein, is barred because Plaintiff is estopped by her own conduct to claim any right to damages or any relief against Defendant.

## FOURTEENTH DEFENSE

### (Unclean Hands - All Causes of Action)

14.     Plaintiff's Complaint, and each purported cause of action alleged therein, is barred to the extent Plaintiff has unclean hands.

## FIFTEENTH DEFENSE

### (Consent and Ratification - All Causes of Action)

15.     Plaintiff's Complaint, and each purported cause of action alleged therein, is barred to the extent any conduct attributable to Defendant was ratified or consented to by Plaintiff.

## SIXTEENTH DEFENSE

### (Failure to Mitigate Damages - All Causes of Action)

16.     Defendant is informed and believes and thereon alleges that Plaintiff is barred from recovering any damages for lost wages, or any recovery for lost wages and/or earnings potential must be reduced, by virtue of Plaintiff's failure to exercise reasonable diligence to mitigate her alleged damages.

## SEVENTEENTH DEFENSE

### (Workers' Compensation Exclusivity - All Causes of Action)

17.     Plaintiff's claims for purported physical or emotional injuries allegedly suffered during or as a result of her employment against Defendant are barred in whole or in part because Plaintiff's sole and exclusive remedies, if any, lie under the California Workers' Compensation Act.

## EIGHTEENTH DEFENSE

### (Unconstitutionality of Punitive Damages - All Causes of Action)

18.     Plaintiff's causes of action are barred to the extent that punitive damages are unconstitutional under the California and United States Constitutions.

DEFENDANT MICHAEL KORS (USA), INC.'S ANSWER TO PLAINTIFF'S COMPLAINT

73333096v.1

**NINETEENTH DEFENSE**

**(Lack of Malice - All Causes of Action)**

19.    Defendant is not liable for punitive damages because it committed no alleged oppressive, willful, fraudulent, or malicious acts, authorized or ratified such alleged acts, or had advance knowledge of the unfitness of any employee or employees who allegedly committed such an act, or employed any such employee or employees with a conscious disregard of the rights or safety of others, pursuant to Civil Code section 3294.

**TWENTIETH DEFENSE**

**(Employment Decisions Contrary to Employer's Policies - All Causes of Action)**

20.    Plaintiff may not recover punitive damages for alleged discriminatory and/or retaliatory employment decisions or conduct to the extent that those decisions or alleged conduct are contrary to policies Defendant has instituted in good faith against wrongful conduct.

**TWENTY-FIRST DEFENSE**

**(No Substantial Motivating Factor - All Causes of Action)**

21.    Plaintiff's alleged disability and/or alleged perceived disability was not a substantial motivating factor in Plaintiff's termination or alleged injuries.

**TWENTY-SECOND DEFENSE**

**(Improper Defendant - All Causes of Action)**

22.    Defendant did not employ Plaintiff, it is an improperly named Defendant.

**TWENTY-THIRD DEFENSE**

**(Arbitration - All Causes of Action)**

23.    Plaintiff's claims are barred to the extent such claims are covered by an applicable arbitration agreement between Plaintiff and any defendant.

**TWENTY-FOURTH DEFENSE**

**(Scope of Authority - All Causes of Action)**

24.    The Complaint, and each of and every purported cause of action therein, is barred to the extent that the actions of Defendant's agents, employees, and representatives, if they occurred, were not actions taken within the course and scope of their employment.

6

73333096v.1

### TWENTY-FIFTH DEFENSE

**(Set Off- All Causes of Action)**

25.     Defendant is entitled to a set-off of any benefits Plaintiff receives or has received from workers' compensation, unemployment compensation, and from any benefit plans of Defendant or others, for injuries or damages alleged in the Complaint, against any award of damages to Plaintiff in this action.

### TWENTY-SIXTH DEFENSE

**(Failure to Request Reasonable Accommodation- Second and Third Causes of Action)**

26.     Plaintiff's causes of action fail to the extent that Plaintiff failed to request a reasonable accommodation that would have enabled him to perform the essential duties of her job.

### TWENTY-SEVENTH DEFENSE

**(Failure to Engage In the Interactive Process- Third Cause of Action)**

27.     Plaintiff's causes of action fail to the extent that Plaintiff did not engage in the interactive process.

### TWENTY-EIGHTH DEFENSE

**(No Act by A Managing Agent – All Causes of Action)**

28.     Plaintiff's prayer for punitive damages is barred to the extent that she has not identified any unlawful conduct by an officer, director or managing agent of Defendant.

### TWENTY-NINTH DEFENSE

**(Not Eligible For CFRA – Sixth Cause of Action)**

29.     Plaintiff's Complaint, and each purported cause of action alleged therein, is barred to the extent Plaintiff alleges she was denied leave pursuant to the California Family Rights Act ("CFRA") because Plaintiff was not eligible to obtain CFRA leave.

### THIRTIETH DEFENSE

**(Legitimate Business Justification/Same Decision/Mixed Motive - All Causes Of Action)**

30.     Any monetary recovery on Plaintiff's Complaint, or any purported cause of action alleged therein, is barred because assuming *arguendo* that discriminatory or retaliatory reasons had been a motivating factor in any decisions toward Plaintiff, which Defendant expressly denies, Defendant

1    would have made the same decisions toward Plaintiff in any case for legitimate, non-retaliatory and non-

2    discriminatory business reasons.  *See Harris v. City of Santa Monica,* 56 Cal. App. 4th 203 (2013).

3                                    **THIRTY-FIRST DEFENSE**

4                        **(Failure to Use Ordinary Care - All Causes Of Action)**

5           31.     Plaintiff's Complaint, and each purported cause of action alleged therein, is barred to the

6    extent that Plaintiff received good consideration in agreement to serve as an employee of Defendant, yet

7    failed to use ordinary care and diligence during her employment, or employment-related duties, pursuant

8    to California Labor Code section 2854.

9                                    **ADDITIONAL DEFENSES**

10          Defendant presently has insufficient knowledge or information upon which to form a belief

11   whether there may be additional, as yet unstated, defenses and reserves the right to assert additional

12   defenses in the event that discovery indicates that such defenses are appropriate.

13                                          **PRAYER**

14          WHEREFORE, Defendant prays for judgment as follows:

15          1.      That Plaintiff takes nothing by her Complaint;

16          2.      That judgment be entered in favor of Defendant and against Plaintiff on all causes of

17   action;

18          3.      The Complaint be dismissed in its entirety with prejudice;

19          4.      That Defendant be awarded reasonable attorney's fees according to proof;

20          5.      That Defendant be awarded the costs of suit incurred herein; and,

21          6.      That Defendant be awarded such other and further relief as the Court may deem

22   appropriate.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

DEFENDANT MICHAEL KORS (USA), INC.'S ANSWER TO PLAINTIFF'S COMPLAINT

73333096v.1

1

2
DATED: July 22, 2021                          Respectfully submitted,

3                                             SEYFARTH SHAW LLP

4

5                                             By:  /s/ Lauren Schwartz

6                                                  Elizabeth Levy
                                                   Lauren Schwartz
7                                                  Attorneys for Defendant
                                                   MICHAEL KORS (USA), INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT MICHAEL KORS (USA), INC.'S ANSWER TO PLAINTIFF'S COMPLAINT

73333096v.1

**PROOF OF SERVICE**

STATE OF CALIFORNIA )
                                ) SS
COUNTY OF LOS ANGELES )

     I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is 2029 Century Park East, Suite 3500, Los Angeles, California 90067-3021.  On July 22, 2021, I served the within document(s):

**DEFENDANT MICHAEL KORS (USA), INC'S ANSWER TO PLAINTIFF'S COMPLAINT**

☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California, addressed as set forth below.

☐ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☐ by placing the document(s) listed above, together with an unsigned copy of this declaration, in a sealed envelope or package provided by an overnight delivery carrier with postage paid on account and deposited for collection with the overnight carrier at Los Angeles, California, addressed as set forth below.

☒ by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth below.

| | |
|---|---|
| Mohamed Eldessouky, Esq. | Attorney for Plaintiff |
| Maria E. Garcia, Esq. | Emails:  mohamed@eldessoukylaw.com |
| ELDESSOUKY LAW, APC | maria@eldessoukylawcom |
| 17139 Bellflower Boulevard, Suite 202 | T:  (562) 461-0995 |
| Bellflower, Ca 90706 | F:  (562) 461-0998 |
| | |
| Joshua Wagner | Attorneys for Defendant Addeco |
| Gabrielle Gordon, | Emails:  jwagner@grsm.com |
| GORDON REES SCULLY | ggordon@grsm.com |
| MANSUKHUANI LLP | T:  (213) 576-5000 |
| 633 West Fifth Street, 52nd Floor | F:  (213) 680-4470 |
| Los Angeles, CA 90071 | |

     I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

     I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

     Executed on July 22 2021, at Los Angeles, California.

                                   _Lora Calma_

_____
                                Lora Calma

73389599v.1

# EXHIBIT C

45 Trials Digest 16th 9, 2013 WL 5944203 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
Superior Court, Los Angeles County, California.

Salinda vs. DIRECTV Inc.

**TOPIC:**
Synopsis: DIRECTV employee alleges discrimination, retaliation

Case Type: Labor & Employment; Discrimination; Labor & Employment; Disability/Medical Condition; Labor & Employment; Retaliation; Labor & Employment; Termination/Constructive Discharge

DOCKET NUMBER: BC475999

STATE: California
COUNTY: Los Angeles

Verdict/Judgment Date: August 23, 2013

JUDGE: Ronald M. Sohigian
**ATTORNEYS:**
Plaintiff: J. Bernard Alexander III, Alexander, Krakow & Glick, Santa Monica; Tracy L. Fehr, Alexander, Krakow & Glick, Santa Monica; Supreeta Sampath, Sampath Law Firm, Los Angeles; Gail D. Solo, Law Offices of Gail D. Solo, Beverly Hills; Jane Tanimura, Sampath Law Firm, Los Angeles.
Defendant: Cassidy M. English, Sheppard, Mullin, Richter & Hampton, Los Angeles; Dianne Baquet Smith, Sheppard, Mullin, Richter & Hampton, Los Angeles.

**SUMMARY:**
Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $1,178,341

Range: $1,000,000-1,999,999
$159,112 to plaintiff for past economic damages

$369,229 to plaintiff for future economic damages

$400,000 to plaintiff for past noneconomic damages

$250,000 to plaintiff for future noneconomic damages

The jury attributed $214,171 of the damages to plaintiff's disability discrimination claim, $750,000 of the damages to plaintiff's failure to prevent discrimination and/or retaliation claim, and $214,170 of the damages to plaintiff's interactive process claim.

Trial Type: Jury

Deliberations: Not reported.

Jury Poll: Not reported.

**EXPERTS:**

Plaintiff: Anthony E. Reading, Ph.D., psychologist, Beverly Hills, (310) 276-3545.
Defendant: Not reported.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**

According to court records: Plaintiff Noel Salinda was an employee of defendants DIRECTV Inc., DIRECTV Group Inc., DIRECTV LLC and DIRECTV Enterprises, which provided broadcast satellite service, for 13 years.

Plaintiff claimed she began working in 1998 as an executive assistant. She claimed she took over the responsibilities of a project specialist in the Advanced Services Department as well in March 2002. According to plaintiff, from March 2002 to July 2003, she witnessed a culture of favoritism for younger, female employees who engaged in sexual favors and relationships with male managers and executives in the company. She said she also discovered and complained about time card fraud by employees and abuse of corporate funds by management for personal use. Five people, including a senior vice-president and three project managers were allegedly terminated as a result.

Plaintiff claimed that in retaliation for her part in the investigation, she was stripped of her project specialist duties, and was told by management "you brought attention to yourself and you put yourself into this situation." Plaintiff said she remained de facto demoted during most of 2004 and all of 2005.

In September 2005, she was reportedly placed into a Traffic Specialist role full time, and worked in this role from September 2005 until her wrongful termination on Sept. 1, 2011. Plaintiff said she was improperly classified as salaried, as she was not part of the management team and could not make decisions independent of management directions. Plaintiff claimed she was required to be on-call 24-hours a day for one week every six weeks. According to plaintiff, she was not paid overtime, and her complaints to defendants were not addressed. Plaintiff also claimed she was required to pay for a land line and internet access at home in order to be on-call, and defendants refused to reimburse her for that expense.

Defendants reportedly hired a new employee in early 2008, and plaintiff said the practice of favoritism began again when a new employee, a younger female, was hired. Also in 2008, plaintiff was diagnosed with Central Serous Retinopathy, an eye disease that caused severe visual impairment. When plaintiff requested an accommodation in 2011, defendants reportedly retaliated against her by giving her a verbal warning that her job performance was not up to its usual standards and giving her a mid-year review in which her supervisors inappropriately stated she continued to make errors even after being given a different work load.

Plaintiff was eventually terminated.

Plaintiff alleged disability discrimination, failure to accommodate, failure to engage in the interactive process, retaliation, failure to prevent discrimination and retaliation, age discrimination, and wrongful termination.

Defendants contended plaintiff made frequent and repeated errors and caused on-air broadcast outages, and she continued to have performance problems despite numerous warnings and accommodations. Defendant argued plaintiff was terminated for legitimate, non-discriminatory and non-retaliatory reasons and argued it engaged in an interactive process with plaintiff and provided requested accommodations.

**Salinda vs. DIRECTV Inc., 45 Trials Digest 16th 9 (2013)**

**CLAIMED INJURIES**
  NA

**CLAIMED DAMAGES**
  According to court records:
  Not reported.

**SETTLEMENT DISCUSSIONS**
According to court records:

Not reported.

**COMMENTS**
According to court records:

The complaint was filed Dec. 30, 2011.

Trials Digest, A Thomson Reuters/West business
Los Angeles County Superior Court/Downtown

---

**End of Document**                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Bisharat vs. Los Angeles Unified School District, 13 Trials Digest 16th 10 (2013)

13 Trials Digest 16th 10, 2013 WL 1415554 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
Superior Court, Los Angeles County, California.

Bisharat vs. Los Angeles Unified School District

**TOPIC:**
Synopsis: Teacher claims school district failed to accommodate disability, forced early retirement

Case Type: Labor & Employment; Discrimination; Labor & Employment; Disability/Medical Condition; Labor & Employment; Termination/Constructive Discharge; Labor & Employment; Violation of Public Policy

DOCKET NUMBER: BC458496

STATE: California
COUNTY: Los Angeles

Verdict/Judgment Date: February 15, 2013

JUDGE: Ronald M. Sohigian
**ATTORNEYS:**
Plaintiff: Ellen E. Cohen, Law Offices of Joseph M. Lovretovich, Woodland Hills; Paul M. Gleason, Gleason & Favarote, Los Angeles; Victoria N. Jalili, Law Offices of Joseph M. Lovretovich, Woodland Hills; Joseph M. Lovretovich, Law Offices of Joseph M. Lovretovich, Woodland Hills; Janet S. Yavrouian, Gleason & Favarote, Los Angeles.
Defendant: Charlie L. Hill, Office of General Counsel, Los Angeles; Linda Hurevitz, Ballard, Rosenberg, Golper & Savitt, Glendale; Linda Miller Savitt, Ballard, Rosenberg, Golper & Savitt, Glendale.

**SUMMARY:**
Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $473,750

Range: $200,000-499,999
$138,585 to plaintiff for past lost earnings; $328,165 to plaintiff for future lost earnings; $7,000 to plaintiff for past emotional distress.

Trial Type: Jury

Deliberations: Not reported.

Jury Poll: Not reported.

**EXPERTS:**
Plaintiff: Not reported.

Bisharat vs. Los Angeles Unified School District, 13 Trials Digest 16th 10 (2013)

Defendant: Not reported.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**

According to court records: Plaintiff Ghassan Bisharat was hired as a teacher for defendant Los Angeles Unified School District in 1983. Throughout plaintiff's employment, he reportedly worked at schools considered to be in violent neighborhoods, and students physically attacked plaintiff on several occasions.

On Feb. 5, 2008, plaintiff was assaulted by a student while reviewing final grades with a group of senior students. A male student reportedly jumped up, began screaming and cursing, and threatened plaintiff to "watch his back." The student then threw various school supplies at plaintiff's face. At the same time, another student reportedly lunged at plaintiff intending to strike him in the face, but she was pulled away before she was able to strike plaintiff. As she was being pulled away she told plaintiff she would burn him alive in his car. Plaintiff filed a written report detailing the incident, and around 3:00 p.m. police arrived and advised plaintiff to leave the school using the side door to avoid running into the students who had assaulted him.

On Feb. 21, 2008, the student who had threatened plaintiff confronted him again. Plaintiff said he began to suffer an extreme panic attack and believed the student wanted to kill him. Plaintiff said he also thought he was having a heart attack. Plaintiff was ultimately put on disability leave.

While out on disability leave plaintiff's doctor advised plaintiff that he could not return to work in any classroom and defendant would need to find him a position outside of the classroom. Plaintiff claimed he had previously done work for defendant outside the classroom including research and publishing research. Plaintiff claimed defendant refused to place plaintiff in a position outside the classroom and told him he had to appeal to a committee if he wanted an alternative position. Plaintiff said the committee denied plaintiff's request and told him his only option was to take early retirement if he wanted to maintain any of his benefits. Plaintiff said that because he was left with no income and the possibility of no benefits, he was forced to file for retirement April 1, 2009. Plaintiff said that at that time, he was four years away from obtaining full retirement benefits and because he was forced to take early retirement he was receiving only a portion of the benefits he would have been entitled to had he been able to continue working.

Plaintiff alleged disability discrimination, failure to prevent discrimination, failure to accommodate a disability, failure to engage in the interactive process and constructive termination in violation of the Fair Employment and Housing Act, Cal. Gov't Code §§ 12940 et seq., and violations of public policy.

Defendant denied liability and contended plaintiff could not perform the essential functions of his job with or without accommodation. Defendants further contended plaintiff's doctor never provided a letter stating that plaintiff could return to work in any classroom setting.

**CLAIMED INJURIES**

According to court records:
Emotional distress.

**CLAIMED DAMAGES**

According to court records:
Not reported.

**SETTLEMENT DISCUSSIONS**

**Bisharat vs. Los Angeles Unified School District, 13 Trials Digest 16th 10 (2013)**

According to court records:

Not reported.

**COMMENTS**
According to court records:

The complaint was filed March 30, 2011.

Trials Digest, A Thomson Reuters/West business
Los Angeles County Superior Court/Downtown

---

   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Izaguirre vs. International Coffee & Tea LLC, 50 Trials Digest 16th 13 (2013)

50 Trials Digest 16th 13, 2013 WL 6624243 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
Superior Court, Los Angeles County, California.

Izaguirre vs. International Coffee & Tea LLC

**TOPIC:**
Synopsis: Injured barista claims employer failed to provide reasonable accommodation

Case Type: Labor & Employment; Discrimination; Labor & Employment; Disability/Medical Condition; Labor & Employment; Retaliation; Labor & Employment; Termination/Constructive Discharge; Labor & Employment; Family & Medical Leave

DOCKET NUMBER: BC486877

STATE: California
COUNTY: Los Angeles

Verdict/Judgment Date: September 26, 2013

JUDGE: Terry A. Green
**ATTORNEYS:**
Plaintiff: Jordan D. Bello, Lavi & Ebrahimian, Beverly Hills; N. Nick Ebrahimian, Lavi & Ebrahimian, Beverly Hills; Helen U. Kim, deRubertis Law Firm, Studio City; David M. deRubertis, deRubertis Law Firm, Studio City.
Defendant: Keith A. Jacoby, Littler Mendelson, Los Angeles; Elizabeth Nguyen, Littler Mendelson, Los Angeles.

**SUMMARY:**
Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $125,000

Range: $100,000-199,999
$40,000 to plaintiff for past economic damages

$80,000 to plaintiff for past noneconomic damages

$5,000 to plaintiff for future noneconomic damages

Trial Type: Jury

Deliberations: Not reported.

Jury Poll: Not reported.

**EXPERTS:**

Plaintiff: Not reported.
Defendant: Not reported.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**
According to court records: Plaintiff Martha Izaguirre worked as a barista for defendants International Coffee & Tea LLC and The Coffee Bean & Tea Leaf. On April 11, 2010, plaintiff fractured her wrist in a car accident. Plaintiff took a leave of absence from work to have treatment, including surgery performed April 20, 2012.
On June 14, 2010, plaintiff's doctor extended her leave until July 12, 2010. Plaintiff claimed that on July 8, 2010, defendants told her that her 12 weeks of FMLA leave had expired and she was required to contact her manager "within the next 24 hours to schedule [her] return to work to avoid termination." Plaintiff claimed defendants also told her to provide a doctor's note upon her return to work releasing her either with or without restrictions. Plaintiff claimed she went to her doctor and obtained a medical note allowing her to return to work with mild restrictions on the use of her hand for four weeks.
Plaintiff claimed that a few hours into her shift on her first day back at work, defendant's human resources department called and told her she could not continue working with the work restrictions provided by her doctor and that she needed to either get a doctor's note revoking the work restrictions or she would be terminated.
On July 19, 2010, defendants reportedly terminated plaintiff's employment.
Plaintiff alleged failure to provide reasonable accommodation, failure to engage in the interactive process, disability discrimination, retaliation and wrongful termination.
Defendant denied liability and contended accommodating plaintiff's condition created an undue hardship.

**CLAIMED INJURIES**
NA

**CLAIMED DAMAGES**
According to court records:
Not reported.

**SETTLEMENT DISCUSSIONS**
According to court records:

Not reported.

**COMMENTS**
According to court records:

The complaint was filed July 10, 2012.

Trials Digest, A Thomson Reuters/West business
Los Angeles County Superior Court/Downtown

**Izaguirre vs. International Coffee & Tea LLC, 50 Trials Digest 16th 13 (2013)**

**End of Document**                                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**Kivman vs. Worldwide Aeros Corp., 26 Trials Digest 16th 12 (2013)**

26 Trials Digest 16th 12, 2013 WL 3340152 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
Superior Court, Los Angeles County, California.

Kivman vs. Worldwide Aeros Corp.

**TOPIC:**
Synopsis: Disabled employee claims employer failed to accommodate work restrictions

Case Type: Labor & Employment; Discrimination; Labor & Employment; Disability/Medical Condition; Labor & Employment; Termination/Constructive Discharge

DOCKET NUMBER: BC483187

STATE: California
COUNTY: Los Angeles

Verdict/Judgment Date: April 25, 2013

JUDGE: Victor E. Chavez
**ATTORNEYS:**
Plaintiff: Navid Soleymani, Yadegar, Minoofar & Soleymani, Los Angeles; Navid Yadegar, Yadegar, Minoofar & Soleymani, Los Angeles.
Defendant: Grigor Aslanian, Russakow, Greene & Tan, Pasadena; Mark L. Russakow, Russakow, Greene & Tan, Pasadena; Lisa Tan, Russakow, Greene & Tan, Pasadena.

**SUMMARY:**
Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $486,511

Range: $200,000-499,999
$80,505 to plaintiff for past lost earnings

$53,834 to plaintiff for future lost earnings

$4,392 to plaintiff for past medical expenses

$13,780 to plaintiff for future medical expenses

$50,000 to plaintiff for past physical pain

$25,000 to plaintiff for future physical pain

$50,000 to plaintiff for past mental suffering/emotional distress

$25,000 to plaintiff for future mental suffering/emotional distress

$50,000 to plaintiff for past loss of enjoyment of life

$25,000 to plaintiff for future loss of enjoyment of life

$50,000 to plaintiff for past anxiety

$25,000 to plaintiff for future anxiety

$14,500 to plaintiff for past humiliation

$5,000 to plaintiff for future humiliation

$14,500 to plaintiff for past damage to reputation

The total award listed on the special verdict form was $482,511.

Trial Type: Jury

Deliberations: Not reported.

Jury Poll: Not reported.


**EXPERTS:**
Plaintiff: Not reported.
Defendant: Not reported.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**
According to court records: Plaintiff Arkady Kivman began working for defendants Worldwide Aeros Corp. and Aeros Aeronautical Systems Corp. in May 2006. In 2007, plaintiff reportedly suffered a back injury, which required him to have surgery, and was off work for four months. Plaintiff claimed that when he returned to work, he notified defendant that his doctors had restricted him from lifting anything heavier than 15 pounds. Plaintiff claimed defendants ignored the restrictions and failed to accommodate his disability by requiring him to lift heavy objects and otherwise engage in strenuous activities.
In 2010, plaintiff suffered another injury, which required him to be off work again, and his doctors again restricted him from lifting heavy objects. Plaintiff claimed he notified defendants of his work restrictions but defendant ignored his requests for accommodation.
In late June or early July 2011, plaintiff again injured his back and shoulder. He said he attempted to work through the pain. On July 14, 2011, while plaintiff was building wooden tables for defendants, defendant's representative asked him to lift certain heavy objects. Plaintiff said he complained about his injury and said he could not comply with the request because he had too much pain. The representative reportedly left in anger and returned a few minutes later and terminated plaintiff.

Plaintiff alleged disability discrimination, failure to accommodate a disability and wrongful termination.

Defendants denied liability and contended plaintiff never gave them notice of his work restrictions. Defendants contended plaintiff's termination was not based on his alleged disability but rather on poor performance. Defendant claimed that upon observing plaintiff wearing a back brace after his 2007 injury, defendants accommodated plaintiff by assigning lighter tasks, but after transferring him to numerous departments and jobs within the company and a number of costly mistakes, defendants assigned plaintiff as a security guard for an empty airplane hangar. Defendant contended that when the security guard position was no longer needed, they tried to assign plaintiff other tasks but plaintiff refused.

## CLAIMED INJURIES
NA

## CLAIMED DAMAGES
According to court records:
Not reported.

## SETTLEMENT DISCUSSIONS
According to court records:

Not reported.

## COMMENTS
According to court records:

The complaint was filed April 19, 2012.

Trials Digest, A Thomson Reuters/West business
Los Angeles County Superior Court/Downtown

---

**End of Document**        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

27 Trials Digest 16th 14, 2013 WL 3340512 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
Superior Court, Los Angeles County, California.

Jolly vs. City of Long Beach

**TOPIC:**
Synopsis: Former city employee claims discrimination, hostile work environment

Case Type: Labor & Employment; Discrimination; Labor & Employment; Age; Labor & Employment; Disability/ Medical Condition; Labor & Employment; Harassment-General; Labor & Employment; Retaliation; Labor & Employment; Termination/Constructive Discharge

DOCKET NUMBER: BC453032

STATE: California
COUNTY: Los Angeles

Verdict/Judgment Date: May 16, 2013

JUDGE: Terry A. Green
**ATTORNEYS:**
Plaintiff: J. Bernard Alexander III, Alexander, Krakow & Glick, Santa Monica; Tracy L. Fehr, Alexander, Krakow & Glick, Santa Monica.
Defendant: Lisa Bond, Richards, Watson & Gershon, Los Angeles; Robert E. Shannon, Office of City Attorney, Long Beach; Barry M. Meyers, Office of City Attorney, Long Beach.

**SUMMARY:**
Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $325,000

Range: $200,000-499,999
$250,000 to plaintiff for past lost earnings

$75,000 to plaintiff for past noneconomic damages

Trial Type: Jury

Deliberations: Not reported.

Jury Poll: Not reported.

**EXPERTS:**
Plaintiff: Not reported.

Defendant: Not reported.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**

According to court records: Plaintiff Gerald Jolly worked for defendant city of Long Beach for almost nine years and last held the position of Information Systems Analyst. Plaintiff said that up until August 2008, he had received a series of favorable reviews and had never been disciplined or reprimanded.

On Aug. 5, 2008, plaintiff received a negative performance evaluation from the Technology Services Officer, defendant Jeanne Takano, and new manager Jack Cuilla. Plaintiff said that although Cuilla had only supervised plaintiff for one year, Cuilla issued an evaluation that purported to address a four-year period dating back to 2004 and that included no input from plaintiff's previous supervisor from that time period. Plaintiff claimed he was the only employee to have received a performance evaluation encompassing four years.

Plaintiff said that prior to September 2008, he had 35 years' experience as a mainframe information systems analyst. In September 2008, at age 57, plaintiff was reassigned to work on a new operating system with which he had no previous experience. Plaintiff requested assignment to one of two available mainframe positions, but was reportedly denied by Takano. Plaintiff claimed that after he left the department, Takano assigned two employees from his team to work in the mainframe system area.

Plaintiff said that at the direction of Takano, plaintiff's supervisor, Michelle Kimura, informed plaintiff he was expected to "master" the new Hansen system, without training or guidance. Plaintiff said that while a rapid learning curve for the Hansen system would be two to three months, he was given four days of training sessions that were completely unrelated to the Hansen system to which he had been assigned. Plaintiff said that when he asked his supervisors questions about the system, he was belittled in his efforts to learn the system and his inquiries were deflected or went unanswered.

Plaintiff said that although he was a member of a group that was expected to work as a team, plaintiff was excluded from attending or participating in staff or team meetings. Plaintiff claimed he was micro-managed and required to account for his whereabouts at every moment. Plaintiff said he was the only employee required to leave a note at his desk notifying employees of his whereabouts for every time he left his desk, including trips to the restroom. Plaintiff claimed he was subjected to disparaging and unprofessional remarks by his supervisors. Plaintiff said he complained about the hostile work environment to both Kimura and Takano, but his complaints went unaddressed. Plaintiff claimed that in response to his complaints, defendants retaliated against him by attacking his work and requiring and soliciting the assistance of plaintiff's supervisor and his coworkers to harass him. Plaintiff said that Takano labeled him a "special project" and specifically instructed Kimura that regardless of plaintiff's efforts, he had to fail.

In addition, plaintiff claimed defendants harassed him based on his disabilities. Plaintiff said he often spoke in a loud voice due to his hearing loss. Takano and Kimura reportedly chastised plaintiff for speaking in a "loud voice" and purposefully mischaracterized his elevated speech as a temper tantrum and reprimanded him. Further, plaintiff said he suffered from high stress and defendants purposefully scheduled meetings with plaintiff several weeks in advance in order to create additional stress for plaintiff. Plaintiff said that within months of working with Takano and Kimura he experienced high blood pressure, severe leg cramps, stress, anxiety, irritability and sleeplessness.

On June 19, 2009, plaintiff took a medical leave of absence due to the allegedly hostile work environment. Plaintiff resigned in late July 2009.

Plaintiff alleged discrimination based on disability and age, harassment, retaliation, failure to engage in the interactive process, failure to prevent discrimination and harassment, and constructive discharge.

Defendant denied liability.

Jolly vs. City of Long Beach, 27 Trials Digest 16th 14 (2013)

**CLAIMED INJURIES**
  NA

**CLAIMED DAMAGES**
  According to court records:
  Not reported.

**SETTLEMENT DISCUSSIONS**
According to court records:

Not reported.

**COMMENTS**
According to court records:

The complaint was filed Jan. 12, 2011.

Trials Digest, A Thomson Reuters/West business
Los Angeles County Superior Court/Downtown

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

33 Trials Digest 15th 18, 2012 WL 3541952 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
Superior Court, Los Angeles County, California.

Palma vs. Rite Aid Corporation

**TOPIC:**

Synopsis: Rite Aid accused of disability discrimination

Case Type: Labor & Employment; Discrimination; Labor & Employment; Disability/Medical Condition; Labor & Employment; Gender; Labor & Employment; Harassment-General; Intentional Torts; Infliction of Emotional Distress

DOCKET NUMBER: BC465411

STATE: California
COUNTY: Los Angeles

Verdict/Judgment Date: July 24, 2012

JUDGE: Michael L. Stern
**ATTORNEYS:**
Plaintiff: Carney R. Shegerian, Shegerian & Associates, Santa Monica; James Urbanic, Shegerian & Associates, Santa Monica.
Defendant: Sandra R. King, Manatt, Phelps & Phillips, Los Angeles; Alison S. White, Manatt, Phelps & Phillips, Los Angeles.

**SUMMARY:**
Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $3,522,070

Range: $2,000,000-4,999,999
$81,319 past economic loss; $440,751 future economic loss; $1,500,000 past non-economic loss; $1,500,000 future non-economic loss against defendant Rite Aid. The jury declined to award punitive damages.

Trial Type: Jury

Deliberations: Not reported.

Jury Poll: Not reported.

**EXPERTS:**
Plaintiff: Not reported.
Defendant: Not reported.

**TEXT:**

Palma vs. Rite Aid Corporation, 33 Trials Digest 15th 18 (2012)

**CASE INFORMATION**

**FACTS/CONTENTIONS**

According to court records: Plaintiff Martha Palma, a 46-year-old woman, was a store manager who got multiple promotions over 24 years with defendant Rite Aid Corp. Plaintiff said she began experiencing arthritic symptoms in 2008, and by 2010 her illness escalated to an aggressive form of rheumatoid arthritis. Plaintiff had difficulty walking, bending, lifting and using her hands.

In September 2010 defendant Jilbert Shahdaryan, a 30-year-old man, became plaintiff's district manager. Plaintiff claimed defendant Shahdaryan began to ridicule her, calling her "slow" and "lazy." Plaintiff said she took two medical leaves in six months, and defendant Shahdaryan asked her "Did you do this on purpose? Did you plan this?"

Plaintiff alleged defendant Shahdaryan gave her written warnings after she returned from leave and forced her to submit to repeated store inspections, trying to create a pretext to fire her. She was eventually suspended and fired for pretextual reasons, she claimed, after defendant Shahdaryan accused her of having employees work off the clock, an accusation plaintiff denied.

Plaintiff alleged gender, disability and medical leave termination and alleged harassment and infliction of emotional distress.

Defendant contended plaintiff was terminated because she required employees to work off the clock.


**CLAIMED INJURIES**

According to court records:
Emotional distress.


**CLAIMED DAMAGES**

According to court records:
Not reported.


**SETTLEMENT DISCUSSIONS**

According to court records:

Not reported.


**COMMENTS**

According to court records:

The complaint was filed July 14, 2001.


Trials Digest, A Thomson Reuters/West business
Los Angeles County Superior Court/Downtown

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

JVR No. 1203190009, 2012 WL 933613 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
Superior Court, Orange County, California.

SUN v. TRANSIT AIR CARGO INC.

30-2011-00446922
DATE OF INCIDENT: June 30, 2010
DATE OF FILING: February 02, 2011
DATE OF TRIAL: March 18, 2012

TOPIC:


**SUMMARY**
**Outcome: Plaintiff Verdict**
**Total Verdict: $175,000**
**Judge Reduced Award To:**
**Final Demand: $140,000**
**Final Offer: $5000**
HIGH AMOUNT: $0

LOW AMOUNT: $0


**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Brian J. Mankin, Riverside, CA
Defendant: Nicholas D. Mosich, Costa Mesa, CA

JUDGE: Barbara Tam Nomoto Schumann

RANGE AMOUNT: $100,000 - 199,999
STATE: California
COUNTY: Orange

**SUMMARY**
**PLAINTIFF:**
Sex: Female

Age: Adult

General Occupation: General Laborer


**DECEDENT:**
Other Expenses: $0

SUN v. TRANSIT AIR CARGO INC., JVR No. 1203190009 (2012)

**DEFENDANT:**
Sex: Organization

Organization Type: Transit Air Cargo Inc.

Policy Limit:

**ENTITY TYPE: General Business Entity**
Claimed Past Wages: $40,000

**DAMAGES:**
Compensatory Past Medical Award: $0

Compensatory Future Medical Award: $0

Compensatory Past Wages Award: $41,125

Compensatory Future Wages Award: $0

Compensatory Pain And Suffering Award: $0

Other Compensatory Award: $120,959

Total Compensatory Award: $175,000

Punitive Damages: $0

Hedonic Damages: $0

Property Damages: $0

Other Damages: $0

Interest: $0

Loss of Service: $0

**ADVERSE ACTION**
Closer Supervision: false

Constructive Discharge: false

Demotion: false

SUN v. TRANSIT AIR CARGO INC., JVR No. 1203190009 (2012)

Denial Tenure: false

Failure Accomodate: true

Failure Grant Leave: true

Failure Hire: false

Failure Promote: false

Suspension: false

Sexual Harassment: false

Harassment: false

Hostile Work Env: false

Isolation: false

Lay Off: false

Loss Benefits: false

Loss Pay: false

Loss Seniority: false

Negative Eval: false

Negative Reference: false

Pay Increase Denial: false

Reassignment: false

Reduction Pay: false

Reprimands: false

Restrictions: false

Termination: true

**STATUTES**

SUN v. TRANSIT AIR CARGO INC., JVR No. 1203190009 (2012)

**Primary Specific Statute**
Primary Name: ADA/ADAAA


**Primary General Statute**
**Primary Name: Disability Discrimination**
Primary general Statute Discrimination: true


**Specific Statute: General**
**General Statute: Wrongful Termination**
General Statute Discrimination: false

Comparative Negligence Percentage: 0


**FACTS:**

The plaintiff, May Sun, sued Transit Air Cargo Inc. for disability discrimination and wrongful termination. The plaintiff contended that the defendant discriminated against her based on her physical disability, failed to accommodate her request for medical leave, and that this was in non-compliance with the California Family Rights Act, which grants eligible employees a total of 12 work weeks of unpaid leave during a 12 month period for serious health condition. She asserted that she was also wrongfully terminated from her employment only one day after she requested medical leave, and that Transit Air Cargo acted with malice and indifference to her federally protected rights under the Americans with Disabilities Act. Transit Air Cargo denied the allegations and contended that it had a plan in place to discharge the plaintiff from her employment prior to her request for medical leave, and that its decision to terminate her was not due to any discriminatory reasons based on her disability, but out of the necessity for a reduction in the workforce, and because of issues with her performance.


Jury Verdict Research
COURT: Superior

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Dickinson vs. Allstate Insurance Company, 38 Trials Digest 14th 8 (2011)

38 Trials Digest 14th 8, 2011 WL 4048838 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
Superior Court, Orange County, California.

Dickinson vs. Allstate Insurance Company

**TOPIC:**

Synopsis: Adjuster fired after stroke alleges discrimination

Case Type: Labor & Employment; Disability/Medical Condition; Labor & Employment; Discrimination; Labor & Employment; Termination/Constructive Discharge; Defamation; Libel; Labor & Employment; Age

DOCKET NUMBER: 30200900310856

STATE: California
COUNTY: Orange

Verdict/Judgment Date: January 27, 2011

JUDGE: Jamoa Moberly
**ATTORNEYS:**
Plaintiff: Renuka V. Jain, Jain Law Firm, Santa Monica; Wendy Kontos, Parker Straus, Glendale.
Defendant: Lawrence J. Gartner, Ballard Spahr, Los Angeles; Isaac P. Hernandez, Ballard Spahr, Los Angeles; Naomi Young, Ballard Spahr, Los Angeles.

**SUMMARY:**
Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $341,322

Range: $200,000-499,999
$122,305 past lost earnings; $207,017 future lost earnings; $10,000 past emotional distress from defendant Allstate for disability discrimination. $1,000 past economic loss; $1,000 future economic loss from defendant Allstate. Plus $84,864 costs and $567,221 attorney fees.

Trial Type: Jury

**EXPERTS:**
Plaintiff: Andrew H. Woo, M.D., neurologist, Santa Monica, (310) 829-2126.
Defendant: Not reported.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**

According to court records: On May 12, 2009, plaintiff Eric Dickinson was terminated from his job as a staff adjuster after 25 years.

Plaintiff alleged defendant Allstate Insurance Company and Encompass Insurance Company engaged in discriminatory policies and practices which violated the Fair Employment and Housing Act.

Plaintiff said he suffered a heart attack and a severe stroke that left him paralyzed on the left side of his body. He was left with an impairment on the left side and slurred speech.

Plaintiff requested additional time to complete new training in 2005, but said his requests were rejected, and he received an unsatisfactory performance notification. Plaintiff was assigned an increased workload and expanded territory. Plaintiff said his requests for a decreased workload were denied.

According to plaintiff, Allstate claimed it fired him for incorrectly inputting customers' phone numbers. Plaintiff, 51, was replaced by a younger female.

Plaintiff alleged disability discrimination, wrongful termination, retaliation, failure to engage in interactive process, age discrimination, gender discrimination, wrongful harassment, breach of implied-in-fact contract, breach of implied covenant of good faith and fair dealing, intentional infliction of emotional distress, and defamation against his employers, defendant Allstate and its subsidiary Encompass, and his supervisor, Eric Jentgen.

Defendant contended that plaintiff altered customer phone numbers in order to avoid negative customer feedback.


**CLAIMED INJURIES**

According to court records:

Emotional distress.


**CLAIMED DAMAGES**

According to court records:

Not reported.


**SETTLEMENT DISCUSSIONS**

According to court records:


Not reported.


**COMMENTS**

According to court records:


The complaint was filed on October 13, 2009.


Trials Digest, A Thomson Reuters/West business
Orange County Superior Court

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

34 Trials Digest 14th 9, 2011 WL 3606913 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
Superior Court, Los Angeles County, California.

Betson vs. Rite Aid Corporation

**TOPIC:**
Synopsis: Employee alleges retaliatory discrimination

Case Type: Labor & Employment; Discrimination; Labor & Employment; Family & Medical Leave; Labor & Employment; Harassment-General; Labor & Employment; Disability/Medical Condition; Labor & Employment; Age; Defamation; Other

DOCKET NUMBER: BC427992

STATE: California
COUNTY: Los Angeles

Verdict/Judgment Date: May 27, 2011

JUDGE: Gregory W. Alarcon
**ATTORNEYS:**
Plaintiff: Donald Conway, Shegerian & Associates, Santa Monica; Carney R. Shegerian, Shegerian & Associates, Santa Monica.
Defendant: Glenn L. Briggs, Hodel Briggs Winter, Irvine; Theresa A. Kading, Hodel Briggs Winter, Irvine.

**SUMMARY:**
Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $500,000

Range: $500,000-999,999
$250,000 past non-economic loss; $250,000 future non-economic loss.

Trial Type: Jury

Deliberations: Not reported.

Jury Poll: Not reported.

**EXPERTS:**
Plaintiff: Not reported.
Defendant: Not reported.

**TEXT:**

Betson vs. Rite Aid Corporation, 34 Trials Digest 14th 9 (2011)

**CASE INFORMATION**

**FACTS/CONTENTIONS**

According to court records: Plaintiff Doreen Betson, age 46, was employed by defendant Rite Aid Corporation for 21.5 years in defendant's Beverly Hills store. On February 11, 2008, plaintiff injured her knee at work when she slipped and fell. She was on medical leave until December 16, 2008. At one point after she returned to work, she was told that she could not come to work with a "bad look" on her face, i.e., looking as if she were in pain. On other occasions, she was called "stupid," was told that "her bones were too old," "maybe it's time to retire," "you need to retire," "you are too old to work retail," "perhaps you need a cane at your age," "these disability claims cost me money," "nobody missed you while you were on disability leave," and similar other comments.

On January 6, 2009, security representative Jeffrey Storm terminated plaintiff's employment, allegedly because she issued a customer refund when the customer was not present and without a receipt. Plaintiff alleged that everyone knew such refunds were allowed and that more than once she had been asked by defendant to issue such refunds. Plaintiff met with defendant's human resources manager and her union representative, but received no help. Defendant did not issue plaintiff's final paycheck until two weeks after her employment was terminated, and the check did not include all of her accrued vacation time.

**CLAIMED INJURIES**

According to court records:

Emotional distress.

**CLAIMED DAMAGES**

According to court records:

Not reported.

**SETTLEMENT DISCUSSIONS**

According to court records:

Not reported.

**COMMENTS**

According to court records:

The complaint was filed on December 14, 2009.

Trials Digest, A Thomson Reuters/West business
Los Angeles County Superior Court/Downtown

---

End of Document                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

Ronald Vanderheiden v. City of Alameda, 2011 WL 1562075 (2011)

2011 WL 1562075 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 ALM Media Properties, LLC. All Rights Reserved
Superior Court, Alameda County, California.

Ronald Vanderheiden v. City of Alameda

No. RG06 283619

DATE OF VERDICT/SETTLEMENT: March 23, 2011

TOPIC: EMPLOYMENT - CALIFORNIA'S FAIR EMPLOYMENT & HOUSING ACT - DISCRIMINATION - PERCEIVED DISABILITY - EMPLOYMENT - DISABILITY DISCRIMINATION

Terminated Firefighter Denied Being Mentally Unfit for Job

**SUMMARY:**
RESULT: Verdict-Plaintiff

Award Total: $680,182

The jury found in favor of Vanderheiden and awarded him $680,182 in economic damages. It awarded no emotional distress damages.

**EXPERT WITNESSES:**
Plaintiff: Margo R. Ogus, Ph.D.; Economics; Mountain View, CA Steven A. Harman; Human Resources Policies; Dublin, CA
Defendant: Mark D. Cohen, M.S.; Economics; Lafayette, CA Rhoma D. Young; Human Resources Policies; Oakland, CA

**ATTORNEYS:**
Plaintiff: Christopher E. Platten; Wylie, McBride, Jesinger, Platten & Renner; San Jose, CA (Ronald Vanderheiden);
Amy L. Sekany; Wylie, McBride, Platten & Renner; San Jose, CA (Ronald Vanderheiden, Ronald Vanderheiden)
Defendant: Ian P. Fellerman; Wiley Price & Radulovich, LLP; Alameda, CA (City of Alameda); Joan Pugh Newman; Wiley, Price & Radulovich, L.L.P.; Alameda, CA (City of Alameda)

JUDGE: Wynne S. Carvill

RANGE AMOUNT: $500,000-999,999
STATE: California
COUNTY: Alameda

**INJURIES: Vanderheiden sought recovery of economic damages for lost wages and pension, as well as significant non-economic emotional distress damages. After his termination, Vanderheiden started his own business providing instruction and certification in First Aid and CPR.**

**Facts:**

Ronald Vanderheiden v. City of Alameda, 2011 WL 1562075 (2011)

In April 2006, plaintiff Ronald Vanderheiden, 50, was terminated from his position as a firefighter for the city of Alameda. He had held the position for 14 years.

Vanderheiden sued the city for disability discrimination under California's Fair Employment and Housing Act, alleging he was terminated based on a perceived psychological disability. He claimed he was wrongfully terminated by the city on the ground that he was psychologically unable to perform as a member of a team with the Alameda Fire Department.

Vanderheiden contended that he had a sterling career as a firefighter with the city, and he contended the city was unable to cite a single instance wherein he was unable to execute his duties as a firefighter or emergency medical technician. Instead, Vanderheiden contended that the city relied on unverified complaints made by co-workers regarding his alleged "erratic behavior" in justifying a fitness for duty evaluation. He alleged that the co-workers' complaints were retaliation for his previously reporting alleged misconduct of a fellow firefighter to the police.

Vanderheiden claimed that the city knew it placed him into a potentially hostile work environment because he had filed the police report. He contended that the city ignored his complaints of retaliation, including alleged ostracism by fellow firefighters, purported destruction of his safety equipment and alleged threats to his physical safety.

The city stated that one of the primary bases for terminating Vanderheiden was a fitness for duty evaluation performed by a psychologist. The report deemed Vanderheiden psychologically incapable of performing as a member of a team with the Fire Department. However, plaintiffs' counsel argued that the city relied on the psychologist's evaluation despite reports from four other mental health professionals that indicated Vanderheiden was able to work.

Vanderheiden contended that the city refused to accept his pre-termination offer for an independent medical examination, and instead relied on the single opinion of the other psychologist.

The trial court held that under the standard of "objective reasonableness" only that information which the decision-maker had knowledge of prior to the termination was relevant. Therefore, the court excluded all expert testimony pertaining to the objective scientific and medical validity of the tests administered in the fitness for duty evaluation, as well as the underlying basis for each of the five professional opinions offered by Vanderheiden because none of that information was known by the fire chief at the time he terminated Vanderheiden.

The city contended that its decision to terminate Vanderheiden was reasonable because: 1) numerous employees personally observed Vanderheiden engage in erratic behavior (including getting dressed in his car, acting depressed, having mood swings, staring at other firefighters, calling in sick 160 hours during a four and a half month time period, sleeping at work in the morning, pacing the hallways, tape-recording conversations, crying and showing up unannounced at chiefs' homes); 2) Vanderheiden indicated that he was interested in obtaining an industrial disability retirement if he would receive his full salary; 3) two outside psychologists separately concluded that Vanderheiden was psychologically unable to work; 4) one of Vanderheiden's treating therapists repeatedly informed the City's Employee Assistance Program that Vanderheiden was unable to work; 5) the most recent performance evaluation by Vanderheiden's direct supervisor concluded that Vanderheiden had excessive problems in emotional self-control and interpersonal behavior; and 6) Vanderheiden failed to obtain any additional counseling or treatment after the second outside psychologist concluded that he was psychologically unable to work.

The defense noted that following his termination, Vanderheiden never applied for another firefighter position.

ALM Properties, Inc.

**Ronald Vanderheiden v. City of Alameda, 2011 WL 1562075 (2011)**

Superior Court of Alameda County, Oakland

PUBLISHED IN: VerdictSearch California Reporter Vol. 10, Issue 17

**End of Document**                                            © 2018 Thomson Reuters. No claim to original U.S. Government Works.

27 Trials Digest 14th 10, 2010 WL 6806990 (C.D.Cal.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
United States District Court, C.D. California, Western Division.

Peacock vs. Quest Diagnostics

**TOPIC:**

Synopsis: Employee alleges discriminatory termination in violation of CFRA

Case Type: Labor & Employment; Discrimination; Labor & Employment; Termination/Constructive Discharge; Labor & Employment; Violation of Public Policy; Labor & Employment; Family & Medical Leave; Labor & Employment; Disability/Medical Condition; Labor & Employment; Retaliation

DOCKET NUMBER: 09CV09206(JHN)

STATE: California
COUNTY: Not Applicable

Verdict/Judgment Date: December 15, 2010

JUDGE: Jacqueline H. Nguyen
**ATTORNEYS:**
Plaintiff: Christopher B. Adamson, Lavi & Ebrahimian, Los Angeles; Joseph Lavi, Lavi & Ebrahimian, Los Angeles.
Defendant: Deanna L. Ballesteros, Epstein, Becker & Green, Los Angeles; David Jacobs, Epstein, Becker & Green, Los Angeles.

**SUMMARY:**
Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $229,638

Range: $200,000-499,999
$71,138 past economic; $8,500 future economic; $150,000 past non-economic.

Trial Type: Jury

Deliberations: Not reported.

Jury Poll: Not reported.

**EXPERTS:**
Plaintiff: Not reported.
Defendant: Not reported.

**TEXT:**

## CASE INFORMATION

### FACTS/CONTENTIONS

According to court records: Plaintiff Janeen A. Peacock was an employee of defendant Quest Diagnostics, working as a Specimen Tech II from February 2003 until approximately January 16, 2008, when she was wrongfully terminated. In the later part of 2007, plaintiff's Manager and/or Supervisor, Raymond Candeleria, started causing plaintiff severe emotional distress and depression, which manifested itself in panic attacks which were witnessed by Candeleria. Plaintiff informed Candeleria that she had been under a lot of stress at work and that was the reason for her panic attacks, which, over the months, started to increase in frequency and/or duration.

In early January 2008, plaintiff had an outburst at work in front of Candeleria. Plaintiff started crying uncontrollably in front of Candeleria and told him that her outburst was due to severe distress at work.

On January 16, 2008, plaintiff checked herself into Northridge Hospital's Emergency Room due to severe depression. On January 17, 2008, plaintiff informed defendant's Human Resources that she had been admitted into hospital for severe depression and that she had been taken off work. Plaintiff was released on January 21, 2008 and was placed on disability by her treating physician until February 5, 2008. Upon release from the hospital, plaintiff informed defendant of her disability and mailed a copy of her doctor's note placing her off work and on disability.

On January 22, 2008, plaintiff contacted defendant's Benefit Department and informed them that she had to receive psychological treatment and group therapy from January 22, 2008 to February 1, 2008. She was informed that that was okay and that defendant would follow up with plaintiff in a few days.

On February 1, 2008, plaintiff was informed by her treating physician that her insurance had been canceled. Plaintiff contacted Human Resources to find out why and was told that they did not know why.

On February 1, 2008, plaintiff received a letter dated January 31, 2008, stating that defendant had terminated plaintiff's employment for job abandonment.

Plaintiff filed suit for Discriminatory Termination in Violation of the California Family Rights Act, California Government Code § 12945.2; Violation of the California Family Rights Act, California Government Code § 12945.2(a), Interfering with the Rights and Refusing an Employee's Request for a CFRA Medical Leave; Retaliatory Termination in Violation of the California Family Rights Act, California Government Code § 12945.2, for Requesting and Going on a Medical Leave; Tortious Termination and Discrimination in Violation of Public Policy; Disability Discrimination in Violation of FEHA; Discrimination Based on Perceived Disability in Violation of FEHA; Disability Discrimination in Violation of FEHA, Failure to Provide Reasonable Accommodation; Disability Discrimination in Violation of FEHA, Failure to Engage in Interactive Process; Retaliatory Termination in Violation of FEHA for Requesting a Reasonable Accommodation; Tortious Termination and Discrimination in Violation of Public Policy Based on FEHA; and Tortious Termination, Discrimination, and Failure to Hire in Violation of Public Policy for the Right to File a Workers' Compensation Claim due to Work Related Injury.

### CLAIMED INJURIES

NA

### CLAIMED DAMAGES

According to court records:

Not reported.

### SETTLEMENT DISCUSSIONS

According to court records:

**Peacock vs. Quest Diagnostics, 27 Trials Digest 14th 10 (2010)**

Not reported.

**COMMENTS**

According to court records:

The complaint was filed on October 29, 2009.

Trials Digest, A Thomson Reuters/West business
Central District Federal Court/Los Angeles

                        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 4111579 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 ALM Media Properties, LLC. All Rights Reserved
Superior Court, Contra Costa County, California.

Victoria Li v. Wyndham Vacation Ownership, Inc.; Wyndham Resorts
Development Corp. dba WorldMark By Wyndham; Trendwest Resorts, Inc.

No. C05-01991
DATE OF VERDICT/SETTLEMENT: September 15, 2010
TOPIC: EMPLOYMENT - GENDER DISCRIMINATION - EMPLOYMENT - DISABILITY DISCRIMINATION
- INTENTIONAL TORTS - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS - EMPLOYMENT -
RETALIATION

Sales Manager Said Demotion Based on Gender, Medical Leave

**SUMMARY:**
RESULT: Verdict-Plaintiff

Award Total: $346,000

The jury found for the plaintiff and awarded her $346,000.

**EXPERT WITNESSES:**
Plaintiff: Paul A. Berg, Ph.D.; Psychology/Counseling; San Francisco, CA Robert B. Cottle, Ed.D.; Vocational
Rehabilitation; Oakland, CA Robert H. Wallace, C.P.A.; Economics; San Diego, CA
Defendant: Bernard S. Rappaport, M.D.; Psychiatry; Berkeley, CA
**ATTORNEYS:**
Plaintiff: J. Gary Gwilliam; Gwilliam, Inary, Chiosso, Cavalli & Brewer; Oakland, CA (Victoria Li); Jan C. Nielsen;
Law Offices of Jan C. Nielsen; Clayton, CA (Victoria Li, Victoria Li); Randall E. Strauss; Gwilliam, Ivary, Chiosso,
Cavalli & Brewer; Oakland, CA (Victoria Li)
Defendant: Robert S. Shwarts; Orrick, Herrington & Sutcliffe; San Francisco, CA (Trendwest Resorts, Inc., Wyndham
Resorts Development Corp. dba WorldMark By Wyndham, Wyndham Vacation Ownership, Inc.); Oswald B. Cousins;
Orrick Herrington & Sutcliffe LLP; San Francisco, CA (Trendwest Resorts, Inc., Wyndham Resorts Development Corp.
dba WorldMark By Wyndham, Wyndham Vacation Ownership, Inc.)

JUDGE: Barry P. Goode

RANGE AMOUNT: $200,000-499,999
STATE: California
COUNTY: Contra Costa

**INJURIES: Li was out of work for one year on disability before she obtained another job. She claimed she suffered severe
emotional distress from the denials of promotions and demotion following her first medical leave. With denials of promotions
taken into account, her damages potentially increased to $1 million or more.**

**Facts:**

In 1995, plaintiff Victoria Li began working as a timeshare salesperson for Wyndham Vacation Ownership Inc. She claimed that she worked hard and was eventually promoted to sales manager. She applied for jobs as project director in 2004 and 2005, but claimed that repeatedly, the Northern California region's Vice Presidents Kevin Fiore, Carter Lee and Jeff Peterson filled the jobs with men instead. She also claimed that Lee announced at a meeting that any employee who goes out on disability leave would not have any future at Wyndham and wouldn't be promoted.

In March 2005, Li went out on a medical leave. When she returned, she was demoted, and replaced in her sales manager job by a man. She then went on disability leave, and eventually resigned.

Li sued Wyndham Vacation Ownership, Wyndham Resorts Development Corp. (doing business as WorldMark By Wyndham) and Trendwest Resorts Inc., alleging gender discrimination, disability discrimination, retaliation and intentional infliction of emotional distress. A harassment claim was dismissed on summary adjudication.

According to the plaintiff's counsel, at trial, witnesses testified that Lee and Fiore used profane and derogatory terms to refer to women. Peterson allegedly told a witness, referring to Li, that he "had to get rid of the bitch," and that he brought in "a great bunch of guys."

The defendants claimed that Li was not promoted, and demoted, because of the San Francisco store's poor performance. They argued that she could have accepted the demotion and made more money in another office.

The case was originally combined with a second case, Steve Wiley v. Wyndham Vacation Ownership Inc. (VerdictSearch case number 170029); however, the cases were separated after the defendants' motion. The Wiley case was tried last year, and resulted in a $1 million verdict plus $1,029,000 in attorney fees.

ALM Properties, Inc.
Superior Court of Contra Costa County, Contra Costa

PUBLISHED IN: VerdictSearch California Reporter Vol. 9, Issue 41

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Larkin Landau v. County of Riverside, a governmental entity, 2010 WL 1648442 (2010)

2010 WL 1648442 (C.D.Cal.) (Verdict and Settlement Summary)

Copyright (c) 2018 ALM Media Properties, LLC. All Rights Reserved
United States District Court, C.D. California, Western Division.

Larkin Landau v. County of Riverside, a governmental entity

No. 2:07-cv-06807-DSF-OP

DATE OF VERDICT/SETTLEMENT: February 12, 2010

TOPIC: EMPLOYMENT - DISABILITY DISCRIMINATION - EMPLOYMENT - FAILURE TO ACCOMMODATE - EMPLOYMENT - WRONGFUL TERMINATION - DISCRIMINATION - ADA - EMPLOYMENT - FMLA - EMPLOYMENT - WAGES AND HOURS - EMPLOYMENT - COMPENSATION

County Failed to Accommodate Disabilities, Fired Plaintiff Alleged

**SUMMARY:**

RESULT: Verdict-Plaintiff

Award Total: $1,033,500

The jury found for Landau and awarded her $1,033,500.

**EXPERT WITNESSES:**

Plaintiff: Jay M. Finkelman, Ph.D.; Human Resources Policies; Alhambra, CA Stephanie Rizzardi, M.B.A.; Economics; Pasadena, CA

Defendant: Jubin Merati, Ph.D.; Economics; Los Angeles, CA Scott Barer; Human Resources Policies; Bell Canyon, CA

**ATTORNEYS:**

Plaintiff: Richard A. Love; Law Offices of Richard A. Love; Los Angeles, CA (Larkin Landau)

Defendant: Daniel K. Spradlin; Woodruff, Spradlin & Smart; Orange, CA (County of Riverside, County of Riverside); Caroline A. Byrne; Woodruff Spradlin & Smart; Costa Mesa, CA (County of Riverside)

JUDGE: Dale S. Fisher

RANGE AMOUNT: $1,000,000-1,999,999

STATE: California

COUNTY: Not Applicable

**INJURIES: Landau claimed economic damages related to losing a $90,000-a-year job. She also claimed damages for emotional distress.**

**Facts:**

On Jan. 5, 2007, plaintiff Larkin Landau, 53, was terminated from her redevelopment specialist job with the County of Riverside Housing Authority. She had worked for the agency for 12 years in its Indio office, where she directly supervised roughly 20 employees and worked an official schedule of nine hours per day, for nine days every two weeks, with every other Friday off.

In early 2006, Landau developed physical and psychological maladies, including severe tinnitus, headaches, pain and numbness on the left side of her face, severe anxiety with panic attacks and sporadic disorientation or dizziness when driving. Plaintiff's counsel claimed that Landau reported her symptoms and problems to her immediate supervisor and kept management abreast of her medical appointments and testing, which ultimately resulted in a June spinal tap, which left Landau with neurological damage and a limp in her left leg.

In August, the plaintiff began psychotherapy. She was referred for testing and was diagnosed with conversion disorder, severe anxiety and depression that September.

Landau continued to work until June 8, when she requested a review of her job duties and workload, which she believed were a major source of stress. Her supervisors denied that request. On July 11, Landau's supervisors informed her that she would be transferred for one year to the agency's Riverside office for training, which required her to drive 184 miles round trip from her house every workday. On July 17, Landau filed an internal complaint with the county for retaliation and disability discrimination which ultimately was denied. On July 26, she made a formal request through the county's disabilities office for a reasonable accommodation in her work conditions due to her physical and emotional problems. She claimed that she submitted the requested paperwork, which included an authorization for the county to talk to her doctors and obtain all her medical information.

On Aug. 1, Landau was placed off work by her family doctor, and the county placed her on leave as per the Family Medical Leave Act.

On Oct. 10, her FMLA leave expired.

Plaintiff's counsel argued that when Landau's FMLA leave expired in October, the county did not formally notify her of the expiration or the county option of an unpaid leave of absence (LOA) until Nov. 15.

Landau filled out and returned the LOA paperwork on Nov. 17, but the county claimed that it was inadequate due to a lack of unspecified medical documentation not requested in the LOA form and instructed her to contact the assistant director of the Housing Authority. The assistant director did not return Landau's telephone messages or respond to her Dec. 29 e-mail, which documented her medical history, identified all her doctors and authorized the county to contact them. Reportedly, the county ignored her LOA requests, and on Jan. 5, 2007, fired her for job abandonment.

Landau sued the county for disability discrimination, reasonable accommodation, retaliation under the Americans with Disabilities Act and FMLA and overtime compensation.

Plaintiff's counsel claimed that the county ignored eight separate requests by Landau -- from June 8, 2006, through her termination -- for a reasonable accommodation of her work schedule and work requirements, and for an LOA. In a roughly 2.5-year period, 16 LOA requests were submitted to the county, but Landau's request was the only one denied, plaintiff's counsel claimed.

At trial, Landau's supervisor admitted that, by June 8, 2006, she knew that Landau had an ADA physical disability, Landau's request for a job analysis was a request for accommodation, and that at that time the county was under an affirmative obligation to engage in the interactive process. The supervisor admitted in an Oct. 26, 2007, e-mail that the county had not responded to Landau's formal request for a reasonable accommodation through its disabilities department and that the county failed to introduce any evidence that Landau's requested accommodations would pose an undue hardship on the county, according to plaintiff's counsel.

Defense counsel argued that Landau was performing below standard in 2005 prior to her claims of any health problems. Rather than trying to improve her performance, Landau claimed that the Indio office where she worked had "too much work," according to the defense. The Indio office performed roughly 20 percent of the Housing Authority's work, yet Landau claimed that she had a higher volume of work than those at the Riverside office. In order to determine if the volume of work was too high, the county proposed a cross training rotation between the Indio and Riverside offices. Defense counsel argued that Landau did not want to perform the cross training because she claimed that it would cause a child care issue for her. At no time did Landau tell anyone it was because of health care problems, defense counsel contended. Landau had applied for a promotion to a deputy director position which would have required working in the Riverside office each day, defense counsel stated, but she didn't get the job.

The defense purported that Landau claimed health problems after she was told her work performance needed improvement and that the county was going to rotate the Riverside and Indio offices. The county provided Landau with every requested medical leave when it was supported by a doctor's note and at Landau's request, the defense claimed, and the scheduled rotation between the Riverside and Indio offices was postponed.

Via a letter dated Oct. 31, 2006, the county notified Landau that her LOA had expired on Oct. 10, 2006. The letter advised Landau that if she did not believe that she was medically able to return to work, she could request an official LOA. Landau was advised that she would have to prepare and submit a written request on a form supplied by the county, together with medical documentation supporting her request. But Landau did not submit the requested medical documentation, defense counsel purported. No medical practitioners seen by Landau advised the county that Landau was unable to return to work as of Oct. 15, 2006.

One doctor released Landau to work on Oct. 15, 2006, with no restrictions. Another doctor did not advise the county that Landau had any further disability. The defense alleged that Landau has the burden of proof with regard to being a "qualified individual with a disability," the availability of reasonable accommodation, and a nexus between some nefarious motive on the county's behalf and her automatic resignation, in the absence of a legitimate business purpose/ explanation for some automatic resignation, defense counsel claimed.

Defense counsel argued that the evidence at trial showed that, based on the information the county had in its possession as of January 2007, Landau had been released by her doctors to return to work; that Landau had already requested and had been granted three months of medical leave; and that according to the information provided to the county by her doctors, Landau was physically able to participate in the cross training in Riverside.

When Landau requested that her leave be extended beyond Oct. 15, 2006, the county asked for additional medical information, which the county had every right to do, defense counsel stated. Landau did not provide the requested medical information. Instead, she submitted her own subjective complaints and identified doctors from whom she hoped to get the requested information, defense counsel claimed.

Under these circumstances, Landau had the responsibility to respond as requested, to provide the required information or to appear for work, defense counsel claimed. Reportedly, she did none of these.

ALM Properties, Inc.
United States District Court, Central District, Los Angeles

PUBLISHED IN: VerdictSearch California Reporter Vol. 9, Issue 18

**Larkin Landau v. County of Riverside, a governmental entity, 2010 WL 1648442 (2010)**

**End of Document**                                © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Beverly Dodd v. Haight Brown & Bonesteel LLP, 2010 WL 4845803 (2010)

2010 WL 4845803 (Cal.Superior) (Verdict and Settlement Summary)

Copyright (c) 2018 ALM Media Properties, LLC. All Rights Reserved
Superior Court, Los Angeles County, California.

Beverly Dodd v. Haight Brown & Bonesteel LLP

No. BC413813
DATE OF VERDICT/SETTLEMENT: October 15, 2010
TOPIC: EMPLOYMENT - WRONGFUL TERMINATION - EMPLOYMENT - AGE DISCRIMINATION - EMPLOYMENT - DISABILITY DISCRIMINATION - EMPLOYMENT - FMLA

Suit: Secretary Terminated While Undergoing Cancer Treatment

**SUMMARY:**
RESULT: Verdict-Plaintiff

Award Total: $410,520

The jury found the defendant liable, and awarded Dodd $410,520 in damages for future lost earnings, including her life insurance policy. Dodd was not awarded damages for pain and suffering.

**EXPERT WITNESSES:**
Plaintiff: Flavio Marenco; Clinical Psychology; Los Angeles, CA Solomon Hamburg, M.D.; Oncology; Beverly Hills, CA
**ATTORNEYS:**
Plaintiff: Michael J. Procopio; Campion, Rodolff, Van Riper & Procopio; Santa Ana, CA (Beverly Dodd) Michael Louis Kelly; Kirtland & Packard; El Segundo, CA (Beverly Dodd)
Defendant: Linda Miller Savitt; Ballard, Rosenberg, Golper & Savitt, LLP; Glendale, CA (Haight Brown & Bonesteel LLP); Eric C. Schwettmann; Ballard, Rosenberg, Golper & Savitt; Glendale, CA (Haight Brown & Bonesteel LLP)

JUDGE: Joanne O'Donnell

RANGE AMOUNT: $200,000-499,999
STATE: California
COUNTY: Los Angeles

**INJURIES: Dodd asked the jury for $525,000 in damages for past and future lost earnings, as well $900,000 in damages for past pain and suffering and $900,000 for future pain and suffering.**

**Facts:**
On Nov. 14, 2008, plaintiff Beverly Dodd, 66, was terminated from her job as a legal secretary at the firm of Haight Brown & Bonesteel LLP, located in Los Angeles. Dodd, who had been employed at the firm for roughly 20 years, was on medical leave at the time as she received treatment for liver cancer.

Beverly Dodd v. Haight Brown & Bonesteel LLP, 2010 WL 4845803 (2010)

Dodd sued Haight Brown & Bonesteel, alleging she was wrongfully terminated due to her age, medical condition, disability and her high rate of compensation, in violation of Federal and State Law.

Dodd contended that at the time of her termination she had 10 days remaining on 12 weeks of unpaid leave under the Family Medical Leave Act, for treatment of her liver cancer. She claimed that she called the firm's human resources manager to request an additional three to six months of unpaid leave for further cancer treatment. She said she then received a Federal Express letter terminating her employment on Nov. 14, 2008, with her initial leave expiring on Nov. 24.

The law firm contended that Dodd was lawfully terminated as a result of her inability to come back to work after her FMLA leave period expired. It claimed it received a note from Dodd's doctor, which indicated that she would not be able to return after her leave since she had another six months of treatment left.

The law firm further contended that Dodd could not return in any capacity for at least a year given her physician's certifications. It also argued that Dodd did not request any reasonable accommodation and that it engaged in the interactive process to the fullest extent possible, given Dodd's refusal to allow all relevant information to be shared.

The defendant further contended that neither Dodd's age nor salary had any bearing on her termination.

She claimed she lost her annual salary of $70,000 and benefits, including a 3 percent of salary-per-year pension plan contribution, a life insurance policy, and medical insurance. She claimed that she planned to work full-time until age 70 and part-time until age 75. Dodd testified that she also suffered emotional distress as a result of her termination, and has been unable to find work thereafter.

Haight contended that Dodd's inability to work at the time her leave expired, and for at least a year after, precluded any award of damages to her. The defendant further contended that Dodd failed to mitigate her damages when she was allegedly able to return to work nearly 18 months later by seeking subsequent employment.

Insurer:

Underwriters at Lloyd's of London

ALM Properties, Inc.
Superior Court of Los Angeles County, Central

PUBLISHED IN: VerdictSearch California Reporter Vol. 9, Issue 46

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2404221 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 ALM Media Properties, LLC. All Rights Reserved
Superior Court, Los Angeles County, California.

Jeanette A. Ybarra v. Dacor Holdings Inc., Distinctive Appliance Inc. and Rene Castro

No. KC-054144

DATE OF VERDICT/SETTLEMENT: February 26, 2010

TOPIC: EMPLOYMENT - WRONGFUL TERMINATION - EMPLOYMENT - AGE DISCRIMINATION - EMPLOYMENT - DISABILITY DISCRIMINATION - INTENTIONAL TORTS - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Fired Pltf With Kidney Disease Alleged Age, Disability Bigotry

**SUMMARY:**

RESULT: Verdict-Plaintiff

Award Total: $615,236

The jury found disability discrimination. Ybarra dismissed her age discrimination claim, after the jury was locked 6-6 on the question.

Ybarra was awarded $615,236.

**EXPERT WITNESSES:**

Plaintiff: Anthony E. Reading, Ph.D.; Psychology/Counseling; Beverly Hills, CA Jenny McNulty; Economics; Los Angeles, CA

Defendant: Edward J. Workman, Ph.D.; Vocational Rehabilitation; San Clemente, CA Stuart Friedman, M.D.; Nephrology; Los Angeles, CA

**ATTORNEYS:**

Plaintiff: Charles T. Mathews; Charles T. Mathews & Associates; San Marino, CA (Jeanette A. Ybarra); Deane L. Shanander; Charles T. Mathews & Associates; San Marino, CA (Jeanette A. Ybarra)

Defendant: Michelle T. Harrington; Stone & Hiles; Los Angeles, CA (Dacor Holdings Inc., Rene Castro); Paula G. Tripp; Anderson, McPharlin & Conners; Los Angeles, CA (Dacor Holdings Inc., Rene Castro)

JUDGE: Robert A. Dukes

RANGE AMOUNT: $500,000-999,999

STATE: California

COUNTY: Los Angeles

**INJURIES: Ybarra claimed past and future lost earnings and benefits, insisting that she had difficulty finding a new job due to her age, medical condition and the current economical climate. Ybarra alleged that she had intended to work at Dacor until retirement.**

**Facts:**

In May 1991, plaintiff Jeanette Ybarra was hired by Dacor Holdings Inc. as a sales coordinator. She was then promoted to the position of inventory control coordinator, working at the company's distribution center in the City of Industry.

In 1996, Ybarra began dialysis treatment for a congenital kidney disease, which she administered to herself at work, two times a day. Approximately two years later, Ybarra developed a severe peritonitis and went off work for eight months. On her return, she began renal hemodialysis, which required her to come into work early three days a week.

In January 2008, Ybarra missed four weeks of work due to an infection. She claimed that before her infection, in late 2007, her supervisor, Rene Castro, began taking her job duties away from her. Ybarra also claimed that the company accumulated her missed time as negative 960 hours in sick days, which forced her to use vacation days.

On April 1, 2008, Ybarra was terminated as Castro informed that her position was being eliminated.

Ybarra sued Dacor and Castro, as well as Distinctive Appliance Inc., the holdings company that owned Dacor, alleging wrongful termination, disability discrimination, age discrimination and intentional infliction of emotional distress.

Distinctive was discontinued from the case prior to trial.

Ybarra claimed that her illness and age eventually led to her discharge. She asserted that Castro made efforts to exclude her from activity with younger coworkers and that his decision to take away her responsibilities was in response to her medical condition.

Ybarra further purported that the company was undergoing a change in health insurance coverage, and the new provider had increased rates for employees with pre-existing conditions. Ybarra alleged that all the combined factors led to her being the first Dacor employee to be laid off.

In regard to the age discrimination claim, she charged that the company fired several employees who were over the age of 40 while promoting younger individuals.

The defense responded that Ybarra was not fired due to her age or disability, and that she was just an unlucky employee in regard to company layoffs. The defendants further claimed that the plaintiff's performance was becoming weak, and her work wasn't timely enough, also contributing to her termination.

Ybarra countered that her performance didn't suffer as a result of her medical condition, and that her annual performance appraisals were always good. She contended that she received a score of 3 or 4 in her reviews, with 3 being deemed as "efficient" and 4 being "commendable."

Ybarra also sought past and future medical costs due to her affected coverage after termination. She additionally sought pain and suffering damages.

The defense contested Ybarra's damages, arguing that if she were awarded anything, it should be reduced due to her shortened life expectancy. Counsel contended that Ybarra should have been able to obtain a new job within a year of termination.

ALM Properties, Inc.
Superior Court of Los Angeles County, Pomona

PUBLISHED IN: VerdictSearch California Reporter Vol. 9, Issue 24

---

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 330252
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

Earnest J. MALONE, Plaintiff,

v.

John E. POTTER, Postmaster General, Defendant.

No. CV 07-05530 MMM (FFMx).
|
Jan. 15, 2010.

West KeySummary

**1**     **Civil Rights**
👉 Back Pay or Lost Earnings
**Civil Rights**
👉 Aggravation, Mitigation, or Reduction
of Loss

A former employee, impermissibly discriminated against because of his disabilities, was entitled to five years of front pay in the amount of $17,530.00. The employee testified that he intended to work until age 58, due to his health problems, and the uncertain future availability of work within his increasing physical restrictions. The evidence also indicated the employee had ample opportunity to mitigate his damages by obtaining a customer service job, and the annual loss over the front pay period was calculated as $3,506.00.

Cases that cite this headnote

**Attorneys and Law Firms**

Andrew M. Wyatt, Andrew M. Wyatt Law Offices, Woodland Hills, CA, for Plaintiff.

Gwendolyn Millicent Gamble, AUSA - Office of U.S Attorney, Los Angeles, CA, for Plaintiff/Defendant.

Keith M. Staub, Office of U.S Attorney, Lisa Klerman, Los Angeles, CA, for Defendant.

FINDINGS OF FACT AND CONCLUSIONS LAW

MARGARET M. MORROW, District Judge.

**\*1**  This action was tried to a jury on March 3 through 6, 2009. On March 10, 2009, the jury returned a verdict for plaintiff Earnest Malone on his claims for disability discrimination under the Rehabilitation Act and retaliation for protected activity in violation of Title VII. The jury awarded Malone $300,000 in damages for emotional distress. Malone's entitlement to the equitable remedies of back and front pay was tried to the court on July 21, 2009. Having considered the evidence, the arguments of counsel, and the record in this action, the court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

**I. FINDINGS OF FACT**

**A. Summary of Relevant Background Evidence Adduced During Jury Trial**

1. Malone's claims for disability discrimination under the Rehabilitation Act and retaliation for protected activity, i.e., filing EEOC complaints, were tried to the jury on March 3 through 6, 2009. As respects his Rehabilitation Act claim, Malone argued that his supervisor, Postmaster Tyrone Williams, failed reasonably to accommodate him and subjected him to adverse employment action on the basis of his disability when he changed his work assignments in 2007. Malone also argued that Postmaster McGee subjected him to adverse employment action on the basis of his disability when he transferred him to the Hub City Post Office in 2005. As respects his retaliation claim, Malone argued that his filing of EEOC complaints was a motivating factor behind these actions.[1]

2. Malone is 53 years old and has a twelfth grade education.[2] He began working at the Compton Post

Office as a letter carrier in 1978; that remained his official position through 2007. [3] Since 1999, he has filed at least ten employment discrimination claims against the Post Office. [4]

3. Malone injured his right thumb in 1994, and filed a worker's compensation claim as a result. He subsequently underwent an operation in which his right thumb joint was fused to his hand. [5]

4. Dr. Joan Wright, a hand surgeon, testified at trial regarding Malone's injuries. Wright first saw Malone on October 4, 1996. [6] Malone went to see Wright because he was concerned that a 25% impairment rating he had received on a worker's compensation claim was incorrect. [7] The percentage rating represents the degree to which the person is limited and is used to calculate a financial settlement. [8] Dr. Wright determined that Malone's rating was 31%. [9]

5. At the time he first saw Dr. Wright, Malone was experiencing pain in his right hand due to the prior operation. The pain primarily occurred when Malone attempted to pinch. [10] Because of this pain, Malone had begun to favor his left hand over his right, and was experiencing pain in the left hand as well. [11]

6. Over the course of Dr. Wright's treatment, Malone began to develop wrist and shoulder pain as well. [12] Dr. Wright attributed the shoulder pain to bursitis, an inflammation of the sac that separates the shoulder bone from the muscle. [13]

*2  7. Dr. Wright treated Malone's problems with physical therapy, anti-inflammatory medication, and splints. [14] She also concluded that he should avoid gripping, pinching, pushing, pulling and lifting over five pounds. [15] Dr. Wright selected five pounds as a limit because that was the maximum Malone told her he could lift. [16]

8. Malone did not see Dr. Wright between May 2001 and January 2004. [17] In January 2004, he again visited Dr. Wright. He complained that he had been assigned to the Santa Monica Post Office and that the drive was causing him hand and shoulder pain. [18] At that point, Dr. Wright prescribed arm braces for Malone. [19]

9. In January 2004, Malone also began to see a psychologist, Dr. Barbara Ammon, who testified at trial regarding her opinion of Malone's mental health. Ammon diagnosed Malone with anxiety disorder, NOS, and depressive disorder, NOS, in January 2004. [20] "NOS" stands for "not otherwise specified" and indicates that the disorders diagnosed by Dr. Ammon did not fit into any specific categort of disorder; Ammon testified that NOS is a "catch-all, left-over diagnosis." [21] Dr. Ammon stated that Malone's feelings of anxiety and depression resulted from a perception that he was mistreated at work. [22] When she saw him in January 2004, Dr. Ammon placed Malone on medical leave so that he could "regroup emotionally." [23] Malone was out of work on Dr. Ammon's orders until May 2004. [24]

10. Dr. Ammon testified that Malone's emotional condition was stable between January 2004 and July 2006. [25] She placed him on medical leave for five months in 2005, however, after he became upset over a confrontation with a Postmaster Deer. [26] At this time, Malone experienced difficulty sleeping, suspiciousness, headaches, and gastrointestinal issues. [27]

11. Malone returned to work in October 2005. During Malone's time at the Post Office, his supervisors had provided him with various limited duty job assignments to fulfill the Post Office's workers' compensation obligations. When he returned in October 2005, he was assigned to work as lobby director at the Hub City Post Office. [28]

12. As described by Malone, the duties of a lobby director include greeting customers and assisting them to mail items, such as by helping them find the proper forms. [29] Malone was capable of performing the position. [30] He testified that he liked the job and enjoyed working with the public. [31]

13. Dr. Ammon placed Malone on leave again for one month in June 2006, because she believed he had become increasingly "agitated" and "hopeless." [32]

14. In July 2006, Malone returned to the Compton Post Office and was assigned to work as lobby director there. [33]

15. In September 2006, Dr. Wright diagnosed Malone with carpal tunnel syndrome. [34]

16. On July 12, 2007, Malone's supervisor, Postmaster Tyrone Williams told him that he could no longer work as lobby director due to a grievance decision in favor of the postal clerk's union. [35] Malone was assigned various duties including express mail delivery and custodial work. While he did not attempt the custodial assignment, he tried to deliver the mail and found he was unable to do it. Malone told Williams about his inability to deliver to mail, and Williams gave Malone a choice between delivering mail and going home. [36] Thereafter, Malone continue to receive job assignments consisting of various tasks, including mail delivery. [37]

**\*3** 17. In July 2007, Dr. Wright placed the following restrictions on Malone: no repetitive or forceful bilateral hand gripping, pushing, pulling, lifting over five pounds, or overhead activities; a ten minute break after 50 minutes; no driving more than 30 minutes at a time; no standing more than 30 minutes without a break; and no manual opening of letters or stapling. [38] She testified that she added these restrictions because Malone was "having more problems." [39] As respects several of the restrictions, Dr. Wright could not recall specifically why she imposed them other than Malone's own description of his limitations.

18. In September 2007, Dr. Wright imposed a new limitation that Malone not do any street delivery of mail. [40] On September 14, 2007, he obtained a note from Dr. Wright to this effect. [41]

19. Williams asked Malone to deliver mail on September 14, and sent Malone home when he refused. The same thing occurred on September 17 and 18. [42]

20. On September 19, Malone received a new job assignment that included casing and carrying mail. [43] The job offer stated that Malone's restrictions would not be honored. [44] Malone became upset and walked out of the Post Office. He did not return to work again. [45]

21. Dr. Ammon testified that Malone experienced nervousness in 2007 due to the changes in his job assignments and uncertainty as to whether there would be something for him to do when he arrived at the job site. [46] Because Malone was being given assignments outside his medical restrictions, Dr. Ammon placed him on leave on September 19, 2007. [47] Malone decided to file for disability retirement. [48] In December 2007, he applied for unemployment benefits. [49]

**B. Relevant Trial Evidence Regarding Malone's Ability to Work**

22. Malone's future ability to work is one of main points of dispute between the parties. Malone contends that as a result of the Post Office's actions, he is mentally unable to work. The Post Office contends that Malone is capable of working. The court first considers the physical limitations on Malone's ability to work.

**1. Physical Limitations**

23. Dr. Wright testified that she did not believe Malone's physical restrictions prevented him from working in the future. [50]

24. Dr. Thomas Grogan, an orthopedic surgeon testified as a defense expert regarding Malone's physical limitations. Hand injuries makes up 15% of his practice, and he has performed numerous hand surgeries. [51]

Malone v. Potter, Not Reported in F.Supp.2d (2010)

25. Dr. Grogan examined Malone on September 23, 2008; the examination included x-rays of both hands, Malone's shoulders, and neck. [52] Dr. Grogan opined that Malone could lift up to twenty pounds. [53] He also concluded that Malone did not suffer from carpal tunnel syndrome, [54] and found Malone's shoulders to be in normal condition. [55]

26. Dr. Grogan concluded that Malone's main problems were the improper positioning of the fusion of his right thumb and degeneration of his left joints, particularly the wrist joint. [56] The only physical restrictions Dr. Grogan would have placed on Malone were no lifting over ten pounds with one hand and no lifting over twenty pounds with both hands. [57] Like Dr. Wright, Dr. Grogan believed that Malone was physically capable of working. [58]

**2. Mental Limitations**

**\*4** 27. Dr. Ammon prepared a report for Malone's disability retirement application. In connection with the report, she administered a variety of tests. The "Beck Anxiety Test" measures anxiety based on a patient's self-rating of the severity of various symptoms, such as "My heart races fast" and "I feel unsteady." [59] Malone scored a 43; Dr. Ammon stated that this score indicated "a severe level of anxiety." [60]

28. Dr. Ammon also administered the "Beck Depression Inventory 2," a self-reported test similar to the Beck Anxiety Test. Malone scored 35; Dr. Ammon considered this score "severe" as well. [61]

29. Finally, Dr. Ammon administered the Psycho Diagnostic Screening Questionnaire, another test based on the patient's responses to various statements. Based on this test, Dr. Ammon concluded that Malone suffered from anxiety and depression, albeit not from any specifically identifiable disorder. [62]

30. Dr. Ammon found that Malone was "totally disabled" and "not able to return to the labor market." [63] She stated that his mental problems were not only "related to work" but also to his financial concerns. [64] Dr. Ammon opined that Malone would have difficulty returning to work because he was "suspicious and mistrustful of others." [65]

31. Dr. Brian Jacks testified as a defense expert. In addition to reviewing the record in the case, Dr. Jacks interviewed Malone to formulate a diagnosis of his mental condition. [66] Like Dr. Ammon, he administered the Beck Anxiety Inventory and Depression Inventory as well as the Beck Suicide Scale and Wahler Physical Symptoms Inventory. The latter tests are similar to the Anxiety and Depression inventories in that they are based on the patient's written responses to various statements. [67]

32. Dr. Jacks also administered the Minnesota Multiphasic Personality Inventory ("MMPI"), which he described as "the best psychological test which we have." [68] Unlike the Beck tests, which consist of 21 questions, the MMPI has 567 qeustions. [69]

33. Dr. Jacks diagnosed Malone as suffering from dysthymia, a chronic low grade depression, characterized by intermittent mood changes or depression that lasts for at least two years. [70] Dr. Jacks described dysthymia as "a common form of depression" that does not usually cause "major impairments or difficulties in one's ability to function"; he stated that for patients with the condition, "it seems like ... there's clouds outside even when it's sunshiny, and you feel that life is not satisfying or making you very happy." [71]

34. Dr. Jacks testified that Malone's depression began in 1998 or 1999, and has not significantly worsened since that. [72] He noted that from 2005 to 2007, there were no increases or changes in Malone's symptoms, the frequency of his treatment or his medication. [73]

35. Dr. Jacks identified several causes of Malone's depression: health issues and physical problems; excessive suspiciousness and mistrust of others; difficulty following instructions; and financial problems, as well as the present litigation. [74]

Malone v. Potter, Not Reported in F.Supp.2d (2010)

**\*5** 36. Dr. Jacks opined that Malone should be prescribed anti-depressants but that he did not require further psychological counselling. [75]

37. Dr. Jacks also stated that, in his opinion, although Malone's depression resulted in a lack of energy and difficulty with concentration, it did not impair his ability to work. [76] He did state, however, that Malone was not able to work for the month of September 2007. [77]

38. Dr. Jacks was critical of Dr. Ammon's opinions. He noted that she did not review Malone's complete history, and did not consider whether his health issues were a cause of his depression. [78]

39. After evaluating the testimony of both experts, the court finds that Malone suffers from mild depression that does not prevent him from working. In this regard, the court does not find Dr. Ammon's testimony that Malone is "totally disabled" due to psychological conditions credible. When asked to explain this opinion, Dr. Ammon stated in conclusory fashion that she did not believe Malone could ever return to the Postal Service, and that she believe he was not "at this time" able to return to the labor market. She offered no specific reasons or analysis supporting this conclusion. [79] In addition, the court accords Dr. Jacks' testimony greater weight based his credentials, the thoroughness of his testing, and his review of prior medical records. In particular, Dr. Jacks administered the MMPI test, which revealed that Malone had significant worries and concerns about his physical problems. [80] He also reviewed medical records indicating, contrary to Dr. Ammon's testimony, that Malone had sleep apnea, which contributed to his depression because he was unable to achieve a deep level of sleep. [81] Consequently, the court credits Dr. Jacks' testimony that there have been no significant changes in Malone's depression since 2005, and that Malone is presently able to work despite his dysthimia or low grade depression.

## C. Testimony At Court Trial Regarding Malone's Efforts to Find Employment

40. Malone testified that he does not consider himself mentally prepared to return to the work force. [82] The court does not consider Malone's self-diagnosis an accurate indicator of his psychological capability to work.

41. Malone did not submit any written applications, cover letters or resumes to employers after leaving the Post Office, nor did he prepare a resume. [83] He did not attend any job interviews . [84] Malone testified that during the time he was receiving unemployment benefits, he did not believe he was capable of working and would not have accepted a job if one had been offered to him. [85]

42. Malone's disability retirement became effective August 2008. [86] There was no evidence that Malone's disability retirement was approved based on his mental condition rather than his physical disabilities.

43. Malone has not made any efforts to find employment since he began receiving federal disability retirement benefits. [87]

## D. Testimony of Defendant's Expert Jerald Udinsky

**\*6** 44. Dr. Jerald Udinsky testified as a defense expert during the bench trial. Udinsky described himself as a "rehabilitation economist," a position he characterized as "an economist who is specialized in labor markets, employment, wages, and unemployment within labor markets." [88] He claimed to have a particular speciality in "the labor market activity of people with injuries ... who have had to change jobs." [89]

45. To form an opinion about the availability of employment for Malone, Udinsky considered Malone's employment record, worker's compensation records, unemployment records, and the depositions of Malone, Dr. Ammon and Dr. Wright; he also spoke with Dr. Grogan. [90] In addition, Udinsky conducted what he described as

a "labor market survey" that focused in particular on the types of jobs for which Malone applied while receiving unemployment insurance . [91] The positions Udinsky considered were insurance salesman, mail room supervisor, receptionist, customer service representative and security guard. His labor market survey included calling companies by telephone and inquiring if jobs were available. [92] Udinsky asked the employers if the jobs required lifting more than 15 pounds. [93]

46. Udinsky did not, however, consider Malone's educational background, an omission that considerably undermines the credibility of his opinions. [94] Udinsky justified this omission on by noting that Malone had "a considerable amount of experience" and could take classes to learn skills he lacked. [95]

47. Udinsky's analysis also did not take Malone's psychological issues into account. [96] He simply assumed that Malone was capable of working. [97]

48. Udinsky expressed a variety of opinions regarding what he considered a "normal and ordinary job search." [98] The court does not discuss these here, as it can conclude based on Malone's testimony, standing alone, that Malone did not undertake a reasonably diligent effort to obtain employment. Malone testified that he was simply going through the "protocols," that is, making the minimum effort necessary to continue to receive unemployment insurance and that he had no intention of working or accepting a position if one was offered. [99]

49. Udinsky testified that he believed Malone could have found employment as a mail room supervisor because he "had skills in shipping and receiving." [100] He also testified that Malone could manage a store such as "Mailboxes R Us." [101] The court does not find this opinion credible, given that Malone had no supervisory experience during his thirty years of work at the Post Office. [102]

50. Udinsky opined that Malone could work as a receptionist. [103] As Udinsky reached this opinion without considering that Malone had been diagnosed with carpal tunnel syndrome, the court does not find it credible.

51. Because Malone had mentioned looking for work as an insurance salesman at his deposition, Udinsky also considered the field of insurance sales. [104] He believed that Malone's disabilities as well as his "background ... in a work environment where there's physical labor involved" gave Malone "experience when it comes to selling disability and liability insurance." [105] On direct examination, Udinsky testified that he did not consider Malone's level of education in evaluating his ability to succeed as an insurance salesman. [106] According to Udinksy, Malone could pass the licensing exam to work in insurance sales "based on the fact that he had been working at the post office for some time." [107] Despite this testimony, on cross examination, when asked about the basis for his opinion that Malone could pass the exam, Udinsky cited the fact that Malone had a high school diploma; apparently, he had consulted Malone's deposition during the recess to discover this fact. [108] Udinsky's testimony regarding Malone's ability to find work in insurance sales considerably undermined his credibility.

**\*7** 52. Udinsky also testified that he believed Malone could find work as a security guard. [109] He stated that he had selected this position to research because Dr. Wright had stated that it was compatible with Malone's physical restrictions. [110] He acknowledged, however, that some training would be required, [111] as it does not appear to be a comparable position to the lobby director position Malone performed at the Post Office.

53. Udinsky also testified regarding Malone's ability to find work as a customer service representative. Of all the positions discussed by Udinsky, this is the only one that the court finds both to be compatible with Malone's education and experience.

It is, moreover, comparable to the lobby director position Malone held at the Post Office. Based on Malone's description, the lobby director job essentially resembles a customer service position.

54. Udinsky testified that the median income for customer service representatives was $31,873 in 2007. He testified in 2007-08, this figure increased 1.74 percent. [112]

55. Udinsky calculated that if Malone had obtained work as a customer service representative on June 19, 2008, he would have earned $33,973 through July 20, 2009, the date of the court trial. [113] This calculation included Malone's earnings from disability retirement. It assumed that he would find a job nine months after leaving the post office and that his salary would begin at the 25th percentile. Udinsky calculated that if Malone continued working as a customer service representative through retirement, his future earnings would be $360,729. In this regard, he assume that Malone would reach the 75th salary percentile after three years of work. [114] This translates to a 20 percent salary increase in each of the first three years, and an increase consistent with inflation thereafter. [115] Udinsky did not cite any data to support his assumption that Malone would receive a yearly twenty percent salary increase as a customer service representative. Rather, he apparently based this assumption on his perception that Malone was "a mature person [and] a capable person." [116] It is not entirely clear how Udinsky formed this opinion of Malone.

56. Udinsky explained that Malone's receipt of disability retirement did not prevent him from working and that, as long as he earned less than 80 percent of his prior salary at the post office, he would continue to receive payments. [117]

57. Malone's expert, Anand Khemlani, a certified public accountant, criticized Udinsky's conclusions with respect to the customer service representative, receptionist, and security guard positions. [118] He argued that Udinsky applied a one hundred percent probability that Malone would be able to obtain these

positions, and did not factor in educational licensing requirements, economic conditions, and Malone's lack of personal drive. [119] The value of Khemlani's criticism was limited, however, as he was unable to identify a specific probability Udinsky should have utilized to account for the factors he identified. [120]

**E. Stipulated Facts Regarding Malone's Salary and Benefits**

**\*8** 58. Malone would have earned a total of $111,404 in salary and benefits had he continued to work at the Post Office from September 19, 2007 through July 20, 2009. [121]

59. Malone received a total of $45,770 in federal disability retirement benefits through July 20, 2009. [122]

60. Had Malone worked for the Post Office through April 21, 2018, he would have earned $472,566 in salary and benefits reduced to present cash value. He would have earned $323,754 in retirement benefits, reduced to present cash value, from April 2018 through September 4, 2034, the end of his statistical life expectancy. [123] For the period from July 21, 2009 to September 4, 2034, Malone would receive a total of $460,152 in disability retirement benefits. [124] While the parties stipulated to these figures, the court does not find them particularly useful, as they appear to reflect a misunderstanding of the nature of the front pay remedy.

61. Any findings of fact that are deemed to be conclusions of law are incorporated herein as such.

## II. CONCLUSIONS OF LAW

### A. Legal Standards Governing Back Pay, Front Pay & Reinstatement

62. "Title VII of the Civil Rights Act of 1964 permits courts to grant equitable remedies to employees who have been impermissibly discriminated against by employers with fifteen or more employees. See 42 U.S.C. § 2000e-5(g) (1994). The relevant remedies include reinstatement and awards of back pay and

Malone v. Potter, Not Reported in F.Supp.2d (2010)

front pay." [125] *Caudle v. Bristow Optical Co., Inc.,* 224 F.3d 1014, 1020 (9th Cir.2000). "The district court has wide discretion in awarding remedies to make a Title VII plaintiff whole." *Odima v. Westin Tucson Hotel,* 53 F.3d 1484, 1495 (9th Cir.1995) (citing *Edwards v. Occidental Chem. Corp.,* 892 F.2d 1442, 1448 (9th Cir.1990)).

63. "Back pay is calculated by subtracting the actual wages a discharged employee earned subsequent to termination from the amount the employee would have earned absent the employer's discriminatory conduct." *E.E.O.C. v. Sunfire Glass, Inc.,* No. CV-08-1784-PHX-LOA, 2009 WL 976495, *11 (D.Ariz. Apr.10, 2009). Back pay is typically computed "from the date of the discriminatory act until the date of final judgment." *Thorne v. City of El Segundo,* 802 F.2d 1131, 1136 (9th Cir.1986). Back pay awards "advance 'Congress' intent to make "persons whole for injuries suffered through past discrimination." ' " *Caudle,* 224 F.3d at 1020 (quoting *Loeffler v. Frank,* 486 U.S. 549, 558, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988) (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)). Accordingly, "once a court finds unlawful discrimination, backpay should be denied only if denial 'would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.' " *Thorne,* 802 F.2d at 1137 (quoting *Albemarle Paper,* 422 U.S. at 421)); see also *Caudle,* 224 F.3d at 1202; *Odima,* 53 F.3d at 1495.

*9 64. "Front pay is the term used to describe damages paid as [prospective] compensation for training or relocating to another position. An award of front pay is made in lieu of reinstatement when the antagonism between employer and employee is so great that reinstatement is not appropriate." *Caudle,* 224 F.3d at 1020 (quoting *Fadhl v. City and County of San Francisco,* 741 F.2d 1163, 1167 (9th Cir.1984), overruled on other grounds, *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (alteration original)).

65. "[R]einstatement, when it is feasible, is 'the preferred remedy' in a discrimination suit." *Gotthardt v. National R.R. Passenger Corp.,* 191 F.3d 1148, 1156 (9th Cir.1999) (quoting *Cassino v. Reichhold Chems., Inc.,* 817 F.2d 1338, 1346 (9th Cir.1987)). Nonetheless, "[a]wards of front pay are appropriate when it is impossible to reinstate the plaintiff or when it would be inappropriate due to excessive hostility or antagonism between the parties." *Thorne,* 802 F.2d at 1137 (citing *Fadhl,* 741 F.2d at 1167).

66. A plaintiff seeking an award of back pay or front pay has a duty to mitigate damages by making reasonably diligent efforts to obtain alternative employment. *Caudle,* 224 F.3d at 1020 (citing 42 U.S.C. § 2000e-5(g)(1)). In regard to front pay, the Ninth Circuit has observed:

"A court awarding front pay should consider a plaintiff's ability to mitigate her damages by finding other employment in the future. '[F]ront pay awards ... must be reduced by the amount plaintiff could earn using reasonable mitigation efforts.... Thus, front pay is intended to be temporary in nature. An award of front pay does not contemplate that a plaintiff will sit idly by and be compensated for doing nothing.' *Cassino,* 817 F.2d at 1347 (citations and quotations omitted). 'Because of the potential for windfall, [front pay's] use must be tempered.' *Duke v. Uniroyal, Inc.,* 928 F.2d 1413, 1424 (4th Cir.1991)." *Gotthardt,* 191 F.3d at 1157.

67. Defendant bears the burden of establishing plaintiff's failure to mitigate. *Odima,* 53 F.3d at 1497. To satisfy this burden, defendant must prove that "during the time in question there were substantially equivalent jobs available, which [the plaintiff] could have obtained, *and* that [the plaintiff] failed to use reasonable diligence in seeking one." *Id.* (quoting *EEOC v. Farmer Bros. Co.,* 31 F.3d 891, 906 (9th Cir.1994) (alteration and emphasis original)); see also *Sias v. City Demonstration Agency,* 588 F.2d 692, 696 (9th Cir.1978) ("To satisfy this burden, defendant must establish (1) that the damage

suffered by plaintiff could have been avoided, i.e. that there were suitable positions available which plaintiff could have discovered and for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position").

68. On the other hand, the Ninth Circuit has held that back pay and front pay are not warranted where a plaintiff voluntarily withdraws from the workforce. *Caudle,* 224 F.3d 1020-2; see also *Thorne,* 802 F.2d at 1136 ("Our court has recognized, however, that the backpay period may terminate earlier if the plaintiff has voluntarily removed herself from the job market," citing *Sangster v. United Airlines, Inc.,* 633 F.2d 864, 868 (1980)).

**B. Calculation of Back Pay**

**\*10** 69. The difference between the amount Malone would have earned at the Post Office through the date of judgment and the federal disability benefits he received through judgment is $78,022.95. [126] This is the amount of back pay to which Malone is entitled before further mitigation is considered.

70. As noted above, the court has found that Malone did not exercise reasonably diligent efforts to find alternative employment at any time after leaving the Post Office. Even discounting Udinksy's opinions regarding what constitutes a reasonable job search, Malone's own testimony is sufficient to establish that he did not make a reasonable effort to find work. During the period Malone was receiving unemployment, before he began to receive disability payments, he did not prepare a resume, mail applications, or attend interviews. While he filled out the forms necessary to receive unemployment benefits, [127] and made certain inquiries about the jobs he listed on the form, Malone's testimony made it clear that he did not really attempt to find work. Indeed, his testimony that he would not have accepted a job during the period he was receiving unemployment underscores the fact that he did not make any real effort to locate work. After Malone began receiving disability payments,

he ceased all efforts to find work. Based on these facts, the court concludes that the Post Office satisfied the second prong of the showing it must make to establish that Malone did not reasonably attempt to mitigate damages. The Post Office must also establish, however, that comparable jobs were available. *Odima,* 53 F.3d at 1497.

71. While the Post Office offered Udinsky as an expert to satisfy this aspect of its burden, his testimony had substantial credibility problems. Udinsky opined that Malone could obtain positions that required specific skills and experience without fully considering Malone's background. Thus, the court must reject the majority of Udinsky's testimony. It credits, however, Udinsky's conclusion that Malone could have found work in the customer service field. Unlike other opinions Udinshy offered, this opinion was corroborated by Malone's own testimony that he enjoyed and could perform the lobby director position. Further, neither Dr. Wright nor Dr. Grogan testified that Malone's physical limitations would prevent him from succeeding in a customer service position. The court therefore concludes that the Post Office has carried its burden of establishing that it is more likely than not that Malone could have found a customer service position, and that such a position would have been substantially similar to his previous lobby director position. As to the time within which Malone could have found such a position, the court finds Udinsky's estimate that he would have had to undertake a nine-month job search reasonable. Udinsky testified that if Malone had obtained a customer service position on June 19, 2008, he would have earned $33,973 through July 20, 2009. This equals $86.01/day ($33,973/395 days). Accordingly, the court finds that, had Malone made reasonable efforts to mitigate his damages, he would have earned $49,282.78 through the date of judgment. Thus, the court concludes that Malone is entitled to $28,740.17 in back pay.

**\*11** 72. The court cannot accept the Post Office's argument that, because Malone did not make reasonable efforts to find work, he is not entitled to economic damages. The Ninth Circuit in *Odima* expressed disapproval of the rule

that "[i]f an employer proves that a plaintiff failed to look for work, the employer is not required to prove that jobs were available." *Id.* It observed that "[defendant] notably cites no Ninth Circuit authority for this purported exception to the general rule, and we can find none." [128] Although the Post Office has carried its burden of proving that customer service jobs were available to Malone, it has not established that jobs were available that would have paid him the equivalent of his Post Office salary. Malone is entitled to an award of back pay equal to the difference between what he would have earned at the Post Office absent its illegal conduct and what he could have earned had he made reasonable mitigation efforts. See *Loeffler,* 486 U.S. at 558 (purpose of back pay is to make plaintiff whole).

73. The Post Office's argument to the contrary relies on *Caudle,* in which the Ninth Circuit held that plaintiff's "withdrawal from the workforce in September 1995 barred her recovery [of lost wages] under Title VII as of that date because the withdrawal was voluntary." 224 F.3d at 1020. In *Caudle,* plaintiff was terminated in March 1995, when she was eight months pregnant. She gave birth in April 1995 and began seeking employment without success. *Id.* at 1019. In September 1995, plaintiff "elected to stay at home with her child for a period that she originally anticipated would last approximately three years." *Id* . The Court explained:

"The [district] court apparently found Caudle's decision to withdraw from the workforce [was] not only uncompelled by her situation but also unaffected by the defendant's discriminatory behavior. In holding that the voluntariness of Caudle's withdrawal precluded her recovery for lost pay during the ensuing period, the district court correctly focused on the general objective underlying Title VII remedies and the plaintiff's duty to mitigate damages generally: ensuring that the plaintiff is made whole. Caudle never alleged (and there is no reason otherwise to believe) that her decision to withdraw from the workforce in September 1995 was in any way affected

by Bristow's discriminatory termination of her employment. She therefore failed to show that her diminished income after that date was not 'voluntary' and was thus an injury for which she would need to be 'made whole' by Bristow. Absent any injury, an award of back pay or front pay is plainly unwarranted under 42 U.S.C. § 2000e-5(g) (1)." *Id.* at 1020-21 (alterations added and footnote omitted).

74. Malone's situation differs from Caudle's. The district court found that Caudle left the labor market to care for her child, a decision unrelated to her prior termination. Malone, by contrast, applied for disability retirement only after the Post Office failed to provide the type of reasonable accommodation to which the jury found he was entitled. Malone's situation resembles that of the plaintiff in *Szedlock v. Tenent,* 139 F.Supp.2d 725 (E.D.Va.2001). There, plaintiff left her employment at the CIA and applied for medical disability retirement after the CIA failed to reasonably accommodate her. *Id.* at 728-29. Defendant advanced essentially the same argument put forth by the Post Office here. It contended that "neither a back pay nor a front pay award is warranted because defendant's unlawful conduct-the failure to provide reasonable accommodations-did not result in plaintiff's discharge and claim for lost wages. Instead, any lost wages were the result of plaintiff's voluntary pursuit of a medical disability retirement." *Id.* at 733. The court rejected the argument:

**\*12** "Defendant's argument fails ultimately because plaintiff's pursuit and acceptance of the [disability retirement] was the direct result of defendant's failure to accommodate her disability. Simply put, when defendant failed, over an extended period of time, to accommodate plaintiff's disability ... and when defendant thereafter concluded that there were no positions in the CIA, at plaintiff's experience level, in which she could perform with or without a reasonable accommodation-she was left with no option but to pursue and accept the

[disability retirement]. It follows, then, that her lost wages are a direct result of defendant's unlawful conduct. Thus, it was defendant's failure to provide plaintiff with the reasonable accommodations she sought-to which the jury found she was legally entitled-that compelled plaintiff to seek and accept the [disability retirement]. In a real sense, plaintiff's claim for lost wages is the result of discrimination, and she is thus entitled to some equitable relief in the form of back pay or front pay to place her in the position she would have enjoyed absent discrimination. See *Albemarle,* 422 U.S. at 421." *Id.*

75. The court similarly cannot accept Malone's argument that he had no obligation to mitigate damages because the Post Office's conduct caused him mental distress that rendered him unable to work. Malone cites several cases for the proposition that under Title VII, "an employee who cannot mitigate damages because of the unlawful actions of the employer can still receive back pay." See *Johnson v. Spencer Press of Maine, Inc.,* 364 F.3d 368, 384 (1st Cir.2004); see also *Lathem v. Department of Children and Youth Services,* 172 F.3d 786, 794 (11th Cir.1999) ("[A] Title VII claimant is entitled to an award of back pay where the defendant's discriminatory conduct caused the disability"); *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 157 (3d Cir.1999) ("Because [the employer's] conduct affirmatively impaired [the employee's] ability to mitigate her damages, it would be inequitable to reduce her back pay award in this case"). This principle has no application in the present case, because Malone's psychological capability to work is a factual question, and the court has found that he is mentally capable of working. As Malone's psychological issues do not prevent him from working, the court need not consider the degree to which such conditions were "caused" by the Post Office. Malone argues that the jury's award of emotional distress damages indicates that it credited Dr. Ammon's testimony that Malone would be unable to work in the future. Malone's psychological capacity to work in the future was simply not before the jury, and the court does not find Dr. Ammon's

testimony regarding Malone's ability to work credible. [129]

76. Although neither party has briefed the issue, "[a]n award of prejudgment interest on a back pay award is appropriate." *Domingo v. New England Fish Co.,* 727 F.2d 1429, 1446 (9th Cir.1984). The interest rate used to calculate prejudgment interest is within the discretion of the trial judge. *W. Pac. Fisheries, Inv. v. SS President Grant,* 730 F.2d 1280, 1288 (9th Cir.1984). This discretion must be exercised with a view to the fact that prejudgment interest is an element of compensation, not a penalty. *Id.; Jung v. Potter,* No. CV 04-429-PHX-MHM, 2008 WL 2620905, *6 (D.Ariz. July 1, 2008). In calculating prejudgment interest, the court will use the weekly average Treasury Bill rate, see *id.,* see also *Blankenship v. Liberty Life Assur. Co. of Boston,* 486 F.3d 620, 628 (9th Cir.2007) ("Generally, 'the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate,' " quoting *Grosz-Salomon v. Paul Revere Life Ins. Co.,* 237 F.3d 1154, 1163-64 (9th Cir.2001)), and calculate interest at the date of judgment. On January 15, 2010, the applicable rate was 0.41%, yielding prejudgment interest of $271.50.

**C. Availability of Reinstatement**

**\*13** 77. As noted, "reinstatement, when it is feasible, is 'the preferred remedy' in a discrimination suit." *Gotthardt,* 191 F.3d at 1156. The court has seriously considered the possibility of awarding reinstatement. Considering Malone's testimony that working at the Post Office is the only job that interests him, and his unwillingness to look for work elsewhere, the court believes that reinstatement has considerable appeal as an appropriate equitable remedy. The court does not believe, despite Malone's contention to the contrary, that this is a case where hostility between the parties would prohibit reinstatement. During the ten years prior to this litigation, Malone filed at least ten employment discrimination claims against the Post Office, indicating that the parties had an ability

Malone v. Potter, Not Reported in F.Supp.2d (2010)

to co-exist as employer-employee while at the same time being legal antagonists. While this case may have generated some additional hostility between the parties, the court does not believe, considering their past history, that the hostility is so excessive as to foreclose reinstatement.

78. The court concludes that reinstatement is impossible for a different reason, however. The position of lobby director has apparently been eliminated throughout the Los Angeles Postal District since March 2009.[130] The testimony at trial indicated that lobby director was the only existing position at the Post Office that Malone was capable of performing within his restrictions .[131] As there is no indication that any position that Malone can perform is presently available at the Post Office, the court finds that reinstatement is not appropriate at this time. It therefore considers the appropriate front pay award.

**D. Calculation of Front Pay**

79. The evidence presented during the court trial and in both parties' post-trial briefs reflects a fundamental misunderstanding of the nature of front pay. Front pay is intended to be a *temporary* award. As the court stated in *Glenn-Davis v. City of Oakland, No. C 02-2257 SI, 2008 WL 410239, *3 (N.D.Cal. Feb.12, 2008)*, prior to adopting a three-year front pay period:

"The Ninth Circuit has noted, in the context of discussing a plaintiff's duty to mitigate damages, that 'front pay is intended to be temporary in nature.' *Cassino v. Reichhold Chemicals, Inc.,* 817 F.2d 1338, 1347 (9th Cir.1987); see also *Boehm v. American Broadcasting Co., Inc.,* 929 F.2d 482, 488 (9th Cir.1991) (noting that 6 year front pay period 'is longer than customary in federal discrimination actions, [but] it is not so unsound as to warrant reversal'). In addition, courts have noted that '[t]he longer a proposed front pay period, the more speculative the damages become.' *Peyton v. DiMario,* 287 F.3d 1121, 1128 (D.C.Cir.2002) (internal citation and quotation omitted)."

80. Malone seeks to recover salary and benefits through 2018, and retirement benefits through 2034-a front pay period of twenty five years. The court has not identified a single case in which front pay was awarded for so long a period. In fact, in *Peyton,* the D.C. Circuit concluded that an "award of 26 years of front pay was unduly speculative and therefore an abuse of discretion." 287 F.3d at 1129; cf. *Gotthardt,* 191 F.3d at 1157 (noting that district's court award of an eleven-year front pay period "seem[ed] generous," but concluding that it was not an abuse of discretion under the circumstances of the case). While it might have been expected that the Post Office would argue for a more reasonable front pay period, it appears to have accepted Malone's position that the appropriate period is the remainder of his life expectancy. This may well have been because Udinsky's opined that, coupled with his disability retirement payments, Malone's earnings from employment over this period would exceed what he could have earned had he remained employed at the Post Office.[132] The court must therefore exercise its discretion to determine the appropriate length of the front pay period.

**\*14** 81. "Factors that courts have considered in determining the amount of a front pay award include: (1) the length of prior employment; (2) the permanency of the position held; (3) the nature of the work; (4) the age and physical condition of the employee; (5) possible consolidation of jobs; and (6) myriad other nondiscriminatory factors which could validly affect the employer/employee relationship." *Sanders v. City of Newport,* 602 F.Supp.2d 1195, 1201-02 (D.Or.2009) (citing *Reneau v. Wayne Grifin & Sons, Inc.,* 945 F.2d 869, 871 (5th Cir.1991)).

82. Evaluating these factors, Malone had worked for the Post Office nearly twenty years at the time his employment terminated. By itself, this tends to indicate that Malone would have remained at the Post Office for a significant time.

83. On the other hand, the permanency of the position Malone held prior to termination suggests that a front pay period of more than several years would be unduly speculative. Although Malone's letter carrier position was permanent in the sense that he was not hired on a temporary basis, the fact that Malone's employment depended on the availability of limited duty positions adds an element of speculativeness to his continued future employment. Based on the evidence at trial, the jury could have concluded that permitting Malone to remain as a lobby director rather than transferring the position to a window clerk was a reasonable accommodation which the Post Office could have provided without undue hardship. Considering the elimination of the lobby director position, however, it is uncertain whether it would have continued to be economically feasible for the Post Office to employ Malone in that capacity for a significant period into the future. As there was no evidence that Malone could perform any other position at the Post Office, the length of time for which he would have been able to continue working for the Post Office is highly speculative.

84. Further, Malone's physical condition adds to the speculative nature of his continued ability to work for the Post Office. Dr. Wright regularly added to Malone's physical limitations. Considering this, it is likely that his limitations would have reached a point where the Post Office would no longer have been able to accommodate him.

85. Finally, Malone's deposition testimony indicated that he contemplated retiring at age 58. [133] At trial, Malone attempted to explain that he did not in fact mean that he would retire at 58. He testified that what he meant was "if my health was good [at 58] and I was feeling good, I would have kept working." [134] Considering Malone's incentives to testify that he would have worked for a longer period, the court does not find this testimony credible; the

court's credibility determination is reinforced by Malone's arguably fraudulent conduct in applying for unemployment benefits despite his belief that he was unable to work and his unwillingness to accept a job if one were offered to him. Finally, given Malone's mental and physical issues, the court finds it unlikely that he would have continued "feeling good" past age 58.

**\*15** 86. Considering all the evidence in the record, the court finds that it would be unduly speculative to conclude that Malone would have continued his employment with the Post Office longer than five years, even absent the discriminatory and retaliatory conduct found by the jury. The court accepts Malone's testimony that he intended to work until age 58; however, considering his health problems, and the uncertain future availability of work within his increasing physical restrictions, the court concludes he is unlikely to have continued work after age 58, and would likely have taken disability retirement at that point. Under the circumstances, and particularly considering Malone's testimony that he intended to stop working at age 58, the court finds that a five-year period of front pay is sufficient to place Malone in the position he would have occupied but for the Post Office's discriminatory actions. Accordingly, Malone is entitled to five years of front pay. Cf. *Jung,* 2008 WL 2620905 at \*3 (awarding front pay for five years to a postal worker who had been performing temporary light duty tasks and who prevailed on Rehabilitation Act claim).

87. The stipulated facts indicate that Malone's annual earning capacity at the Post Office beginning in 2009 was $61,330. [135] The court has concluded that Malone could have mitigated his damages by obtaining a customer service job. To calculate the amount of mitigation that should be offset, the court will use the median salary for customer service representatives identified by Udinsky, $31,873. [136] Applying Malone's annual disability retirement benefit of $25,951, [137] his annual loss over the front pay

period was $3,506.00. Accordingly, Malone is entitled to $17,530.00 in front pay.

88. Any conclusions of law that are deemed to be findings of fact are incorporated herein as such.

### III. CONCLUSION

For the reasons stated, the court concludes that Malone is entitled to $28,740.17 in back pay, $271.50 in prejudgment interest, and $17,530.00 in front pay. The court will enter judgment for these amounts and for the $300,000 in emotional distress damages awarded by the jury.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 330252

Footnotes

1    Conceivably, the jury could have reached its verdict based solely on McGee's transfer of Malone to Hub City, and rejected Malone's contention that Williams engaged in discriminatory or retaliatory conduct. If this were the case, Malone would not be entitled to back or front pay, as the transfer to Hub City did not result in a loss of employment. The evidence that Williams' reassignment of Malone constituted a failure to accommodate was considerably stronger than the evidence that Malone was transferred as a result of a disability, however. The court therefore assumes that the jury reached its verdict on this basis. Indeed, considering the amount of the jury's emotional distress award, it is likely that the jury accepted all theories of liability that Malone advanced.

2    Reporter's Partial Transcript of Proceedings, March 3, 2009 ("Mar. 3 RT") at 4.

3    *Id.* at 5; Reporter's Transcript of Proceedings, March 5, 2009 ("Mar. 5 RT") at 104.

4    Mar. 5 RT at 113.

5    Mar. 5 RT at 8.

6    *Id.* at 7.

7    *Id.* It is unclear whether this was the claim Malone filed in 1994 or a different one.

8    *Id.* at 7-8.

9    *Id.* at 8.

10   *Id.* at 9.

11   *Id.;* Mar. 3 RT at 15.

12   Mar. 5 RT at 11-12.

13   *Id.* at 33.

14   *Id.* at 13.

15   *Id.* at 15-16.

16   *Id.* at 17.

17   *Id.* at 18-19.

18   *Id.*

19   *Id.*

20   Reporter's Transcript of Proceedings, March 4, 2009 ("Mar. 4 RT") at 7-8.

21   *Id.* at 8.

22   *Id.* at 7.

23   *Id.* at 10.

24   *Id.* at 11.

25   *Id.* at 17.

26   *Id.* at 18-19.

27   *Id.* at 19.

28   Mar. 3 RT at 42-43.

29   *Id.* at 41.

| 30 | *Id.* at 45. |
|----|------|
| 31 | Mar. 4 RT at 158. At the court trial, however, he testified that he enjoyed working alone, though he also testified that he liked customer service and working with the public. (Reporter's Transcript of Proceedings, July 21, 2009 ("July 21 RT") at 38, 40.) |
| 32 | Mar. 4 RT at 25:1-2. |
| 33 | Mar. 3 RT at 48-49. |
| 34 | Mar. 5 RT at 12. |
| 35 | Mar. 3 RT at 44. |
| 36 | *Id.* at 46-52. |
| 37 | *Id.* |
| 38 | Mar. 5 RT at 23. |
| 39 | *Id.* |
| 40 | *Id.* at 28. |
| 41 | Mar. 4 RT at 142. |
| 42 | *Id.* at 143-44 |
| 43 | *Id.* at 149. |
| 44 | *Id.* |
| 45 | *Id.* at 151. |
| 46 | Mar. 4 RT at 22. |
| 47 | *Id.* at 25. |
| 48 | *Id.* |
| 49 | *Id.* at 155-56; Mar 5 RT at 115. |
| 50 | Mar. 5 RT at 56. |
| 51 | *Id.* at 59-60. |
| 52 | *Id.* at 63. |
| 53 | *Id.* at 66. |
| 54 | *Id.* at 68. |
| 55 | *Id.* at 72. |
| 56 | *Id.* at 70. |
| 57 | *Id.* at 72. |
| 58 | *Id.* at 77. |
| 59 | Mar. 4 RT at 27. |
| 60 | *Id.* |
| 61 | *Id.* at 28:10. |
| 62 | *Id.* at 30. |
| 63 | *Id.* at 32. |
| 64 | *Id.* at 33-34. |
| 65 | *Id.* at 35. |
| 66 | *Id.* at 51. |
| 67 | *Id.* at 54. |
| 68 | *Id.* at 55. |
| 69 | *Id.* at 122. |
| 70 | *Id.* at 55. |
| 71 | *Id.* at 56. |
| 72 | *Id.* |
| 73 | *Id.* at 66. |
| 74 | *Id.* at 59-72. |

| | |
|---|---|
| 75 | *Id.* at 74. |
| 76 | *Id.* at 77. |
| 77 | *Id.* at 83. |
| 78 | *Id.* at 81-82. |
| 79 | *Id.* at 32. At a later point, Dr. Ammon referenced Malone's physical limitations-a subject outside her expertise-as well as suspiciousness, mistrustfulness and anxiety as a basis for her opinion that it would be difficult for Malone to return to gainful employment. (*Id.* at 35.) Once again, however, she did not describe the manner in which these psychological conditions would make it difficult for Malone to work for an employer other than the Postal Service. |
| 80 | *Id.* at 60-61. |
| 81 | *Id.* at 63; compare *id.* at 41. |
| 82 | July 21 RT at 43. |
| 83 | *Id.* at 49. |
| 84 | *Id.* at 50. |
| 85 | *Id.* at 53. |
| 86 | Mar. 4 RT at 158. |
| 87 | *Id.* at 123; July 21 RT at 44. |
| 88 | July 21 RT at 67:20-21. |
| 89 | *Id.* at 67:23-24. |
| 90 | *Id.* at 75-76. |
| 91 | *Id.* at 76-77. |
| 92 | *Id.* at 91-92. |
| 93 | *Id.* at 93. |
| 94 | *Id.* at 90. |
| 95 | *Id.* at 90:23-24. |
| 96 | *Id.* at 138. |
| 97 | *Id.* at 140. |
| 98 | *Id.* at 80. |
| 99 | *Id.* at 53. |
| 100 | *Id.* at 86:18. |
| 101 | *Id.* at 89. |
| 102 | *Id.* at 38. |
| 103 | *Id.* at 88. |
| 104 | *Id.* at 96. |
| 105 | *Id.* at 96:22-25. |
| 106 | *Id.* at 99. |
| 107 | 99:23-25. |
| 108 | *Id.* at 153. |
| 109 | *Id.* at 103. |
| 110 | *Id.* |
| 111 | *Id.* |
| 112 | *Id.* at 107. |
| 113 | *Id.* at 126. |
| 114 | *Id.* at 171. Udinsky provided similar calculations regarding the other positions he identified. The court has not included these because Udinsky's testimony failed to establish that Malone could obtain those positions or that they were similar to the lobby director position; thus, they are not relevant to the court's damages calculations. |
| 115 | *Id.* at 172. |
| 116 | *Id.* at 173:3. |

Malone v. Potter, Not Reported in F.Supp.2d (2010)

117  *Id.* at 108.

118  *Id.* at 24-25.

119  *Id.* at 25.

120  *Id.* at 32.

121  Second Amended Stipulated Facts for Court Trial at 2; see also *id.,* Table 4.

122  *Id.*

123  *Id.*

124  *Id.* at 3.

125  The Rehabilitation Act incorporates Title VII's remedial procedures. See *McLean v. Runyon,* 222 F.3d 1150, 1155 (9th Cir.2000) (citing 29 U.S.C. § 794a).

126  The figures provided by the parties are based on the time period between September 19, 2007, the date Malone ceased work at the Post Office, and July 20, 2009, the date of the court trial. To calculate the additional wages Malone would have earned for the time period between the conclusion of the court trial and date of judgment, the court utilized the daily wage to which the parties stipulated-$143.60-and the daily amount of disability retirement benefits to which the parties stipulated-$71.15. (See Amended Stipulated Facts for Court Trial, ¶¶ 1, 2.) Multiplied by the average number of days per month to which the parties stipulated-30 .4-this yields additional wages of $24,555.60 and additional disability retirement benefits of $12,166.65. Total wages that might have been earned had Malone remained employed at the Post Office, therefore, are $135,959.60, while disability retirement benefits actually received are $57,936.65. The difference between these two numbers is $78,022.95.

127  July 21 RT at 47.

128  Technically, the court did not reach the issue because it found that the plaintiff had sought work. Subsequent courts have cited *Odima,* however, for the proposition that the Ninth Circuit "places the burden on Defendant to prove both that there were substantially equivalent jobs available and that plaintiff failed to use reasonable diligence in seeking one." See, e.g., *Kawar v. JPMorgan Chase and Co.,* No. CV-08-0046-PHX-DGC, 2009 WL 1699818, *6 (D. Ariz. June 16, 2009); *Santana v. Westaff, Inc.,* No. Civ. 02-572-KI, 2003 WL 21087731, *6 (D.Or. May 5, 2003).

129  Moreover, the jury need not have credited Dr. Ammon's testimony to have awarded Malone emotional distress damages. It could, for example, have relied on the following testimony:

"Q: [ ] How has [not being able to work at the post office] impacted your life?

A: It caused a financial hardship. It caused problems with my personal life and home, my wife. I just don't know what the future holds for me.

Q: What type of problems are you having with your wife at this point?

A: Relationship problems. As far as how the bills going to get paid, and there's not much romance going on these days. So-and I don't even feel that anyway because I just don't know what the future holds for me, for Earnest Malone." (Mar. 4 RT at 159.)

It could also have credited testimony regarding the fact that Malone was unable to pay his mortgage and awarded damages for the emotional distress associated with that situation. (See *id.* at 33.)

130  This fact was not adduced at either the jury or the bench trial; rather, it is included in the declaration of Koula Fuller, Beverly Hills Postmaster and Team Leader for the Los Angeles Postal District's National Reassessment Process District Assessment Team. Fuller's declaration is attached to the Post Office's trial brief. (Declaration Koula Fuller, ¶ 3.) Fuller states that " 'lobby directing' is no longer an operationally necessary task due to the decrease in mail volume and the concomitant decrease in lines in the Los Angeles Postal District." (*Id.*) Although this declaration was presented as evidence post-trial, Malone cites to and relies on it in support of his argument that reinstatement is inappropriate. Accordingly, the court will consider the elimination of the lobby director position for purposes of assessing the propriety of reinstatement.

131  Malone was also capable of performing a position known as DA-CFS mail, but this position was eliminated prior to the time of trial.

132  See, e.g., July 21 RT at 121-22.

133  Mar. 4 RT at 158:24.

134  *Id.*

Malone v. Potter, Not Reported in F.Supp.2d (2010)

135   Second Amended Stipulated Facts for Court Trial, Table 4.

136   The court declines to use the 25th percentile salary and to increase it to the 75th percentile over three years, as Udinsky failed to substantiate his opinion that Malone would receive such increases. Using the median salary to which Udinsky testified, however, credits his opinion that Malone might have accepted a lower salary to start in order to secure employment (July 21 RT at 110, 111-12), and also credits the fact that Malone would have received appropriate salary increases (albeit not 20 percent annual increases) over the five year period.

137   Second Amended Stipulated Facts for Court Trial at 2, Table 6.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

38 Trials Digest 12th 15, 2009 WL 2837507 (E.D.Cal.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
United States District Court, E.D. California.

Jadwin vs. County of Kern

**TOPIC:**
Synopsis: Physician sues hospital for retaliation, disability discrimination

Case Type: Labor & Employment; Retaliation; Labor & Employment; Disability/Medical Condition; Labor & Employment; Family & Medical Leave; Labor & Employment; Termination/Constructive Discharge

DOCKET NUMBER: 07CV00026(OWW)

STATE: California
COUNTY: Not Applicable

Verdict/Judgment Date: June 8, 2009

JUDGE: Oliver W. Wanger
**ATTORNEYS:**
Plaintiff: Joan Herrington, Bay Area Employment Law Office, Oakland; Eugene D. Lee, Law Offices of Eugene D. Lee, Los Angeles.
Defendant: Mark A. Wasser, Law Offices of Mark A. Wasser, Sacramento.

**SUMMARY:**
Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $505,457

Range: $500,000-$999,999
The jury found that defendant (1) retaliated against plaintiff for engaging in certain activities, in violation of the Family and Medical Leave Act and the California Fair Employment and Housing Act; (2) retaliated against plaintiff for taking medical leave under the Family and Medical Leave Act and the California Family Rights Act; (3) discriminated against plaintiff on the basis of his mental disability in violation of the Fair Employment and Housing Act; (4) failed to reasonably accommodate plaintiff's mental disability in violation of the Fair Employment and Housing Act; and (5) failed to engage in an interactive process with plaintiff in violation of the Fair Employment and Housing Act. The jury awarded damages as follows: $30,192 past medical; $321,285 past loss of earnings; $154,080 future loss of earnings. Certain claims were not submitted to the jury; the parties stipulated that these claims would be tried by the court sitting without a jury. The judge later ruled that no compensatory damages would be awarded on plaintiff's procedural due process claim.

Trial Type: Jury

Deliberations: Not reported.

Jury Poll: Not reported.


**EXPERTS:**

Plaintiff: Not reported.

Defendant: Not reported.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**

According to court records: Plaintiff David F. Jadwin, D.O. was the former Chair of Pathology at Kern Medical Center. He was hired to improve patient care quality. In October 2005, certain senior medical staff placed multiple letters of reprimand in plaintiff's file for a five-to-eight minute time overrun during an otherwise successful one-hour medical conference. The fallout from this exacerbated plaintiff's chronic depression to the point that it became so disabling that plaintiff was forced to request and take an approved reduced work schedule medical leave as an accommodation. When plaintiff requested an extension of his reduced schedule leave, Peter Bryan, then CEO of Kern Medical Center, both withdrew plaintiff's accommodation and interfered with his right under the Family and Medical Leave Act, the California Family Rights Act, and the California Fair Employment and Housing Act to a medically necessary reduced-work schedule by requiring plaintiff to go on full-time medical leave instead so as to burn up his medical leave allotment. Bryan also threatened plaintiff with termination should he not return to work full-time, despite his disability.

Approximately six weeks later, during which time plaintiff was expressly ordered not to contact anyone or enter the hospital premises on threat of termination, Bryan recommended, and defendant County of Kern endorsed, the decision to demote plaintiff solely for "unavailability" due to his medical leave, his subsequent absence from the hospital, and his failure to make any effort to contact anyone at the hospital. In addition, Kern County conditioned plaintiff's return to work as a regular pathologist on his release to full-time work and acceptance of disparate terms and conditions, including an excessive pay cut and abbreviated duration of his employment contract.

Two months after plaintiff returned to work as a demoted staff pathologist, Kern Medical Center placed him on administrative leave "pending resolution of a personnel matter." Plaintiff was given no procedural due process as guaranteed by the Fourteenth Amendment. Plaintiff remained on administrative leave for another 10 months until his contract expired on October 4, 2007. No one from Kern County contacted him about his administrative leave or renewal of his employment contract or responded to his numerous requests for an explanation. Kern County decided not to renew plaintiff's contract, saying: "He had been on medical leave, and had requested even more leave, and for that reason and the fact that he was suing us, we decided not to renew his contract."


**CLAIMED INJURIES**

NA


**CLAIMED DAMAGES**

According to court records:

Injunctive, economic, punitive damages.


**SETTLEMENT DISCUSSIONS**

According to court records:

Jadwin vs. County of Kern, 38 Trials Digest 12th 15 (2009)

Not reported.


**COMMENTS**

According to court records:

The complaint was filed on January 6, 2007.


Trials Digest, A Thomson Reuters/West business
Eastern District Federal Court/Fresno

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

43 Trials Digest 16th 11, 2013 WL 5820140 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
Superior Court, Los Angeles County, California.

Silverman vs. Stuart F. Cooper Inc.

**TOPIC:**
Synopsis: Terminated employee claims age discrimination

Case Type: Labor & Employment; Discrimination; Labor & Employment; Age; Labor & Employment; Harassment-General; Labor & Employment; Termination/Constructive Discharge

DOCKET NUMBER: BC467464
STATE: California
COUNTY: Los Angeles

Verdict/Judgment Date: July 19, 2013

JUDGE: Deirdre H. Hill
**ATTORNEYS:**
Plaintiff: Allen J. Beck, Gleason & Favarote, Los Angeles; Paul M. Gleason, Gleason & Favarote, Los Angeles; Janet S. Yavrouian, Gleason & Favarote, Los Angeles.
Defendant: Charles J. Schufreider, Barton, Klugman & Oetting, Los Angeles.

**SUMMARY:**
Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $325,223

Range: $200,000-499,999
$133,222 to plaintiff for past loss of earnings

$40,668 to plaintiff for future loss of earnings

$116,333 to plaintiff for past emotional distress

$35,000 to plaintiff for future emotional distress

The jury found defendants Stuart F. Cooper Inc. or Burdge Cooper Inc. acted with oppression, fraud or malice but declined to award punitive damages.

Trial Type: Jury

Deliberations: Not reported.

Jury Poll: Not reported.


**EXPERTS:**
Plaintiff: Not reported.
Defendant: Not reported.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**
According to court records: Plaintiff Joe Silverman was hired by defendant Stuart F. Cooper Inc. in 1994 as a salesman. Plaintiff said he was compensated with a base salary, commission, expense reimbursement and medical benefits, regardless of sales performance. Plaintiff said his sale performance fluctuated, but he was never subjected to discipline, and he achieved an acceptable sales record. In August 2009, plaintiff was reportedly demoted by defendant David Overgaar, defendant Stuart Cooper's president, without warning and his compensation package was changed. His compensation change converted him to 100 percent commission and limited his automobile reimbursement to $200 per month. Plaintiff said the company had never forced such a compensation package on any other employee. The new package also established a sales quota for plaintiff in order to return to his prior compensation plan. He said he was required to have sales of at least $90,000 over a six-month period with no single job accounting for more than 30 percent of sales. This quota was unprecedented and never applied to other sales employees, plaintiff claimed.
In November 2009, another sales representative, 49, was allegedly hired with a salary plus commissions compensation package.
In October 2010 plaintiff, 76, apparently filed a claim for age discrimination with the Department of Fair Employment and Housing based on the demotion and his change in compensation. Within six months of his complaint, plaintiff said, plaintiff was terminated by defendant Burdge Cooper Inc. for the pretextual reason of "poor attitude."
Plaintiff alleged age discrimination in violation of the Fair Employment and Housing Act and public policy, unlawful retaliation in violation of the FEHA, age harassment in violation of the FEHA, failure to prevent discrimination and harassment in violation of the FEHA, wrongful termination in violation of public policy and failure to pay final wages and waiting time penalties.


**CLAIMED INJURIES**
According to court records:
Emotional distress.


**CLAIMED DAMAGES**
According to court records:
Not reported.


**SETTLEMENT DISCUSSIONS**
According to court records:

Not reported.

**Silverman vs. Stuart F. Cooper Inc., 43 Trials Digest 16th 11 (2013)**

**COMMENTS**

According to court records:

The complaint was filed Aug. 12, 2011.

Trials Digest, A Thomson Reuters/West business
Los Angeles County Superior Court/Downtown

---

**End of Document**                                © 2018 Thomson Reuters. No claim to original U.S. Government Works.

JVR No. 1402210041, 2013 WL 7852947 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
Superior Court, Los Angeles County, California.

VASQUEZ v. LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY

BC484335
DATE OF FILING: October 25, 2012
DATE OF TRIAL/SETTLEMENT: November 12, 2013

**SUMMARY**
**Outcome: Plaintiff Verdict**
**Total: $1,904,635**
HIGH AMOUNT: $0

LOW AMOUNT: $0


**Related Court Documents:**
Plaintiff's second amended complaint: 2012 WL 10007313

Defendant's trial brief: 2013 WL 6506751

Verdict form: 2013 WL 6506795


**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: Scott O. Cummings, Cummings & Franck P.C., Gardena, CA
Plaintiff: Lee Franck, Cummings & Franck P.C., Gardena, CA
Defendant: Calvin R. House, Gutierrez Preciado & House L.L.P., Pasadena, CA
Defendant: Caroline Shahinian, Gutierrez, Preciado & House L.L.P., Pasadena, CA

JUDGE: Kevin C. Brazile

RANGE AMOUNT: $1,000,000 - 1,999,999
STATE: California
COUNTY: Los Angeles

**SUMMARY**
**PLAINTIFF:**
Sex: M

Age: Adult

General Occupation: General Laborer

**DEFENDANT:**
Sex: O

Organization Type: Los Angeles County Metropolitan Transportation Authority

**DAMAGES:**
Compensatory Pain & Suffering: $1,250,000

Compensatory Future Medical: $185,000

Compensatory Past Wages: $84,348

Compensatory Future Wages: $385,287

Total Compensatory Award: $1,904,635

Punitive Damages: $0

Hedonic Damages: $0

Property Damages: $0

Interest: $0

Other Damages: $0

Loss of Services: $0

**ADVERSE ACTION**
Closer Supervision: false

Constructive Discharge: false

Demotion: false

Denial Tenure: false

Failure Accomodate: true

Failure Grant Leave: true

Failure Hire: true

Failure Promote: false

Suspension: true

Sexual Harassment: false

Harassment: true

Hostile Work Env: false

Isolation: false

Lay Off: false

Loss Benefits: false

Loss Pay: false

Loss Seniority: false

Negative Eval: false

Negative Reference: false

Pay Increase Denial: false

Reassignment: false

Reduction Pay: false

Reprimands: true

Restrictions: false

Termination: true

**Entity Type: Government Entity**
**STATUTES**
**Primary Specific Statute**
Primary Name: State

**Primary General Statute**
**Primary Name: Disability Discrimination**
Primary General Statute Discrimination: true

Specific Statute: State


**General Statute: Family and Medical Leave**
General Statute Discrimination: false


Specific Statute: General


**General Statute: Retaliation**
General Statute Discrimination: false


Comparative Negligence Percentage: 0


**FACTS:**

Raphael Vasquez, a former bus driver, sued the Los Angeles County Metropolitan Transportation Authority for disability discrimination, failure to accommodate, failure to engage in the interactive process, in violation of the Americans with Disabilities Act (ADA), and interference with the Family and Medical Leave Act (FMLA) and the California Family Rights Act (CFRA), and retaliation in violation of the Fair Employment and Housing Act (FEHA) Cal. Gov't. Code Secs. 12940 et seq. The plaintiff alleged during his employment, he suffered from a variety of disabilities, including but not limited to gout, cataracts, blurry vision, diabetes, for which he treated with doctors, and in January 2010, he requested a medical leave of absence for hip replacement surgery due to Avascular Necrosis of the femur, which the defendant admitted he was eligible for, and he provided the necessary documentation indicating he would be out for approximately five months. He asserted following the surgery, his doctor provided a note that he was unable to work until June 1, 2010 due to Trochanteric Bursitis, and aftercare from his hip replacement, thereafter, he was cleared to return to work. Vazquez claimed in November 2010, he had cataract surgery, but the defendant began to use his disabilities for adverse actions, including discipline and suspensions, and in January 2011, he was terminated, and the proffered reason for his termination was his attendance. He asserted the defendant failed to engage in a timely, good faith, interactive process to determine the most effective reasonable accommodations for him, discouraged the use of FMLA leave, which violated the CFRA, and that his disability, his request for and/or taking medical leave were substantial motivating factors in the decision to terminate him. The defendant denied the allegations and contended the plaintiff was charged with excessive absenteeism after accumulating eight absences within a 12-month period, and at his discharge hearing he told the hearing officer he was in perfect health, but that he had treated some medical conditions. The defendant argued that the officer had no reason to believe the plaintiff might be disabled, and terminated him for violating it's attendance policy.


Jury Verdict Research
COURT: Superior


**End of Document**                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

ABOULAFIA v. GACN INC. D/B/A CABLE'S RESTAURANT, JVR No. 1403200023 (2013)

JVR No. 1403200023, 2013 WL 8115991 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
Superior Court, Los Angeles County, California.

ABOULAFIA v. GACN INC. D/B/A CABLE'S RESTAURANT

BC469940
DATE OF FILING: September 23, 2011
DATE OF TRIAL/SETTLEMENT: December 17, 2013

**SUMMARY**
**Outcome: Plaintiff Verdict**
**Total: $5,681,682**
HIGH AMOUNT: $0

LOW AMOUNT: $0


**Related Court Documents:**
Plaintiffs' complaint: 2011 WL 6463766

Verdict form: 2013 WL 6870002

Verdict form (punitive damages): 2013 WL 6869977


**EXPERT-WITNESSES:**
**ATTORNEY:**
Plaintiff: James R. Rosen, Rosen Saba LLP, Beverly Hills, CA
Plaintiff: Elizabeth L. Bradley, Rosen Saba LLP, Beverly Hills, CA
Plaintiff: Jonathan S. Dennis, Rosen Saba LLP, Beverly Hills, CA
Defendant: Eric J. Erickson, Lewis, Brisbois, Bisgaard & Smith LLP, Los Angeles, CA
Defendant: Christopher M. Habashy, Lewis, Brisbois, Bisgaard & Smith LLP, Los Angeles, CA
Defendant: Marie Dominguez-Gasson, Lewis, Brisbois, Bisgaard & Smith LLP, Los Angeles, CA

JUDGE: Yvette Palazuelos

RANGE AMOUNT: $5,000,000 - 999,999,999
STATE: California
COUNTY: Los Angeles

**SUMMARY**
**PLAINTIFF:**
Sex: Martha Aboulafia: F

Age: Adult, 58

ABOULAFIA v. GACN INC. D/B/A CABLE'S RESTAURANT, JVR No. 1403200023 (2013)

General Occupation: Food Service Worker

Sex: Cheryl B. Colgin: F

Age: Adult, 58

General Occupation: Food Service Worker

Sex: Patricia Monica: F

Age: Adult, 67

General Occupation: Food Service Worker

Sex: Regina Greene: F

Age: Adult, 46

General Occupation: Food Service Worker

**DEFENDANT:**
Sex: O

General Occupation: Restaurant, Nightclub or Tavern

Organization Type: GACN Inc. d/b/a Cable's Restaurant

**DAMAGES:**
Compensatory Pain & Suffering: Martha Aboulafia: $250,000

Compensatory Past Wages: Martha Aboulafia: $58,164

Compensatory Future Wages: Martha Aboulafia: $53,592

Total Compensatory Award: Martha Aboulafia: $361,756

Compensatory Pain & Suffering: Cheryl B. Colgin: $250,000

Compensatory Past Wages: Cheryl B. Colgin: $66,262

Compensatory Future Wages: Cheryl B. Colgin: $131,372

Total Compensatory Award: Cheryl B. Colgin: $447,634

**ABOULAFIA v. GACN INC. D/B/A CABLE'S RESTAURANT, JVR No. 1403200023 (2013)**

Compensatory Pain & Suffering: Patricia Monica: $250,000

Compensatory Past Wages: Patricia Monica: $95,588

Compensatory Future Wages: Patricia Monica: $157,486

Total Compensatory Award: Patricia Monica: $503,074

Compensatory Pain & Suffering: Regina Greene: $250,267

Compensatory Past Wages: Regina Greene: $56,613

Compensatory Future Wages: Regina Greene: $62,338

Total Compensatory Award: Regina Greene: $369,218

Punitive Damages: $1,000,000

Hedonic Damages: $0

Property Damages: $0

Interest: $0

Other Damages: $0

Loss of Services: $0

**ADVERSE ACTION**
Closer Supervision: false

Constructive Discharge: false

Demotion: false

Denial Tenure: false

Failure Accomodate: false

Failure Grant Leave: false

Failure Hire: false

Failure Promote: false

Suspension: false

ABOULAFIA v. GACN INC. D/B/A CABLE'S RESTAURANT, JVR No. 1403200023 (2013)

Sexual Harassment: false

Harassment: true

Hostile Work Env: false

Isolation: false

Lay Off: false

Loss Benefits: false

Loss Pay: true

Loss Seniority: false

Negative Eval: false

Negative Reference: false

Pay Increase Denial: false

Reassignment: false

Reduction Pay: false

Reprimands: false

Restrictions: false

Termination: true

**Entity Type: Service/Retail Company**
**STATUTES**
**Primary Specific Statute**
Primary Name: State

**Primary General Statute**
**Primary Name: Age Discrimination**
Primary General Statute Discrimination: true

Specific Statute: General

ABOULAFIA v. GACN INC. D/B/A CABLE'S RESTAURANT, JVR No. 1403200023 (2013)

**General Statute: Wrongful Termination**
General Statute Discrimination: false

Comparative Negligence Percentage: 0

**FACTS:**

58-year-old Martha Aboulafia, 58-year-old Cheryl B. Colgin, 46-year-old Regina Greene, and 67-year-old Patricia Monica, formerly employed as servers, sued GACN Inc. d/b/a Cable's Restaurant, for age discrimination, wrongful termination, in violation of California's public policy, and failure to provide rest periods and/or 30 minute meal periods, pursuant to Cal. Lab. Code Sec. 226.7. The plaintiffs claimed during their employment, they were never the subject of any negative reviews or disciplinary actions until the restaurant came under new ownership, thereafter, they experienced negative treatment, a reduction in hours, and sudden complaints about job performance. They alleged after the transfer of ownership, suddenly they were systematically harassed, wrongfully terminated, and were replaced by younger female servers. Aboulafia, who worked for the defendant for more than 17 years, contended after the transfer of ownership, two days later she was terminated allegedly because business was slow, and she was told that an unidentified customer had complained about her. Colgin, who worked for the restaurant for more than 14 years, alleged she was also told two days after the transfer that she was no longer needed, but the manager called her again 10 minutes later, and fired her a second time, likely not remembering he had terminated her minutes earlier. Greene, who worked for the restaurant for three years, claimed that after the transfer, she was instructed to train newly hired younger female employees, but seven months later her manager falsely accused her of being under the influence of drugs and/or alcohol, terminated her, and subsequently falsely reported to the California Employment Development Department that she had voluntarily resigned in its attempt to avoid paying her unemployment benefits. Monica, who was employed for 13 years, asserted she was terminated two days after the transfer purportedly because her services were no longer needed, and business was slow. The defendant denied the allegations and contended it used nondiscriminatory factors to facilitate the layoffs, including identifying servers with flexible schedules and a willingness to work with all customers, and that it retained 11 servers employed by former management, and eight of those servers were within the protected class, ranging from 45 to 75 years old. The defendant also claimed the plaintiffs were allowed to take appropriate rest breaks. The jury awarded Aboulafia $1,361,756, Colgin $1,447,634, and Monica $1,503,074 for their age discrimination claims, and Greene's award included $952 for missed rest periods for a total award of $1,369,218.

Jury Verdict Research
COURT: Superior

---

**End of Document**                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

34 Trials Digest 14th 9, 2011 WL 3606913 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
Superior Court, Los Angeles County, California.

Betson vs. Rite Aid Corporation

**TOPIC:**
Synopsis: Employee alleges retaliatory discrimination

Case Type: Labor & Employment; Discrimination; Labor & Employment; Family & Medical Leave; Labor & Employment; Harassment-General; Labor & Employment; Disability/Medical Condition; Labor & Employment; Age; Defamation; Other

DOCKET NUMBER: BC427992

STATE: California
COUNTY: Los Angeles

Verdict/Judgment Date: May 27, 2011

JUDGE: Gregory W. Alarcon
**ATTORNEYS:**
Plaintiff: Donald Conway, Shegerian & Associates, Santa Monica; Carney R. Shegerian, Shegerian & Associates, Santa Monica.
Defendant: Glenn L. Briggs, Hodel Briggs Winter, Irvine; Theresa A. Kading, Hodel Briggs Winter, Irvine.

**SUMMARY:**
Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $500,000

Range: $500,000-999,999
$250,000 past non-economic loss; $250,000 future non-economic loss.

Trial Type: Jury

Deliberations: Not reported.

Jury Poll: Not reported.

**EXPERTS:**
Plaintiff: Not reported.
Defendant: Not reported.

**TEXT:**

Betson vs. Rite Aid Corporation, 34 Trials Digest 14th 9 (2011)

## CASE INFORMATION

### FACTS/CONTENTIONS

According to court records: Plaintiff Doreen Betson, age 46, was employed by defendant Rite Aid Corporation for 21.5 years in defendant's Beverly Hills store. On February 11, 2008, plaintiff injured her knee at work when she slipped and fell. She was on medical leave until December 16, 2008. At one point after she returned to work, she was told that she could not come to work with a "bad look" on her face, i.e., looking as if she were in pain. On other occasions, she was called "stupid," was told that "her bones were too old," "maybe it's time to retire," "you need to retire," "you are too old to work retail," "perhaps you need a cane at your age," "these disability claims cost me money," "nobody missed you while you were on disability leave," and similar other comments.

On January 6, 2009, security representative Jeffrey Storm terminated plaintiff's employment, allegedly because she issued a customer refund when the customer was not present and without a receipt. Plaintiff alleged that everyone knew such refunds were allowed and that more than once she had been asked by defendant to issue such refunds.

Plaintiff met with defendant's human resources manager and her union representative, but received no help. Defendant did not issue plaintiff's final paycheck until two weeks after her employment was terminated, and the check did not include all of her accrued vacation time.

### CLAIMED INJURIES

According to court records:

Emotional distress.

### CLAIMED DAMAGES

According to court records:

Not reported.

### SETTLEMENT DISCUSSIONS

According to court records:

Not reported.

### COMMENTS

According to court records:

The complaint was filed on December 14, 2009.

Trials Digest, A Thomson Reuters/West business
Los Angeles County Superior Court/Downtown

---

**End of Document**  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**Vaughn vs. CNA Casualty of California, 36 Trials Digest 11th 4 (2008)**

36 Trials Digest 11th 4, 2008 WL 4056256 (C.D.Cal.) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
United States District Court, C.D. California, Southern Division.

Vaughn vs. CNA Casualty of California

**TOPIC:**

Synopsis: In-house attorney claims she was terminated because of stress-related disability

Case Type: Labor & Employment; Disability/Medical Condition; Labor & Employment; Discrimination; Labor & Employment; Termination/Constructive Discharge; Labor & Employment; Retaliation

DOCKET NUMBER: 06CV00859(JVS)

STATE: California
COUNTY: Not Applicable

Verdict/Judgment Date: February 28, 2008

JUDGE: James V. Selna
**ATTORNEYS:**
Plaintiff: Michael G. Jacob, Kesluk & Silverstein, Los Angeles; Douglas N. Silverstein, Kesluk & Silverstein, Los Angeles.
Defendant: Heather M. Davis, Littler Mendelson, Irvine; Michael A. Gregg, Littler Mendelson, Irvine; J. Kevin Lilly, Littler Mendelson, Irvine.

**SUMMARY:**
Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $850,000

Range: $500,000-999,999
$550,000 past and future economic loss; $300,000 past and future non-economic loss.

Trial Type: Jury

**EXPERTS:**
Plaintiff: Not reported.
Defendant: Sanford Lechtick, J.D., legal profession placement expert, Esquire Inc., Woodland Hills, (818) 712-9700.;
Michael P. Ward, Ph.D., economist, Welch & Associates, Santa Monica, (310) 393-5530.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.  1

**Vaughn vs. CNA Casualty of California, 36 Trials Digest 11th 4 (2008)**

According to court records: In 1985, plaintiff Bari Vaughn began working as outside counsel for Continental Casualty Company ("CCC") when she worked at Kirtland & Packard. After nearly 10 years, in 1996, CCC recruited her to work as an in-house attorney and help to develop CCC's construction defect division.

Plaintiff alleged that she developed a stress-induced bleeding ulcer in her stomach. Plaintiff was hospitalized on March 18, 1999 and forced to take disability. She returned to work with restrictions in place to manage her psychiatric disability. Plaintiff was restricted to a maximum caseload of 45 cases. Plaintiff said CCC recognized her disability and accommodated her disability under managing trial attorney Bill Chopak.

In approximately 2001, Linda Libertucci became managing trial attorney. Plaintiff said Libertucci claimed she did not know about plaintiff's disability claim and restrictions. Plaintiff said she repeatedly notified Libertucci that her caseload needed to be reduced to comply with her restrictions, but Libertucci refused and told her that no restrictions were on file for her.

Plaintiff said she had a nervous breakdown in November 2004. Plaintiff was terminated in June 2005.

Plaintiff alleged defendants CNA Casualty of California and Law Offices of Linda M. Libertucci wrongfully refused to reasonably accommodate her disability and retaliated against her.

Defendant CCC, erroneously sued as CNA Casualty of California and Law Offices of Linda M. Libertucci, contended that plaintiff was terminated because she refused to meet with defendant or speak with her supervisor. Defendant also claimed plaintiff was unable to meet an essential function of her job, which was to work more than 50 hours per week and handle more than 45 cases. Defendant said plaintiff was granted leave multiple times but refused to meet with defendant after she was released to return to work.


**CLAIMED INJURIES**

According to court records:
Ulcer; nervous breakdown.


**CLAIMED DAMAGES**

According to court records:
Not reported.


**SETTLEMENT DISCUSSIONS**

According to court records:


Not reported.


**COMMENTS**

According to court records:


The case was removed to federal court on September 16, 2006.


Trials Digest, A Thomson/West business
Central District Federal Court/Santa Ana

---

**End of Document**                                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

36 Trials Digest 11th 5, 2008 WL 4056258 (Cal.Superior) (Verdict and Settlement Summary)

Copyright (c) 2018 Thomson Reuters/West
Superior Court, Los Angeles County, California.

Ismen vs. Beverly Hospital

**TOPIC:**
Synopsis: Employer terminates employee following work restrictions placed by doctor

Case Type: Labor & Employment; Disability/Medical Condition; Labor & Employment; Discrimination; Labor & Employment; Workplace Injury; Labor & Employment; Termination/Constructive Discharge; Labor & Employment; Violation of Public Policy; Labor & Employment; Retaliation; Labor & Employment; Workers Compensation

DOCKET NUMBER: BC366198

STATE: California
COUNTY: Los Angeles

Verdict/Judgment Date: August 13, 2008

JUDGE: Ernest M. Hiroshige
**ATTORNEYS:**
Plaintiff: Joseph Lavi, Lavi & Ebrahimian, Los Angeles; David M. deRubertis, The deRubertis Law Firm, Woodland Hills.
Defendant: Joan M. Cotkin, Cotkin & Collins, Los Angeles; C. Ed Langhammer, Cotkin & Collins, Los Angeles.

**SUMMARY:**
Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $1,180,164

Range: $1,000,000-1,999,999
During the punitive damages phase, defendant elicited evidence that it suffered ongoing financial losses between $9 and $12 million for the last several years and argued that any punitive damages awarded would impact the operation's charitable purposes. The jury found for the plaintiff on all claims: disability discrimination, failure to accommodate, and retaliation for filing workers' compensation claims in violation of public policy. The jury also found that an officer or managing agent of defendant engaged in fraudulent, malicious, or oppressive conduct. The jury awarded plaintiff $355,164 in compensatory damages, plus $825,000 in punitive damages. The compensatory damages consisted of $242,064 in economic damages and $113,100 for emotional distress. The economic damage award included five years of future wage loss and benefits.

Trial Type: Jury

Trial Length: 6 weeks.

Deliberations: 3.5 days on phase 1; 1 day on phase 2.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Jury Poll: Not reported.

**EXPERTS:**

Plaintiff: Alessandro F. Anfuso, vocational rehabilitation consultant, Anfuso Vocational Services Inc., Alhambra, (626) 588-1590.; Susan P. Bleecker, C.P.A., economist, Susan P. Bleecker Corp., Pasadena, (626) 449-9151.; Anthony E. Reading, Ph.D., psychologist, UCLA Medical School, Beverly Hills, (310) 276-3545.; Roger S. Sohn, M.D., orthopedic surgeon, Century City, (310) 203-0870.

Defendant: Daniel B. Auerbach, M.D., psychiatrist, Encino, (818) 980-3876.; Michael A. Robbins, human resources consultant, EXTTI Inc., Bell Canyon, (818) 712-0203.; David J. Weiner, Ph.D., economist, Vavoulis & Weiner, Costa Mesa, (714) 434-2253.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**

According to Plaintiff: Plaintiff Wilma Ismen, now age 75, worked as a medical records clerk at defendant Beverly Hospital, a non-profit community hospital in Montebello, California, since 1985. Before plaintiff became an employee, plaintiff spent 10 years volunteering for defendant. Over the course of plaintiff's employment, plaintiff sustained a number of work-related injuries and filed a total of eight workers' compensation claims. Three of these claims were related to back injuries. From approximately 1991 until her termination in September 2006, plaintiff was under relatively constant medical care for her back condition, degenerative disc disease, which included physical therapy, epidurals, etc. Plaintiff's last work-related injury occurred in November 2004, when she fell at work, twisting her ankle and aggravating her existing back condition. After the November 2004 injury, plaintiff took off work for one week and returned to work without medical restrictions throughout 2004 and 2005.

In March 2006, as part of the workers' compensation action related to the November 2004 injury, plaintiff underwent an exam by an agreed medical examiner ("AME"), Roger Sohn, M.D. Sohn's AME report imposed work restrictions on plaintiff of no heavy lifting, repeated bending or stooping, no prolonged weight-bearing, and no walking over uneven ground. Defendant received the AME report in August 2006 and began a process of evaluating the work restrictions in light of plaintiff's job duties. Plaintiff's acting supervisor prepared a detailed job analysis, concluding that the job required walking 6 to 8 hours per shift, bending 3 to 6 hours per shift, squatting 3 to 6 hours per shift, and standing still 3 to 6 hours per shift. Defendant's human resource department claimed it evaluated the AME's restrictions in light of the job analysis and determined that plaintiff could not perform the job given the restrictions, and defendant could not think of any accommodations that could address the restrictions.

On September 1, 2006, plaintiff was called into a meeting with two of defendant's human resource personnel and plaintiff's acting supervisor. At the meeting, plaintiff was told the restrictions in the AME report, which she had not previously seen or heard. The parties disputed what happened in the meeting. According to defendant, those at the meeting reviewed the job description and the AME's restrictions, and everybody, including plaintiff, agreed that she could not perform the job with the restrictions, i.e., the restrictions were inconsistent with the job's requirements and duties. Defendant further stated that no one present in the meeting could think of any accommodations and that it reviewed available job openings with plaintiff, but she was not qualified or interested in any of the open positions. Defendant finally claimed that plaintiff was sent home following the meeting with the suggestion that she contact her attorney, or the AME doctor, to seek clarification of the restrictions, because plaintiff felt she could work despite them. Plaintiff never got back to defendant and instead pursued a lawsuit.

According to plaintiff, she was told at the September 1 meeting that she could not do the job with the restrictions, but she disagreed with that conclusion and maintained that she could perform the job. Plaintiff further disputed that she

was shown the documents regarding the job's requirements that defendant claimed she was shown. Plaintiff contended that she was terminated at the meeting.

Plaintiff alleged that the AME's restrictions were not inconsistent with the job's duties or requirements and that she was able to perform the essential functions of the job, either with or without reasonable accommodations. She stated that the primary restriction that was at issue was "no repeated bending or stooping," which related to retrieval of medical record files located on lower shelves. Plaintiff stated that the amount of bending and stooping required by the job did not exceed the work restrictions and, even if it did, she could kneel instead of bending or stooping to retrieve said files; there was no restriction on kneeling. Plaintiff further stated that terminating her because of the restrictions when they did not actually preclude her from doing the job constituted discrimination based on actual or perceived disability and that the termination decision was also in retaliation for plaintiff's history of filing workers' compensation claims.

Defendant argued that its employees all liked plaintiff and wanted to find a way for her to work despite the restrictions, but they were so severe and the job so physical that they could not accommodate them. Defendant argued that it had to address the restrictions because, if it did not, plaintiff could suffer further injury by working. Defendant pointed to plaintiff's statements to her own doctor and the AME doctor that the physical activity involved in performing her job aggravated her pain and that, at various times, her pain level was between 8 and 10 on scale of 1 to 10. Defendant contended that it engaged in a proper interactive process, including spending a significant amount of time evaluating the job and the restrictions before the September 1 meeting, but it simply could not think of any way to modify the job to allow plaintiff to continue work. Defendant further contended that the meeting ended with agreement that plaintiff would return to either her lawyer or the AME doctor to seek clarification of the restrictions, but that plaintiff failed to follow through with doing so and instead chose to file a lawsuit to seek money. Defendant said that plaintiff was a sophisticated person, having filed eight prior claims and having retained four different workers' compensation lawyers. Thus, if plaintiff desired to keep her job, she knew how to take the steps to address the issues raised at the meeting.

## CLAIMED INJURIES

According to Plaintiff: Plaintiff suffered an episode of major depression with agoraphobia and panic attacks following her termination. Defendant argued that plaintiff's emotional injuries were all pre-existing. Plaintiff's own medical records demonstrated that she had a 13-year history of major depression with panic attacks pre-dating her termination, which began in 1993 following an extended and protracted dispute with co-workers for which plaintiff filed a psych workers' compensation claim. Over those 13 years pre-termination, plaintiff was continuously on anti-depressant medication and frequently on anti-anxiety medication.

## CLAIMED DAMAGES

According to Plaintiff: Both parties agreed that plaintiff had a statistical work life expectancy of just over a year. Defendant claimed that plaintiff's wage loss should not exceed her statistical work life expectancy. Plaintiff countered that she wanted to continue working, loved her job, and needed her paycheck to pay her mortgage and intended to work for as long as she could.

## SETTLEMENT DISCUSSIONS

According to Plaintiff: Plaintiff's initial demand was $950,000 at mediation, inclusive of fees/costs. Defendant's response following a private mediation with Steve Mehta, Esq. was a CCP § 998 offer of $50,000, inclusive of fees/costs. On the first day of trial, the parties had an MSC with Judge Hiroshige. Plaintiff indicated a seven-figure settlement was necessary, inclusive of fees/costs. Defendant responded with the same offer of $50,000 total.

## EXPERT TESTIMONY

According to Plaintiff: Defendant offered psychiatric testimony that plaintiff was in a "pathologic denial of her chronic pain" and the resulting physical limitations.

**COMMENTS**

According to Plaintiff: Plaintiff was entitled to statutory attorney fees under the FEHA and planned on filing a motion for fees and costs. Defendant planned on filing post-trial motions for new trial, etc. David M. deRubertis provided the information for this report.

Trials Digest, A Thomson/West business
Los Angeles County Superior Court/Downtown

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT E

2010 WL 5383296 (Cal.Superior) (Verdict and Settlement Summary)

Copyright (c) 2018 ALM Media Properties, LLC. All Rights Reserved
Superior Court, Los Angeles County, California.

Mark A. Crawford v. DIRECTV Inc.

No. BC417507

DATE OF VERDICT/SETTLEMENT: September 29, 2010

TOPIC: EMPLOYMENT - DISABILITY DISCRIMINATION - EMPLOYMENT - FAILURE TO ACCOMMODATE - EMPLOYMENT - WRONGFUL TERMINATION - EMPLOYMENT - RETALIATION - EMPLOYMENT - CALIFORNIA'S FAIR EMPLOYMENT & HOUSING ACT

Worker With Ptsd Said He Was Forced to Watch Combat Footage

**SUMMARY:**
RESULT: Arbitration

Award Total: $353,172

The parties entered arbitration, and the arbiter found DIRECTV had failed to offer Crawford reasonable accommodations or engage in the interactive process required by FEHA after Crawford was placed on leave. He found no wrongful termination, retaliation or discrimination.

Crawford was awarded $149,234 for past lost income, $25,200 for non-economic damages, $159,762.50 for attorney fees, $11,123.30 for arbitration costs, and $7,851.80 for prejudgment interest.

**EXPERT WITNESSES:**
Plaintiff: David T. Factor; Economics; Pasadena, CA
**ATTORNEYS:**
Plaintiff: Vincent Calderone; Bononi Law Group; Los Angeles, CA (Mark A. Crawford)
Defendant: Dianne Baquet Smith; Sheppard, Mullin, Richter & Hampton; Los Angeles, CA (DIRECTV Inc.)

JUDGE: Sherman W. Smith

RANGE AMOUNT: $200,000-499,999
STATE: California
COUNTY: Los Angeles

**INJURIES: Crawford claimed he was terminated from his job due to DIRECTV's failure to grant him reasonable accommodation of his disability. He sought an unspecified amount for lost income and non-economic damages.**

**Facts:**
In 1999, plaintiff Mark Crawford, a veteran of the first Gulf War, was hired as a broadcast operator at DIRECTV's Los Angeles broadcast center. In October 2006, his schedule was changed from Sunday through Wednesday to Wednesday

**Mark A. Crawford v. DIRECTV Inc., 2010 WL 5383296 (2010)**

through Sunday. He requested a return to his original schedule, claiming he was participating in therapy for post-traumatic stress disorder on his original days off. He also submitted a note from his social worker which stated that viewing violent images aggravated his condition. He was not returned to his original schedule.

In April 2007, Crawford was placed on administrative leave after two supervisors reported what they claimed was a threatening e-mail. After an evaluation, he was found medically unfit for his position due to his PTSD and placed on medical leave. He was terminated in April 2008 when the leave was exhausted.

Crawford sued DIRECTV, alleging violations of the Fair Employment and Housing Act, wrongful termination and retaliation. He claimed DIRECTV failed to offer him reasonable accommodations for his disability or engage in an interactive process after he was placed on leave. He alleged he requested a reasonable accommodation to a position where he would not be required to watch unedited combat footage, and that he knew of and was qualified for a number of such positions at the company. He claimed no discussions of accommodations were made after he was placed on medical leave.

DIRECTV argued that Crawford did not claim any disabilities prior to his schedule change and that it offered him reasonable accommodations such as days off, job transfers, or a leave of absence, but that he refused them. DIRECTV claimed no accommodations were possible after Crawford was placed on leave as he was never medically cleared to return to work. It further argued there were no available positions where Crawford would not be required to view violent images. The defense contended Crawford was terminated because he was not medically cleared to return to work at the time he ran out of medical leave time.

ALM Properties, Inc.
Superior Court of Los Angeles County, Central

PUBLISHED IN: VerdictSearch California Reporter Vol. 9, Issue 48

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

*Fred Denenberg v. California Department of Transportation, 2006 WL 5305734 (2006)*

2006 WL 5305734 (Cal.Super.) (Verdict and Settlement Summary)

Copyright (c) 2018 ALM Media Properties, LLC. All Rights Reserved
Superior Court, San Diego County, California

Fred Denenberg v. California Department of Transportation

No. GIC836582
DATE OF VERDICT/SETTLEMENT: September 16, 2006
TOPIC: EMPLOYMENT - SEXUAL ORIENTATION DISCRIMINATION - EMPLOYMENT - FAILURE TO
ACCOMMODATE

Clerk Claimed Discrimination Based on Disability, Orientation

**SUMMARY:**
RESULT: Verdict-Plaintiff

The jury did not find any discrimination based on sexual orientation. It did, however, find the defendant failed to
provide Denenberg with a reasonable accommodation and discriminated against him on the basis of a disability. The
jury awarded Denenberg $119,000 in economic damages and $25,000 in noneconomic damages, for a total $144,000.
The judge awarded him an additional $490,000 in attorney's fees and $133,000 in costs, and ordered the department
of transportation to award him a retroactive promotion. The promotion will result in an additional $12,000 of annual
earnings through his career as well as upward adjustments to his retirement benefits.

**EXPERT WITNESSES:**
Plaintiff: Brian P. Brinig, J.D., C.P.A.; Damage Analysis; San Diego, CA Christopher Benbo, M.D.; Psychiatry; La
Jolla, CA George Pratt, Ph.D.; Psychology/Counseling; La Jolla, CA Michael A. Robbins; Human Resources Policies;
Bell Canyon, CA
Defendant: Mark A. Kalish, M.D.; Psychology/Counseling; San Diego, CA
**ATTORNEYS:**
Plaintiff: Paul D. Jackson; Law Offices of Paul D. Jackson; San Diego, CA (Fred Denenberg); David M. deRubertis;
The deRubertis Law Firm; Woodland Hills, CA (Fred Denenberg)
Defendant: Christopher J. Welsh; California Department of Transportation; San Diego, CA (California Department
of Transportation); Julie A. Jordan; CalTrans Legal Department; San Diego, CA (California Department of
Transportation)

JUDGE: Steven R. Denton

RANGE AMOUNT: $100,000-199,999
STATE: California
COUNTY: San Diego

**INJURIES: Denenberg claimed that he suffered emotional distress and sought treatment from a psychologist. He also sought
to recover the income he lost when he took a leave of absence to cope with the distress caused by the way his employer
treated him.**

Fred Denenberg v. California Department of Transportation, 2006 WL 5305734 (2006)

**Facts:**

In 1998 plaintiff Fred Denenberg, a gay man, was hired by the California Department of Transportation as an office technician, an entry-level position. He received excellent performance reviews and was promoted to assistant administrator. Starting in 1999, he sought promotion to associate administrator, the next job level above his own. Such a promotion would normally occur in relatively short time, he alleged, but his requests were repeatedly denied. He was told that budgetary constraints had forced the company to put into place a hiring and promotions freeze. When the freeze was lifted on July 1, 2004, Joseph Hull, the deputy director of traffic operations, promised Denenberg that his promotion would be processed.

When Hull had not yet finished processing the paperwork by late August 2004 despite Denenberg's further complaints, Denenberg sought legal counsel. His attorney, Paul Jackson, sent the department's upper management a letter alleging that Denenberg had been the subject of harassment based on his sexual orientation and that the department had failed to promote him because he was gay. Afterward, Denenberg's superiors and co-workers leveled accusations of wrongdoing against him. The alleged wrongdoing included telling a co-worker to "kiss his ass," making derogatory comments about a co-worker's religion, slamming a door in a co-worker's face and acting in a rude manner toward co-workers and management.

In late September 2004, Denenberg, who claimed to be suffering from stress and depression related to his workplace, complained about a sexually related email sent from a co-worker a year earlier. At the instruction of a psychologist, he went on a leave of absence, and the department stopped processing his promotion.

In August 2005, one year after his original stress leave began, Denenberg's psychologist recommended that he be given an accommodation that allowed him to telecommute. Hull did not allow telecommuting, however, and denied the accommodation. The psychologist revised the accommodation to request that Denenberg return to the workplace but that any face-to-face interaction with the co-workers he claimed had retaliated against him be minimized. Hull denied that request as well.

When Denenberg was able to return to work without restriction, the department informed him it had eliminated his position and offered him six other positions that were equivalent or nearly equivalent to his former position. Denenberg declined them all.

Denenberg sued the California Department of Transportation for discrimination and retaliation on the basis of sexual orientation and discrimination and retaliation on the basis of disability. He contended that for a period of about 1.5 years he was harassed based on his sexual orientation; the alleged harassment consisted of perceived sexual advances, derogatory comments about his orientation and a degrading, homophobic email. He claimed that the department's refusal to promote him in September 2004 was in retaliation for the letter his attorney wrote complaining of harassment and discrimination. He also claimed that the department's stated reason for not promoting him--that he went on medical leave--indicated disability discrimination and showed that the company was retaliating against him for seeking accommodation of a disability. He further alleged that when his psychologist approved his return to work with a minimum of interaction with co-workers, there were desks and offices available that could have been used to meet this request.

The defendant denied any wrongdoing. It claimed that the reason Denenberg was not promoted was because he had either failed the promotional exam or did not receive a high enough score for placement. The state budget crises, the department's budget, and the lack of available work prevented promotions for new hires until June 30, 2004. Once the freeze was lifted, the plaintiff was promised a noncompetitive promotion. It contended that it had begun processing a

noncompetitive promotion for Denenberg at the time he took his leave but stopped when he was out for almost two years and the department did not know when or whether he would return to work and that, under the Civil Service Act, the promotion could not go through because he was not at work to accept the new appointment. This had implications for his retirement and benefits.

The department also claimed that the request to telecommute was denied because the position required interaction with co-workers and the timely sharing of information. The department noted that over the course of nine months, it offered the plaintiff six alternative positions at the same classification and rate of pay but he refused all of them. Finally, the company denied any knowledge of the claimed harassment.

Before the trial began, the plaintiff dropped the claim that he should have been promoted before 2003. The state had a freeze on promotions and new hires between June 2003 and June 2004.

At trial, the defense impeached Denenberg's credibility by attacking his assertion that he had never been involved in any other lawsuits by introducing numerous lawsuits that he had either filed or were filed against him.

The defendant claimed that it was not his workplace problems that caused the plaintiff's medical condition but rather other stressors, such as a tumultuous relationship with his domestic partner who suffered from chronic medical problems. The defendant introduced evidence of domestic discord, including allegations of domestic abuse.

Insurer:

Self insured California Department of Transportation

ALM Properties, Inc.
Superior Court of San Diego County, at San Diego

PUBLISHED IN: VerdictSearch California Reporter Vol. 7, Issue 4

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT F

1 Mia Farber (SBN 131467)
   Mia.Farber@jacksonlewis.com
2 Talya Z. Friedman (SBN 216158)
   Talya.Friedman@jacksonlewis.com
3 Eric J. Gitig (SBN 307547)
   Eric.Gitig@jacksonlewis.com
4 JACKSON LEWIS P.C.
   725 South Figueroa Street, Suite 2500
5 Los Angeles, California 90017-5408
   Telephone: (213) 689-0404
6 Facsimile: (213) 689-0430

7 Attorneys for Defendant
   ADECCO USA, INC.

8

                    UNITED STATES DISTRICT COURT
9
       CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION
10

11 KENNETH TAYLOR, on behalf of himself          Case No.: 2:20-CV-4931
    and others similarly situated,
12                                                **DECLARATION OF MEGAN
               Plaintiff,                         GUYTON IN SUPPORT OF
13                                                DEFENDANT ADECCO USA, INC.'S
           vs.                                    NOTICE OF REMOVAL**
14
    MICHAEL KORS, INC.; MICHAEL KORS              (Filed concurrently with Notice of
15 (USA), INC.; MICHAEL KORS STORES              Removal; Declaration of Mia Farber;
    (CALIFORNIA), INC.; MICHAEL KORS              Civil Case Cover Sheet; Notice of
16 RETAIL, INC.; ADECCO USA, INC.; and           Interested Parties; and Corporate
    DOES 1 to 100, Inclusive,                     Disclosure Statement))
17
               Defendants.
18

19

20 / / /

21 / / /

22 / / /

23 / / /

24 / / /

25

26

27

28

## DECLARATION OF MEGAN GUYTON

I, Megan Guyton, declare as follows:

1.      I am over the age of 18 and competent to testify.  The following facts are based on my personal knowledge or based on my personal review of records kept in the course of regularly conducted business activities by Defendant ADECCO USA, INC. ("Adecco"), and if called as a witness, I can and will competently testify hereto.  I submit this declaration in support of Adecco's Notice of Removal.

2.      I currently am the Employee Relations Advisor of Adecco.  As Employee Relations Advisor of Adecco, I am familiar with Adecco's corporate structure and its executive, administrative, financial and management functions.  I also have access to and regularly review payroll data and records of Adecco's current and former employees and the payroll data and records that are created, maintained, regularly updated, and kept by Adecco in the regular and ordinary course of business.

3.      Adecco is not a State, a State official, or any other governmental entity.

4.      At the time the Complaint in this action was filed on March 16, 2020 and currently, Adecco has at all times been a corporation organized under the laws of the State of Delaware, with its principal place of business and company headquarters located in Florida.  The State of Florida is where Adecco's high-level officers, including its Chief Executive Officer, direct, control, and coordinate the company's activities.  Adecco's executive operations are managed from the State of Florida, including, but not limited to, operations relating to administering company policies and procedures, legal affairs, and general business operations.  None of Adecco's executive officers reside in the State of California.

5.      Based on my role as Employee Relations Advisor of Adecco, I have access to the payroll records of Plaintiff Kenneth Taylor ("Plaintiff").  Based on my review of Plaintiff's payroll records, which were created, maintained, and kept by Adecco in the regular and ordinary course of business, I have personal knowledge that Plaintiff's

1    residential address was located in Compton, California throughout the course of his
2    employment with Adecco.

3        6.      Based on my role as Employee Relations Advisor of Adecco, I have access to
4 the payroll records of individuals who are or were employed by Adecco as non-exempt
5 employees in the state of California. In connection with this declaration, I reviewed payroll
6 records for individuals who are or were employed by Adecco and deployed to work for
7 Defendants MICHAEL KORS, INC., MICHAEL KORS (USA), INC., MICHAEL KORS
8 STORES (CALIFORNIA), INC., and/or MICHAEL KORS RETAIL, INC. (collectively,
9 "Michael Kors") as hourly non-exempt employees in the State of California between
10 March 16, 2016 and May 17, 2020, which were created, maintained, and kept by Adecco in
11 the regular and ordinary course of business.

12        7.      Based on my role as Employee Relations Advisor of Adecco, my personal
13 knowledge and my review of the above-referenced payroll records, I am aware that Adecco
14 employed over 1,500 hourly non-exempt employees who were deployed to work for
15 Michael Kors in the State of California who received weekly wage statements between
16 March 16, 2016 and May 17, 2020, of which over 1,200 have separated from their
17 employment between March 16, 2017 and May 17, 2020.

18        8.      Based on my role as Employee Relations Advisor of Adecco, my personal
19 knowledge and my review of the above-referenced payroll records, I am aware that
20 Adecco's hourly non-exempt employees who were deployed to work for Michael Kors in
21 the State of California collectively worked over 25,000 workweeks for Michael Kors
22 between March 16, 2016 and May 17, 2020.

23        9.      Based on my role as Employee Relations Advisor of Adecco, my personal
24 knowledge and my review of the above-referenced payroll records, I am aware that over
25 650 non hourly non-exempt employees have been employed by Adecco deployed to work
26 for Michael Kors in the State of California between March 16, 2019 and May 17, 2020,
27 and that these employees have collectively worked over 9,500 weekly pay periods for
28 Michael Kors during this period.

     DECLARATION OF MEGAN
GUYTON IN SUPPORT OF
NOTICE OF REMOVAL

1    ///

2    ///

3        I declare under penalty of perjury under the laws of the State of Florida and the

4    United States of America that the foregoing is true and correct.

5        Executed this _3rd_ day of June, 2020, at Jacksonville, Florida.

6

7                                    MEGAN GUYTON

8

9

10   4818-6461-7404, v. 1

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

USDC CASE NUMBER: 2:20-CV-4931    4              DECLARATION OF MEGAN
                                                 GUYTON IN SUPPORT OF
                                                 NOTICE OF REMOVAL